# EXHIBIT A

Complaint (with Exhibits)

Part 1 of 7

## IN THE STATE COURT OF MUSCOGEE COUNTY
## STATE OF GEORGIA

OVERLOOK GARDENS PROPERTIES, LLC,  :
CREEKWOOD APARTMENTS, LLC,         :
INVERNESS II, LLC,                 :
GREYSTONE FARMS APARTMENT          :
COMMUNITY, LLC,                    :
                                   :
        Plaintiffs             :    CIVIL ACTION NO. *SC/17CV202*
                                   :
vs.                                :
                                   :
ORIX USA, L.P.,                    :    GEORGIA, MUSCOGEE COUNTY
RED CAPITAL GROUP, LLC,            :    SUPERIOR / STATE COURT
RED MORTGAGE CAPITAL, LLC,         :    FILED IN OFFICE
RED CAPITAL MARKETS, LLC, and      :
RED CAPITAL PARTNERS, LLC          :    APR 1 0 2017
                                   :
        Defendants             :    DEPUTY CLERK
                                   :    ANN L. HARDMAN, CLERK

### SUMMONS

**TO THE ABOVE NAMED DEFENDANTS:**

    You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiffs' attorneys, whose names and addresses are:

CHARLES A. GOWER
MIRANDA BRASH
SHAUN P. O'HARA
1425 Wynnton Road
P. O. Box 5509
Columbus, GA 31906

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

    This _10th_ day of _April_____, 2017.

**Clerk, Muscogee County State Court**

By: _____

**Deputy Clerk**

**IN THE STATE COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA**

OVERLOOK GARDENS PROPERTIES, LLC,   :
CREEKWOOD APARTMENTS, LLC,   :
INVERNESS II, LLC,   :
GREYSTONE FARMS APARTMENT   :
COMMUNITY, LLC,   :
   :
     Plaintiffs   :   CIVIL ACTION NO. _SC17CV202_
   :
vs.   :
   :
ORIX USA, L.P.,   :
RED CAPITAL GROUP, LLC,   :   GEORGIA, MUSCOGEE COUNTY
RED MORTGAGE CAPITAL, LLC,   :   SUPERIOR / STATE COURT
RED CAPITAL MARKETS, LLC, and   :   FILED IN OFFICE
RED CAPITAL PARTNERS, LLC   :
   :   APR 1 0 2017
   :
     Defendants   :   DEPUTY CLERK
      ANN L. HARDMAN, CLERK

COMPLAINT

Come Now Plaintiffs and respectfully show the Court the following facts:

NATURE OF THE CASE

This case concerns the fraudulent practices committed by Defendants, a sophisticated

commercial financing enterprise, in connection with their business of assisting borrowers in

obtaining non-recourse government-guaranteed financing for large scale commercial projects.

Specifically, The United States Department of Housing and Urban Development ("HUD")

insures the loans against default which makes them attractive for borrowers and investors alike.

Not surprisingly, there is a lot of paperwork involved in securing these government guaranteed

loans which are typically in the millions of dollars and cover various types of projects including

multifamily apartment complexes, hospitals and senior housing facilities.

In exchange for the services associated with processing and ultimately securing these

loans, the borrower agrees to pay Defendants a certain and definite fee, plus all necessary costs

1

and expenses. This fee, often referred to as an "origination fee" or "initial service fee" is typically a percentage of the total loan amount and is capped at a maximum amount or percentage set by HUD. Defendants intentionally lead the borrower to believe that in exchange for this disclosed fee they are working for the borrower's benefit to secure the best possible interest rate on these high dollar loans. But instead, Defendants execute a fraudulent scheme by which they purposefully and deceptively commit the borrower to a loan at a higher (or above par) interest rate in order to secretly enhance Defendants' own profit through the resulting yield spread premium. The yield spread premium is generally defined as the money or premium paid to a mortgage originator or lender for providing a borrower with a higher interest rate on a loan typically in exchange for lower upfront costs, generally paid in origination fees, broker fees or discount points. While yield spread premium can function as a legitimate financing tool for borrowers who determine that it is the most suitable financing option for their specific needs, it also can be abused by mortgage originators and lenders, like Defendants, who use it to fraudulently enhance their overall compensation at the unwitting borrower's expense.

## PARTIES, JURISDICTION AND VENUE

1. Plaintiffs in this case are borrowers ("Borrower" or "Mortgagor" or "Plaintiffs") who have utilized Defendants' services to process and procure HUD-guaranteed multifamily financing for various large-scale apartment complexes in Georgia.

2. The named Defendants in this case are comprised of various parent, subsidiary, sister and/or affiliate companies which work together to operate a sophisticated commercial financing enterprise and that all share in the profits resulting from the operation of the enterprise's scheme to glean excessive and undisclosed compensation by defrauding borrowers.

3. The named Defendants in this case, all of which work together and are collectively referred to as the "Red" enterprise, consist of Orix USA, L.P. ("Orix"), the parent

2

company of the Red Capital Group, LLC ("Red Group"), and its three subsidiaries—Red

Mortgage Capital, LLC ("Red Mortgage"), Red Capital Markets, LLC ("Red Markets") and Red

Capital Partners, LLC ("Red Partners").  The Red enterprise also employs various individual

mortgage brokers to assist in executing its fraudulent scheme and who also share in the

additional undisclosed compensation that results.

4.       Orix USA, L.P. (hereinafter "Orix") is a subsidiary of Orix Corp., a publicly owned

Tokyo based global financial services company founded in 1964 and which operates in thirty-six

countries and has more than ninety billion in assets and more than three hundred billion of assets

under management.  (*See* Orix USA official web page, attached hereto as Exh. 1).

5.       In 2010, Orix acquired 88% of the stock of Red Capital Group (hereinafter "Red

Group") from PNC Bank.  (*See* Exh. 2, Business Wire press release).

6.       After Orix acquired 88% of the stock of Red Group in 2010, it sent Mike Moran, a

senior executive of Orix, to become chairman and CEO of Red Group.  While serving as Chairman

of Red Group, Mr. Moran also maintained his responsibilities with Orix.  (*See* Exh. 3, Mike Moran

Orix page; Exh. 4, Mike Moran LinkedIn; and Exh. 5, Mike Moran press release).

7.       In February 2016, Orix acquired the remaining 12% of the stock of Red Group.

(Exh. 2).

8.       In March 2016, the Chairman, President and CEO of Orix, Hideto Nishitani, said

the following about Orix's acquisition of the remaining 12% of the Red Group stock:

> Increasing Orix's investment in RED has been a strategic objective of mine for the last few
> years, as I have seen firsthand the strength of the RED team and their platform.

(*See id.*).

9.       Even before Orix purchased 88% of Red Group in 2010, Orix had a joint venture

relationship with Red Group where the CEO of Orix was co-chairman of the joint venture.  (Exh.

6, Multifamily Executive Magazine article).

3

10.     Thus, Orix clearly took an active part in directing, operating and managing the enterprise's affairs through Red Group, among other ways. Mr. Moran, while continuing in his role as a senior executive of Orix was simultaneously serving as Chairman and CEO of Red Group. (*See supra*, ¶ 8).

11.     Orix's wholly owned subsidiary, Red Capital Group, LLC, ("Red Group") is comprised of these operating subsidiaries:

(a) <u>Red Mortgage Capital, LLC</u> (hereinafter "Red Mortgage") – Originates commercial loans for sale to investors.  Red Mortgage also continues to service said loans after they are sold to investors;

(b) <u>Red Capital Markets, LLC</u> (hereinafter "Red Markets") – Red's "in-house" "registered-broker" which sells the loans originated by Red Mortgage to investors; and

(c) <u>Red Capital Partners, LLC</u> (hereinafter "Red Partners") – Makes loans with Red's money, often, interim financing to facilitate Red Mortgage being able to make a loan for sale to an investor.

(*See* Exh. 7, "About Red" webpage).  Collectively, all of these companies, along with various individual mortgage brokers, operate together as the "Red" enterprise.

12.     Defendants Orix USA, LP, Red Mortgage Capital, LLC and Red Capital Markets, LLC, are subject to the jurisdiction of this court as resident foreign corporations authorized to do business in the state of Georgia.

13.     Defendants Red Capital Group, LLC and Red Capital Partners, LLC are subject to the jurisdiction of this court as nonresident foreign corporations who transact substantial business in the state of Georgia and as the claims underlying this cause of action arise out of their activities in the state of Georgia. O.C.G.A. §§ 9-10-90, 9-10-91.

14.     Venue is proper in this court as Muscogee County, Georgia is where a substantial part of the acts, omissions and events giving rise to the cause of action originated.  O.C.G.A. § 14-2-510 (b)(4).

## FACTUAL BACKGROUND AND ALLEGATIONS

15.    The loan transactions at issue in this case are for large scale multifamily apartment complexes.  In order to finance these costly projects, Plaintiffs ("Borrowers" or "Mortgagors") routinely seek nonrecourse loans guaranteed by the United States government via the Department of Housing and Urban Development ("HUD") through its "Multifamily Accelerated Processing" program ("MAP" program).

16.    HUD's MAP program is "designed to establish national standards for approved Lenders to prepare, process, and submit loan applications for Federal Housing Administration ("FHA") multifamily mortgage insurance." (Exh. 28, Multifamily Accelerated Processing Guide Excerpts ("MAP Guide") at §1.1).

17.    Due to the arduous nature of applying for and securing this HUD-guaranteed financing, Plaintiffs enlist the services of loan origination companies, like Red Mortgage, to assist them in the process.

18.    In exchange for their services, Plaintiffs agree to pay Red Mortgage a pre-determined fee—frequently a percentage of the overall loan amount (*e.g.*, 1% of the loan) plus all costs and expenses associated with procuring the financing.  This fee is typically referred to as a loan origination fee or initial service fee.

19.    While Red Mortgage is referred to as the "Lender" and/or "Mortgagee" as used in the various HUD forms discussed herein, Red Mortgage does not actually lend any money for the underlying loan transaction.

20.    Instead, Red Mortgage's role in the enterprise is to facilitate the processing and procurement of HUD's commitment to insure the loan.  Once HUD issues its commitment to insure the loan, Red Mortgage then relies on its sister company, Red Markets, to sell the resulting Ginnie Mae ("GNMA") Securities to investors in order to actually fund the loan.

21.     Red Mortgage is also assisted in this process by individual mortgage brokers whom Red relies on to solicit borrowers, like Plaintiffs, to hire Red.

22.     Red leads the Borrower to believe that when he hires Red, Red works to secure the best possible financial deal for the Borrower; but the truth is Red works to induce the Borrower to unknowingly accept an interest rate higher than the prevailing market interest rate (also known as "par").

23.     If the investor's required rate of return is the same as the note rate, the loan should sell at its face value, called "par."

24.     If the investor's required rate of return is higher than the note rate, the loan should sell at less than the face value, or "at a discount."

25.     If the investor's required rate of return is lower than the note rate, the loan should sell at more than the face value, or "at a premium."

26.     Red intentionally does not disclose to the Borrower that it intends the loan to be sold at a premium and, thus, Red intends to provide the Borrower with an above par interest rate.

27.     The Red enterprise profits by pocketing additional indirect compensation received via the premium or commission the investor pays to purchase the above par loan which now provides a greater return than the investor was otherwise willing to accept.

28.     This indirect compensation is referred to by a myriad of names throughout the commercial lending industry including, but not limited to, the following: yield spread premium (YSP), rate premium, loan premium, trade premium, trade profit, premium fee, marketing gain and gain on sale, among others (hereinafter, Plaintiffs will refer to it as "yield spread premium" or simply "premium" for ease of reference). (*See* Exh. 8, 2/6/17 Email from HUD acknowledging these as synonymous terms; *see also* Exh. 29, National Association of Mortgage Broker's ("NAMB") published position on yield spread premium (Feb. 24, 2009) (noting that

"[e]ach distribution channel calls indirect compensation something different.").

29.     When utilized properly and, most importantly, *with full disclosure*, this premium can be a legitimate and beneficial financing tool for borrowers who do not have or do not want to expend the upfront funds necessary to close a loan.

30.     Yield spread premium is intended to provide borrowers with "the *choice* of paying for their mortgage origination fees and costs in cash, up front, or paying a portion or all of those fees and costs each month over the life of the loan through the interest rate." (*See* Exh. 29, NAMB's 2/24/2009 published position on yield spread premium).

31.     When a borrower does not want to pay any, or is only willing to pay some, fees and costs associated with the loan upfront, having the *option* of yield spread premium allows the mortgage originator to get paid for their services by financing those fees through the interest rate. (*See e.g.,* Exh. 29 (illustrating how the use of yield spread premium affects borrowers' monthly payments in addition to its impact on the originator's costs, fees and compensation over the life of the loan)).

32.     A higher interest rate then allows the mortgage originator to sell the loan to an investor at a higher price and in turn allows the mortgage originator to recoup the upfront costs it incurred on the borrower's behalf in originating the loan.  The borrower benefits by obtaining a loan without having to pay the upfront direct fees necessary to obtain the financing and the originator is able to receive its compensation for assisting the borrower in obtaining the loan indirectly through the borrower's payment of a higher interest rate.

33.     Yield spread premium can be used to finance a variety of costs associated with closing the new loan including, but not necessarily limited to, prepayment penalties when refinancing a pre-existing HUD-insured loan.

34.     As HUD has explained in the context of residential mortgage loans:

Mortgage brokers and lenders can improve their ability to demonstrate the reasonableness of their fees if the broker discloses the nature of the broker's services and *the various methods of compensation* at the time the consumer first discusses the possibility of a loan with the broker.

. . .

If the fee the [borrower] pays is disclosed and agreed to, *along with its relationship to the interest rate and points for the loan and any lender-paid fees to the broker*, a market price for the services, goods or facilities could be attained. HUD believes that for the market to work effectively, *borrowers should be afforded a meaningful opportunity to select the most appropriate product and determine what price they are willing to pay for the loan based on disclosures which provide clear and understandable information*.

HUD RESPA Statement of Policy, 64 FR 10080, *10087 (Mar. 1, 1999) (emphasis added).

35.     This case, however, is about Red's deceitful and fraudulent abuse of an otherwise legitimate financing tool. Instead of using yield spread premium to assist the Borrower, Red uses yield spread premium to secretly enhance the profitability of these mortgage transactions for the sole benefit of the Red enterprise and at the sole expense of the unwitting Borrower.

36.     Red's undisclosed interest in maximizing its profits via a higher interest rate and the resulting yield spread premium is in direct and irreconcilable conflict with the Borrower's interest in obtaining the lowest possible interest rate.

37.     Red does not present the higher interest rate to the Borrower as a financing *option*; instead, Red intentionally and deceptively leads the Borrower to believe that the rate Red provides him is the best possible (also known as "par") rate.

38.     Because Red keeps the above par rate a secret, Red does not offer the Borrower any added benefit in exchange for the higher interest rate such as lower direct compensation fees and/or other upfront costs as discussed above.

39.     The result of this fraudulent scheme is that the Borrower is unknowingly left paying excessive interest and fees and the Red enterprise reaps compensation above what the Borrower agreed to pay Red for its services.

8

40.     All of Red's compensation is ultimately paid by the Borrower, whether it is paid directly through the upfront origination fee or indirectly through the interest rate and the resulting premium when the loan is sold to investors.

41.     Given the substantial size of the loans in question, the undisclosed profit made by the enterprise when utilizing this scheme is typically in excess of one hundred thousand dollars, and oftentimes even *multiple* hundreds of thousands of dollars, per loan transaction.

42.     For years, HUD has recognized the prevalence of this scheme by unscrupulous lenders and brokers in the context of consumer residential lending.  In response, HUD has attempted to combat these abusive practices relating to the misuse of yield spread premiums through regulation under The Real Estate Settlement Procedures Act ("RESPA").

43.     HUD has unequivocally stated its position concerning disclosure of yield spread premiums for consumer mortgages as follows:

> The Department believes that meaningful disclosure of yield spread premiums, as early as possible in the mortgage origination process, will avoid confusion and enable borrowers to make informed choices. . . . Timely disclosure of upfront costs and mortgage terms would permit them to shop intelligently.  The Department has therefore issued a clarification of the importance of disclosure, with a description of best practices.

(Exhibit 32, at Mortgagee Letter 2001-26).

44.     HUD's stated position concerning "best practices" related to disclosure of yield spread premium goes beyond the requirements of RESPA. For instance, HUD notes that while certain disclosures may satisfy RESPA requirements, "the Department believes that there are better forms of disclosure" which presumably apply equally to both consumer and commercial mortgage originations.  For example:

> Better disclosure would include a description of the services to be performed by the broker, a statement of whether the broker is acting as an agent for the borrower, *and the amount of the total compensation to the broker, including any yield spread premium paid by a lender*.  In addition, the Department believes that the broker should explain the various loan options.  The borrower should be informed that he or she may pay higher

upfront costs for a mortgage with a lower interest rate, or conversely pay a higher interest rate in return for lower upfront costs. In the latter instance, the broker may be receiving a yield spread premium. *HUD regards full disclosure, provided early in the process, with a written acknowledgement by the borrower, as a best practice*.

(*Id.*) (emphasis added).

45.     And while RESPA does not apply to the commercial multifamily housing loans at issue in this case, HUD's stated position regarding yield spread premium and the same best practices regarding disclosure apply to *all* mortgage originators across the board. *See* HUD Statement of Policy 2000-1, 66 FR 53052, *53055 (Oct. 21, 2001) ("The Department strongly believes that *all lenders and brokers* should provide the level of consumer disclosure that the purposes of RESPA intend and that fair business practices demand." (emphasis added)).

46.     In fact, prior to Defendant Orix's acquisition of Red Group from PNC in 2010, it was PNC's practice to provide its multifamily borrowers with *full transparency and disclosure* concerning their loan fees and financing options, including information concerning yield spread premiums, in order to allow the borrower to evaluate and select the specific method and financing terms that best suited the borrower's needs. (*See* Exhibit 30, 10/13/2009 PNC engagement letter).

47.     PNC's commitment to transparency and full disclosure in its dealings with its borrowers is evident from its initial engagement letter in which it promises to provide borrowers with:

> [I]nformation regarding prevailing market conditions based on recent sales of similar GNMA Securities and other relevant factors to assist the Borrower in evaluating the competitiveness of the proposed pricing. PNC will obtain the Borrower's consent before any final pricing terms are set and will take appropriate steps to assure that the GNMA Securities are sold in a competitive, arms length transaction including, if applicable, full and appropriate disclosure to the Borrower of any applicable premiums, discounts, fees or other payments relating to the sale, as well as full disclosure to the Borrower if any portion of the GNMA Securities are proposed to be sold to or retained by PNC, Northmarq or any affiliate of PNC or Northmarq. . . .
> . . .

10

The interest rate on the loans will be locked following the issuance of any HUD commitments through the sale of the GNMA Securities to secondary market investors. There is no way to "lock" this rate prior to the issuance of HUD Firm Commitments. The interest rate carried by the loans will include 25 basis points for the GNMA guaranty and servicing fee. A "good faith deposit" generally equal to .50% of the estimated loan amount will be required by investors purchasing GNMA Securities at the time of rate lock. The Good Faith Deposit is required to assure timely delivery after a funding commitment has been locked-in. All terms and conditions required by these investors will be discussed, and you will have the opportunity to choose the method and financing terms you find are most suitable, given market conditions. The permanent interest rate and financing terms will not be "locked in" without your express authorization.

(Exhibit 30, 10/13/2009 PNC Engagement Letter at pp. 2-3).

48.     The level of transparency and disclosure in this PNC engagement letter, when paired with full disclosure of any yield spread premium on HUD form 92455M, is the **minimum** standard required to comply with HUD's Program Obligations. (*See infra*, ¶ 52 and ¶¶ 54-102, "Multifamily Lending Program Obligations").

49.     After acquiring the bulk of Red Capital Group from PNC in 2010, Red intentionally eliminated any such transparency and ceased offering borrowers full disclosure of all financing options and loan fees, including yield spread premiums.

50.     Red admits that HUD requires full disclosure of "yield spread premium;" however, Red contends that HUD does **not** require disclosure of "trade premium," which is the term Red apparently prefers to use to describe the source of this secret indirect compensation. (Exh. 36, 12/14/16 Letter from Red Capital Group).

51.     This is an artificial distinction Red has intentionally manufactured in a flimsy attempt to legitimize its fraudulent practice of non-disclosure. Yield spread premium and trade premium are just two of a myriad of different names used to refer to the same thing: a monetary premium paid by an investor for a loan originated at an above par rate. (*See supra*, ¶ 28 and *infra*, ¶ 52).

11

52.     HUD has specifically recognized this as a distinction without a difference and has unambiguously stated that "'yield spread premium' (also sometimes called rate premium, trade premium, loan premium, trade profit or premium fee) which is collected by the lender or collected by an affiliate of the lender from the sale to a third-party of a Ginnie Mae security" *is*, in fact, a "financing fee" that must be disclosed to multifamily borrowers.  (Exh. 8, 2/6/17 Email from HUD recognizing "yield spread premium" and "trade premium" as synonymous terms for a financing fee collected by the lender or a lender's affiliate from the sale to a third-party investor of a GNMA security and that must be disclosed on HUD-92455M).

**From:** Grantling, Jessica V [mailto:Jessica.V.Grantling@hud.gov]
**Sent:** Monday, February 06, 2017 10:09 AM
**To:** Charlie Gower <Charlie@cagower.com>
**Cc:** Bernaciak, Thomas A <Thomas.A.Bernaciak@hud.gov>
**Subject:** Your Question Regarding Form 92455M

Hi Mr. Gower,

Thank you for your email questions regarding 92455M listed in the box below:

**Your Questions:**

Is the "yield spread premium" (also sometimes called rate premium, trade premium, loan premium, trade profit or premium fee) which is collected by the lender or collected by an affiliate of the lender from the sale to a third-party investor of a Ginnie Mae security (see paragraph 21(1)) required to be disclosed on HUD form 92455M?

If not required, why isn't it required to be disclosed on HUD form 92455m since it is a "Financing Charge" as defined in paragraph 21 of HUD form 92455M?

**HUD's Answer:**

In reference to your question, the answer is yes. HUD does recognize "yield spread premium," is an earned financing fee, therefore it is recorded on Form HUD-94255M Section 21, along with the other financing charges by the MAP Lenders. Below is an excerpt from the January 2016 MAP Guide which supports Multifamily Housing Production's procedures on loan fees.

**MAP Guide Chapter 11 Section 11.5 Loan Fees –**

11.5.A. Loan Fees. Lenders may charge loan origination and placement fees, both of which are mortgageable, and the combination of which cannot exceed 3.5% of the mortgage amount (or 5.5% for tax-exempt bond financing) for Section 223(f) refinancing transactions and new construction or substantial rehabilitation transactions. The maximum fees for Section 223(a)(7) loans is 2% for loans greater than $2 million, and up to $40,000 for loan amounts

less than $2 million. In addition to loan origination and placement fees, lenders may realize trade profit (also known as marketing gain) on the sale of Ginnie Mae or other mortgage backed securities.

We appreciate your interest in our programs and glad that we were able to assist you on this matter.

Thank you.

Sincerely,


Thomas A. Bernaciak
Director Technical Support Division

From: Charlie Gower [mailto:Charlie@cagower.com]
Sent: Monday, February 06, 2017 10:18 AM
To: Grantling, Jessica V <Jessica.V.Grantling@hud.gov>
Cc: Bernaciak, Thomas A <Thomas.A.Bernaciak@hud.gov>
Subject: RE: Your Question Regarding Form 92455M

Thank you so much. charlie

From:
Sent:
To:
Subject:

Grantling, Jessica V <Jessica.V.Grantling@hud.gov>
Monday, February 06, 2017 10:19 AM
Charlie Gower
RE: Your Question Regarding Form 92455M

YOU ARE WELCOME☺

(Exhibit 8, Feb. 6, 2017 email responses from HUD re YSP disclosure requirement).

53.     Red has intentionally devised and implemented a fraudulent scheme whereby it unilaterally injects yield spread premium into loan transactions without telling borrowers, like Plaintiffs, in order to enhance Red's overall compensation beyond what the borrower agrees to pay Red for its services.

**Multifamily Lending Program Obligations**

54.     Red's failure to disclose its use of yield spread premium and how it affects the Borrower's interest rate and Red's own compensation violates HUD's Program Obligations which bind all parties to the multifamily loan transaction.

55.     These Program Obligations include all applicable statutes and regulations issued by the Secretary and all requirements found in HUD handbooks, guides, notices and mortgagee

letters. (*See e.g.*, Exh. 20 at p. 1; *see also* Exh. 28, Multifamily Accelerated Processing Guide Excerpts ("MAP Guide") at Chpt. 1, § 1.4 F. "Program Obligations").

56.     The various Program Obligations incorporate a lot of the same language found in RESPA concerning requirements for and limits placed on loan fees and charges.

57.     For instance, the Program Obligations set the maximum "fees and charges" a mortgagee can charge the mortgagor in a multifamily loan transaction.  According to the Program Obligations, these loan fees and charges cannot exceed "common market rates for such services" and also "must be for actual required services provided to the mortgagor by the mortgagee . . . ." 24 C.F.R. § 200.41; *Cf.* RESPA, 12 U.S.C. §§ 2607 and 3500.14 (c) (prohibiting duplicative or unearned fees and requiring charges must be for services actually performed).

58.     In the context of consumer loans, HUD has specifically recognized that a lender's use of yield spread premium "to increase the borrower's interest rate and the broker's overall compensation, without lowering up front cash requirements for the borrower[,]" may likely result in total compensation that is in excess of what is reasonably related to the total value of the services provided.  HUD RESPA Statement of Policy 2001-1, 66 FR 53052, *53054 (Oct. 18, 2001).

59.     Likewise, Red's fraudulent scheme of using yield spread premium to secretly increase its overall compensation results in the Borrower paying an excessive interest rate and Red reaping compensation in excess of what is reasonably related to the total value of its services and in excess of the compensation the Borrower agreed to pay.

60.     The Program Obligations also prohibit originators/lenders ***and their affiliates*** from paying anything of value, directly or indirectly, in connection with any insured mortgage

transaction *to any person or entity* if such person or entity has received any other consideration from the mortgagor for their services related to the mortgage transaction, except that additional consideration, as is approved by the Secretary and paid for additional services actually performed. 24 C.F.R. § 202.5 (l). (*See also* Exh. 28, MAP Guide, p. 321, Chpt. 11, §11.5 "Loan Fees", D.).

61.     This prohibition is intended to prevent "double-dipping" and eliminate the financial incentive for loan originators, like Red, to intentionally and deceptively steer borrowers into a higher interest rate for the sole purpose of secretly increasing their compensation via the yield spread premium.

62.     Because Red is already receiving what it leads the Borrower to believe is its full compensation for its services directly from the Borrower via payment of the origination fee (plus fees and expenses), the Program Obligations prohibit it from receiving additional secret and indirect compensation via the yield spread premium for those same services.

63.     The Program Obligations also prohibit "[b]usiness practices that do not conform to those generally accepted by prudent lenders or that show irresponsibility" and/or *committing* "*[f]raud or material misrepresentations in the lender's participation in FHA multifamily programs*." 24 C.F.R. § 200.1530 (a)(6), (b)(2) (emphasis added).

64.     Red's dealings with its Borrowers, and with HUD, are rife with fraud and material misrepresentations concerning the disclosure (or non-disclosure) of all loan fees in violation of the Program Obligations.

65.     The Program Obligations specifically address the nature and extent of the "loan fees" a Lender is permitted to charge for its services. (Exh. 28, MAP Guide at p. 320-21, Chpt.

11, §11.5 "Loan Fees" and *see also* Chpt. 3, § 3.1 K. "Lender Fees and Charges"). HUD defines

and limits permissible "loan fees" as follows:

> Lenders may charge loan origination and placement fees, both of which are
> mortgageable, and the combination of which cannot exceed 3.5% of the mortgage amount
> (or 5.5% for tax-exempt bond financing) for Section 223(f)[1] refinancing transactions and
> new construction or substantial rehabilitation transactions. The maximum fees for
> Section 223(a)(7)[2] loans is 2% for loans greater than $2 million, and up to $40,000.00 for
> loan amounts less than $ 2 million. ***In addition to loan origination and placement fees,
> lenders may realize trade profit (also known as marketing gain) on the sale of Ginnie
> Mae or other mortgage backed securities.***
>
> . . .
>
> ***Loan fees include***: (a) ***origination and placement fees*** as permitted by [the MAP] Guide,
> ***plus*** (b) ***trade profit, trade premium or marketing gain*** earned on the sale of the Ginnie
> Mae security at a value above par, even if the security sale is delayed until after
> endorsement, minus (c) loan fees applied by the lender to its legal expenses incurred in
> connection with loan closing.

(Exh. 28, Multifamily Accelerated Processing Guide Excerpts ("MAP Guide"), at Chpt. 11,

§11.5 A (emphasis added), Chpt. 3, §3.1 K., and Chpt. 18, §18.3 F.2.; *see also* Exh. 32 at

Mortgagee Letter 2011-05, pp. 2-3).

66.     Thus, the combination of origination and placement loan fees is capped at 3.5% of

the total loan amount for 223(f) loans and 2% of the total loan amount for 223(a)(7) loans over 2

million dollars, respectively.

67.     The origination fee is sometimes also referred to as the "initial service charge."

(*See e.g.,* Exh. 17, Commitment to Insure at ¶ 15 ("The Mortgagor shall not be required to pay to

the Mortgagee an initial service charge in excess of two percent (2%) of the original amount of

the Mortgage."); Exh. 20, Overlook Req. for Endorsement at Exhibit A (includes space for Red

---

[1] Section 223(f) insures mortgage loans to facilitate the purchase or refinancing of existing
multifamily housing properties.

[2] A section 223(a)(7) loan is exclusively for the refinancing of ***existing*** HUD debt on multifamily
properties in order to reduce the interest rate and/or increase the amortization so as to ultimately,
(in the eyes of HUD), reduce the chance of default.

to disclose the amount of its "initial service charge"); Exh. 27, Creekwood Req. for Endorsement at Exhibit A (same); Exh. 37, Inverness Req. for Endorsement at Exhibit A (same); Exh. 38, Greystone Farms Request for Endorsement at Exhibit A (same)).

68.     In addition to origination fees and placement fees, the ***total loan fees*** for a multifamily loan transaction also includes any trade profit, trade premium or marketing gain. (*See supra,* ¶ 65).

69.     The Program Obligations provide for a separate ***reporting*** requirement for ***total loan fees*** in excess of 5%. (*See* Exh. 32 at Mortgagee Ltr. 2011-05 (effective Jan. 5, 2011)).

70.     The Program Obligations require participating mortgagees, like Red, to annually report all loan fees that exceed 5% of the insured loan amount on each FHA-insured loan over $2,000,000.00, in its audited financial statements.

71.     This requirement ***to annually report to HUD*** total loan fees in excess of 5% is an additional obligation for participating lenders that is separate and distinct from Red's obligation ***to fully disclose to Borrowers*** all loan fees and charges, direct or indirect, associated with supplying a loan for each transaction. (*Compare* Exh. 32, Mortg. Ltr. 2011-05 at pp. 2-3 ("Loan fees should be reported on a separate schedule included with the Mortgagee's annual audited financial statements submitted to HUD via LASS.") *with* Exh. 20, § I.A. ¶11 (defining "financing charge(s) to mean any charge, direct or indirect, for supplying the Loan to Borrower"), § I.B. "Fees and Charges By Lender" (stating that all Lender charges are disclosed on and attached to Certificate of Lender as "Exhibit A") and Exh. 28, MAP Guide, at Chpt. 11, §11.5 A (defining "loan fees" to include trade premium); *see also* Exh. 8 and *supra,* ¶ 52).

72.     HUD, however, does not require Mortgagees to provide HUD with a separate annual reporting on total loan fees that do not exceed 5%. (Exh. 32 at Mortg. Ltr. 2011-05 p. 3).

73.     The Program Obligations require that if loan fees or trade premium are used to pay prepayment penalty costs, the Lender's application must include an estimated Sources and Uses statement specifying the total amount of any loan fees or profit being used to cover such costs. (Exh. 28, MAP Guide, at Chpt. 18, § 18.3 K.; *see also* Exh. 35, sample Sources and Uses Worksheet).

74.     The Program Obligations do not permit originators to secretly structure the loans to include such trade premium without the consent of the Borrower who ultimately funds the added indirect compensation via his payment of the higher interest rate.

75.     HUD has expressly stated that this type of financial scheming by originators is strictly prohibited in residential mortgage dealings; it would be illogical for HUD to view transparency and full disclosure to be of the upmost importance in residential transactions but yet advocate or encourage a "hide the ball" approach for those originators dealing with commercial loans.

76.     HUD's interest in minimizing its risk is the same for insuring both residential and commercial loans.

77.     Indeed, the Program Obligations require the disclosure of **all** loan fees and financing charges, ***direct and indirect***, associated with the multifamily financing to be set forth on a separate attachment to the HUD application, commonly referred to as "Exhibit A." (*See* Exh. 34, Closing Guide, §§ 2.7 B. (". . .[A]ll required escrows, deposits, fees, charges, and financial obligations must be properly reflected in the Lender's Certificate."), 2.7 F.1 ("The Hub [sic] Director will inform in writing of the aggregate amount that will be allowed at cost certification for discounts, financing fees and issuance costs.  The allowed amount shall be reflected as a percentage of the mortgage loan.  The amount of the fee is listed in the financing

section of form HUD-92264 (Multifamily Summary Appraisal Report) (or in an attachment thereto), which is part of the Firm Commitment."), 2.7 G.1. ("Only financing fees and charges disclosed in the Lender's Certificate will be accepted by HUD as certifiable costs in connection with the determination of the maximum insurable mortgage)).

78.     For instance, the Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower ("Request for Endorsement") form (HUD-92455M), which includes a Certificate of Lender and a Certificate of Borrower,[3] specifically states that all fees and/or charges, *direct or indirect*, for supplying the loan to the Borrower *must* be disclosed therein on a separate schedule, referred to as "Exhibit A." (*See e.g.,* Exh. 20, Overlook Request for Endorsement at p. 3 ¶ 11, § B. "Fees and Charges By Lender", § D. 1. ("Lender certifies and agrees that no financing charges other than charges disclosed herein have been or shall be made."), and § D.1. (c), (g) and (h); *see also* Exh. 27, Creekwood Request for Endorsement at p. 4, § B. "Fees and Charges By Lender" and p. 6, § D. "Other Lender Obligations" ¶ 21; Exh. 37, Inverness Req. for Endorsement (same); Exh. 38 Greystone Farms Req. for Endorsement at p. A-4, § B. "Fees and Charges By Lender" and p. A-6 § D. "Certifications, Agreements, and Acknowledgements"; *see also* Exh. 34, Closing Guide at p. 48 ¶ F. (stating that the Request for Endorsement "shall be completed so as to account for *all of the funds* required by the Firm Commitment." (emphasis added)). **HUD has unambiguously stated that "yield spread premium" is a "financing fee" that must be disclosed on this form (HUD-92455M)**. *See* Exh. 8, Feb. 6, 2017 email from HUD and *see supra*, ¶ 52.

---

[3] *See* Exh. 34, Closing Guide at p. 48 ¶ F (explaining that the Request for Endorsement (HUD-92455M) includes a Certificate of Lender and a Certificate of Borrower).

79.     The Lender's Certificate (HUD-92434M) also contains a disclosure requirement that is substantially the same. (*See* Exh. 31, Lender's Cert. at ¶¶ 8, 20, 21).

80.     The Program Obligations require Red to disclose all of its compensation—*i.e.*, loan fees and charges—that it is set to receive in connection with the loan on Exhibit A. (*See e.g.*, Exh. 20 at p. 5 § D.1.(c),(g),(h) and Exhibit A attached thereto).

81.     The Program Obligations also require that any broker fees related to the mortgage transaction must be fully disclosed in the Lender's Underwriting Narrative and on the applicable HUD application forms, either HUD-92434M[4] or HUD-92455M,[5] as appropriate. (Exh. 28, MAP Guide at p. 321, Chpt.11, § 11.5 D.).

82.     This includes fees paid to individual mortgage brokers that Red employs to solicit borrowers, and may also apply to any brokers Red subsequently relies on to fund the loan by selling it to investors, like its affiliate Red Markets. All of which are "brokers" who share in the profits netted from the undisclosed yield spread premium.

83.     Red does not fully disclose broker fees as required by the Program Obligations. Red either falsely states the broker fees as being a lower amount than what the brokers actually receive, including the undisclosed yield spread premium (*see e.g.,* Exh. 20 at Exh. A (showing Lender paying $22,080.00 to Trillium Capital Resources) or, in some instances, Red fails to disclose the broker fees all together (*see e.g.,* Exh. 27, Exh. 37 and Exh. 38 all at Exh. A (failing to disclose any sums being paid to Trillium Capital Resources despite it sharing in the funds received by Red including yield spread premium).

---

[4] *See e.g.*, Exhibit 31, sample Lender's Certificate.
[5] *See e.g.,* Exhibit 20, Overlook Request for Endorsement and Exhibit 27, Creekwood Request for Endorsement.

84.     In addition to broker fees, the additional trade premium or marketing gain profit that Red is set to receive are indirect "loan fees" and should also be fully disclosed on Exhibit A.

85.     Red intentionally does not disclose it despite the following unambiguous warning from HUD against making false statements:

<u>WARNING</u>

Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability and administrative sanctions.

(Exh. 20 at p. 13).

86.     Red's failure to properly disclose broker fees and the use of yield spread premium or trade premium and how it impacts the Borrower's interest rate and Red's compensation violates HUD's Program Obligations.

87.     The Program Obligations also expressly prohibit MAP lenders, like Red, from having any conflict of interest that would "represent an unfair business practice with the Borrower, e.g., due to lack of disclosure or skewing arm's length incentives." (Exh. 28, "MAP Guide" at p. 25 § 2.7, A. 4.).

88.     Red's routine practice of failing to properly disclose all loan fees and charges, both direct and indirect, including, but not limited to, its unilateral decision to provide the Borrower with an above par interest rate and then use yield spread premium to secretly increase its overall compensation above that which the Borrower agreed to pay is an unfair business practice and violates HUD's Program Obligations.

89.     According to the Program Obligations, the "MAP Lender" includes not only Red Mortgage as the FHA-approved MAP Lender, but also "its parent company, subsidiaries,

22

affiliates and any other related entities, and any officers, directors, partners, members or employees of the MAP Lender, its affiliates and other related parties." (Exh. 28, MAP Guide at p. 26, § 2.7, B.).

90.     The Program Obligations prohibit the MAP Lender from receiving any payment, kickback or other consideration, directly or indirectly, which would affect the Lender's independent evaluation, or represent a conflict of interest, in connection with any FHA insured mortgage transaction." 24 C.F.R. 200.1530(b)(7); *Cf.* RESPA, 12 U.S.C. §§ 2607 and 3500.14 (b) (prohibiting kickbacks and unearned fees). (*See also* Exh. 28, "MAP Guide" at p. 25, Chpt. 2, § 2.7).

91.     Red's receipt of additional undisclosed indirect compensation via the Borrower's payment of an above par interest rate and the resulting yield spread premium is irreconcilably in conflict with the interest of both the Borrower, as payor on the loan, and Ginnie Mae, as the insurer of the loan, in having the lowest interest rate possible.

92.     In January 2010, HUD issued a public 60-day notice concerning various proposed revisions and updates it was considering making to the documents used in multifamily lending transactions.  Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD; HUD Multifamily Rental Project Closing Documents: Proposed Revisions and Updates and Notices of Information Collection, 75 Fed. Reg. 3544 (proposed Jan. 21, 2010).  (Exhibit 38).

93.     Specifically, HUD stated that it was considering a revision to the Lender's Certificate (HUD-92434M) to include a specific line item disclosure for trade profit or trade premium. (*Id.* at 3548, "Mortgagee's Certificate Changes" at ¶ 7).

94.   In response, multifamily lenders and brokers voiced fierce but vague objections claiming that it would contradict "the long-standing HUD position that *the determination of the interest rate is between the borrower and the lender*" and that such a disclosure would "adversely affect [their] operations and, conceivably capital markets." (*See e.g.*, Exh. 33 sample objection letters (emphasis added)).

95.   When HUD issued its follow up 30-day notice in December 2010, it acknowledged the vehement objection by lenders and brokers who claimed "that such disclosure does not belong in the closing documents nor should it be part of the process for changing loan documents." Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD, HUD Multifamily Rental Project Closing Documents—Revisions and Updates Notice of Information Collection; 30-Day Notice, 75 Fed. Reg. 80517, 80519 (Dec. 22, 2010). (Exhibit 38).

96.   While HUD stated that it "agree[s] with [their] concern and has removed this requirement" it further specifically stated that it was doing so in order to continue "*to allow Lenders and Borrowers to negotiate appropriate compensation*" for their services. *Id.* at 80523 (emphasis added).

97.   In other words, including a line item disclosure for trade profit would be akin to HUD taking the position that trade profit *must* be a regular part of every loan transaction; such a position would go against HUD's long standing policy that both *the interest rate* and *the lender's compensation* are terms that are *negotiated* with the Borrower.

98.   While there is nothing that prohibits a Borrower from *agreeing* to fund the Lender's compensation via the use of trade profit or yield spread premium, it is not a mandatory term of every multifamily transaction. And it has always been, and continues to be, HUD's

24

policy that *if* yield spread premium is part of the transaction that it must be an agreed upon and fully disclosed term of the loan.

99.     Indeed, the Program Obligations require that the interest rate on multifamily loans must be "***negotiated between the borrower, and the mortgagee (and if applicable, the Ginnie Mae investor)*** and must be locked in by the time of Initial Endorsement." (Exh. 28, MAP Guide at p. 46, Chpt. 3, § 3.1 D. (emphasis added); *see also* 24 C.F.R. § 200.83 (a) ("The mortgage shall bear interest at the rate agreed upon by the mortgagee and mortgagor.").

100.    However, instead of engaging in these required negotiations, Red dictates the interest rate (and its own compensation) by unilaterally marking up the par rate offered by the investor and fraudulently presenting it to the Borrower as the best deal available while claiming that it is only being compensated for its services via the Borrower's payment of a flat rate origination fee.

101.    As part of Red's fraudulent scheme, Red keeps its total loan fees (including the undisclosed yield spread premium profits) below 5% so as not to trigger HUD's separate annual audit report requirement.  Red's theory is that this way HUD will not notice that Red is not disclosing the yield spread premium and the resulting additional secret profit being made at the Borrower's expense.

102.    Red's perpetration of this fraudulent scheme violates the Program Obligations.

### An Illustration of Red's Fraudulent Scheme

103.    Typically, the Borrower is introduced to the Red Group through an individual mortgage broker who almost exclusively solicits borrowers for the Red Group.

104.    Of the various entities and individuals that are involved with and profit from the Red enterprise, the Borrower primarily deals with Red Mortgage and the individual brokers it employs.

105.    Red refers to the individual mortgage brokers and their role in the enterprise as "FHA Consultant[s]." (*See* Exh. 13, "Lender's Commitment Letter" at p. 2).

106.    The individual broker begins by making a "sales pitch" to the potential Borrower telling him that he can get a United States government guaranteed loan at a low interest rate with no personal liability for a long period of time, (generally 35 years), if the Borrower will hire Red to originate the loan for him.

107.    The broker then explains that the Borrower will pay Red a fee for originating the loan plus all out of pocket costs – *e.g.*, attorney fees, survey fees, appraisal fees etc. This "origination fee" is a percentage of the total loan amount—in this case, Red generally claims to charge Plaintiffs 1% of the loan amount, plus all associated fees and expenses. (*See e.g.,* Exh. 9, "Application Letter", detailing Red's compensation as 1% Origination Fee and Exh. 13, Overlook Lender's Commitment Letter showing 1% Origination Fee).

108.    Specifically, Red leads the Borrower to believe that the fee is intended to compensate Red *in full* for handling all the paperwork in processing and obtaining the loan at the lowest possible interest rate.

109.    The individual broker induces the Borrower to sign an "application letter" or "engagement letter" in which Red's compensation is agreed upon and which also gives Red the *exclusive* right to fund and service the loan. (*See e.g.,* Exh. 9). In other words, once the Borrower signs the agreement the Borrower is locked into using Red to obtain the loan—only Red can make the loan and only Red can service the loan after it is closed.

110.    The Application Letter expressly states:

[I]t is agreed that RMC (Red Mortgage Capital) shall have the exclusive right to fund and service the loan.

(*Id.* at p. 2 ¶ 6).

111.    The Application Letter states:

… Neither this Application Letter, any of the information contained herein, any financial advice or other advice rendered by RMC pursuant hereto, nor any of the terms hereof may be disclosed by you or your representative to any competitor or potential competitor of RMC, to any client or potential client of RMC, or to any other party (except to representatives of HUD) in any manner without the prior written approval of RMC.

(*See* Exh. 9, p. 2 ¶ 7). Thus, Red Mortgage has the Borrower locked in to deal ***exclusively***

with Red Mortgage and the Borrower cannot disclose his loan terms to anyone else.

112.    The Application Letter has attached to it the standard "form" Lender's

Commitment Letter that Red issues to the Borrower after HUD agrees to guarantee the loan.

113.    The Lender's Commitment Letter states:

This Commitment may not be assigned by the Borrower without the written consent of the Lender (Red).

(*See* Exh. 9 and Exh. 13, Lender's Commitment Letter at Exhibit 2 ¶ 24).

114.    These restrictions are significant because they prohibit the Borrower from

shopping the interest rate with any other potential lender once HUD agrees to guarantee the loan.

115.    Thus, the Borrower and his project are bound to Red Mortgage and at its mercy

for Red Mortgage to do the right thing and act in good faith to secure the best possible interest

rate for the Borrower.

116.    Thus, once HUD issues its commitment to insure the loan (*see e.g.,* Exh. 12

"Commitment to Insure"), the only lender that the Borrower can deal with to fund the loan and

get interest rate quotes from is Red.

117.    However, Red leads the Borrower to believe that these restrictions are not an issue

by assuring the Borrower that all of the "[p]romises and agreements" made in its Lender's

Commitment Letter "by and on behalf of the Lender ***shall be for the sole and exclusive benefit of the Borrower***." (*See* Exh. 13, Lender's Commitment at Exh. 2: "General Conditions to Lender's Commitment" ¶ 25 B. (emphasis added), which is attached to and incorporated in the initial Application Letter (Exh. 9) by reference).

118.    Red leads the Borrower to believe that Red is working solely and exclusively to secure the best possible interest rate available for the Borrower's benefit.

119.    In reality, and unbeknownst to the Borrower, Red is working against the Borrower's interests to secure an interest rate that is much higher than the best available rate and which will provide the most financial benefit to Red and the enterprise.

120.    The Application Letter states that once HUD guarantees the loan, Red Mortgage will provide the Borrower with an interest rate quote and, if the Borrower accepts the rate quote, Red Mortgage will then commit to make the loan at that rate *if that rate can be obtained*.

121.    While Red Mortgage is referred to as the "Lender" in the transaction, Red Mortgage does not actually use its own money to fund the loan.  Instead, it is understood that the loan will be funded by the issuance and sale of GNMA mortgage-backed securities.  (Exh. 13 "Lender's Commitment Letter at Exh. 2 "General Conditions to Lender's Commitment" ¶ 12; *see also* Exh. 18 ("The financing will be funded through the sale of GNMA mortgage-backed securities")).

122.    Once HUD issues its commitment to insure the requested loan, it is guaranteed by both HUD and Ginnie Mae ("GNMA").  The loan is then securitized and issued as a GNMA Security which is sold to investors in order to fund the loan.

123.    Because the loan is guaranteed and insured against default by both HUD and Ginnie Mae, a potential investor has zero credit risk on the loan.

124.    Specifically, once HUD agrees to guarantee the loan, Red Mortgage finds out what investors are willing to pay for a HUD guaranteed loan for thirty-five years on that day— *i.e.*, what interest rate an investor on Wall Street is looking to get for a no-risk United States government guaranteed loan for thirty-five years.

125.    Red Mortgage then emails a "rate lock letter" to the Borrower requesting authorization to lock the interest rate up to a certain designated rate which is *higher* than what Red Mortgage knows a Wall Street investor would be willing to accept as a return on his money. (*See e.g.,* Exh. 14 (offering rate lock quote of 4.35%)).

126.    The rate lock letter binds the Borrower to close on the loan if Red Mortgage can get any rate up to this "capped" rate.

127.    Red Mortgage does not tell Borrower that the par rate is actually much lower than the capped rate it provides the Borrower in the rate lock letter.

128.    The Borrower relies on Red's statements concerning what the prevailing market interest rate is and there is no way for the Borrower to independently verify the truthfulness of Red's representations.

129.    Red knows that the Borrower must rely on its representations as to the prevailing market interest rate because there is no publicly available information concerning what GNMA securities are selling for—only Red and other similarly situated brokers and investment bankers are privy to this information.

130.    Based on Red's representations, the Borrower signs the rate lock letter agreeing to pay up to the inflated "capped" rate and emails the authorization to Red. (*See e.g.,* Exh. 15).

131.    At this point Red has succeeded in locking in its access to additional undisclosed profits it knows it will receive indirectly via the Borrower's payment of a higher than par interest rate once the loan is sold to investors.

132.   **Within hours**, Red Mortgage emails the Borrower stating that it has managed to lock the Borrower's rate slightly below the rate it provided in the rate lock letter. (*See e.g.,* Exh. 16 (stating that rate has been locked below the quoted rate of 4.35% at 4.28%)).

133.   HUD then amends its commitment to reflect certain required changes (*see e.g.,* Exh. 17) and Red formally notifies HUD of its commitment to make the loan at the locked rate (*see e.g.,* Exh. 18).

134.   Based on Red Mortgage's representations, the Borrower believes that Red Mortgage has done a good job for the Borrower.  However, the truth is Red Mortgage has done a good job for itself and the enterprise by secretly increasing their compensation at the Borrower's expense via the yield spread premium.

135.   Once the rate lock is in place, Red Mortgage then transfers the loan to its sister company, Red Markets, which then sells the loan via a GNMA security to an investor in order to actually fund the loan.

136.   Because the Borrower is paying an above par interest rate, the investor pays Red more to purchase the loan than it would have paid to purchase the loan at par.

137.   Red Mortgage and the enterprise secretly enhance their compensation by intentionally and fraudulently leading the unwitting Borrower to accept a higher interest rate than what is actually available.

138.   **This sum typically amounts to hundreds of thousands of dollars per transaction**.

139.   Red intentionally does not disclose to the Borrower that it receives this additional, indirect compensation, instead leading the Borrower to falsely believe that Red's compensation is limited to the disclosed 1% origination fee plus costs and expenses. (*See* Exh. 13 "Lender's Commitment Letter at ¶¶ A., C., detailing Lender's compensation and all expenses and fees the

Borrower expects to pay Lender for its services in connection with financing and closing the loan).

140.    This undisclosed compensation is paid to Red who keeps most of it and then pays a predetermined percentage to the mortgage broker, who initially suckered in and secured the Borrower's business for Red.

141.    Red then also proceeds to collect servicing fees each month for the duration of the loan for collecting the monthly loan payments and remitting them to the investor.

142.    Red Mortgage knows that once it secures HUD's commitment to insure the loan, the Borrower essentially has to agree to whatever interest rate Red Mortgage dictates.

143.    If the Borrower does not agree, then the loan does not close and the Borrower is obligated to pay Red Mortgage its fees and also forfeit the substantial out of pocket costs the Borrower has already paid.

144.    Knowing that Red's interest in obtaining a loan for the Borrower at a higher interest rate is in direct and irreconcilable conflict with the Borrower's interest in securing the lowest possible interest rate, Red attempts to get advance permission to defraud the Borrower by inserting the following self-serving language into the Application Letter:

> Nothing in this Application Letter creates or is intended to create a joint venture or any agency or fiduciary relationship, duty or obligation between the parties. Borrower hereby agrees and acknowledges that the commitments and services of RMC are being provided as an independent contractor at arm's length.

(*See* Exh. 9, ¶ 8).

145.    Yet, Red Mortgage holds itself out to the Borrower as a lending agent who will work for the benefit of the Borrower, advertising its services on its website as follows:

> Our focus is to get your property the exact financing solution that's *right for your goals*. Our team at RED is recognized for its thoroughness and attention to detail, and *for securing the most beneficial financing solution for our clients*.

(*See* Exh. 10, Red Capital Group, LLC, "The Face of Lending" at p. 11 (emphasis added)).

146.   Red specifically makes twenty-one promises to its customers on its web page,

four of which are repeated here:

1st Rule: Always do the right thing.

8th Rule: Think of your colleagues as customers.  Think of your customers as colleagues.  Value them as people, treat that as you would like to be treated.

9th Rule:  Demand clarity in documentation.

21st Rule: Always do the right thing.

(*See* Exh. 11, Red Capital Group, LLC, "We provide it" at p. 9).

147.   Red further promises its customers:

RED provides a wealth of industry experience along with a premier network of lenders to deliver to our clients the most advantageous financing available.

(*See* Exh. 10, Red Capital Group, LLC, "The Face of Lending"at p. 5).

148.   Red even explicitly promises to obtain for its borrowers/customers the best

available interest rate:

RED's full service Sales & Trading Desk, a registered broker/dealer, sells directly to institutional accounts, thus ***providing you with the best available price*** and execution.

(*See* Exh. 10, Red Capital Group, LLC, "The Face of Lending" at p. 7 (emphasis added)).

149.   Plaintiffs have relied on Red's promises which Red had made knowing they

are false and/or while having no intention to fulfill said promises.

150.   This undisclosed premium is an integral part of the business model of Red and

many other commercial mortgage brokers in this line of business.  (*See* Exh. 24, Decl. of Marie

Head).

151.   The trade premium is an ***extremely closely guarded secret***.  The president of a

major subsidiary of Prudential outlined in an affidavit in support of a protective order just how

important it was to keep this undisclosed trade premium profit a secret and the efforts Prudential
and similar other commercial mortgage broker companies, like Red, go to keep borrowers from
knowing anything about it. (*See id.*).

152.   It is so secret that when the loan is sold to an investor the trade confirmation is
"not saved in hard copy form and is stored electronically under password protection." (*Id.* at 5).

153.   The identity of the investor and how much the investor pays to purchase the
Borrower's loan is also intentionally kept secret. (*Id.*).

154.   The undisclosed yield spread premium allows Red to make enormous undisclosed
profits and individual brokers to make millions of dollars per year in commissions which are
funded solely by the Borrower who has been fraudulently induced into paying an above par
interest rate.

155.   In fact, the secret compensation received via the yield spread premium is typically
the most lucrative part of the deal for multifamily loan originators.

156.   For example, in a suit brought by a broker in United States District Court, District
of Maryland, C.A. No. 14-0142, an individual salesman in 2012 earned over $ 2.5 million dollars
in commissions while his clients were charged an undisclosed yield spread premium of a
minimum of 3% up to 9.075% of their loan. (*See* Exh. 25, *Hausfeld v. Love Funding, Corp.*,
9/17/15 Order on Cross Mot. for Summ. J.).

157.   These commissions of over 2.5 million dollars were paid pursuant to a written
agreement with his employer – a company in the same business as Red. (*See* Exh. 26,
Employment Agreement).

158.   This is why loan originators were so vehemently opposed to HUD's 2009
proposed revision to include a line item disclosure for trade profit. (*See supra,* ¶ 94 and Exh. 33,
Objection Letters).

159.    Plaintiffs are not opposed to Red and other commercial mortgage originators being fairly compensated for their services.  However, the Program Obligations require that both the interest rate and Red's compensation are terms that must be negotiated and agreed upon by both Red and Plaintiffs (and, if necessary, the GNMA investor).  (*See supra* ¶¶ 96, 99).

160.    This means Red must provide Plaintiffs with full disclosure of all loan fees and charges, including any yield spread premium, as required by the Program Obligations.

161.    The documents involved with and executed in connection with these loans are standard "form" documents used in all of the substantially similar loans Plaintiffs have made with Red.

162.    The same factual scenario has occurred in all of the loan transactions Plaintiffs have closed with Red.  Red routinely, intentionally and deceptively does not tell Borrowers that Red is providing them with an above par interest rate and that the resulting yield spread premium will be pocketed by the Red enterprise.

## LIABILITY OF DEFENDANTS

### COUNT ONE
### GEORGIA RACKETEER INFLUENCED AND CORUPT ORGANIZATIONS ACT ("RICO") O.C.G.A. §16-14-1 *et seq.*

163.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 162 as if fully set forth herein.

164.    The named Defendants, through a pattern of racketeering activity or proceeds derived therefrom, have acquired or maintained, directly or indirectly, an interest in and/or control of the enterprise, real property, and/or personal property, including money.

165.    The Red Group's three operating subsidiaries, Red Mortgage, Red Markets and Red Partners, directly or indirectly, participate in executing the enterprise's fraudulent scheme in various ways.

166.    In addition to the named Defendants, there are various persons and entities who are employed by and/or associated with this enterprise, including, but not limited to, various individual mortgage brokers who conspire to conduct, conduct and/or participate in, directly or indirectly, the execution of the enterprise's fraudulent scheme.

167.    Defendants and their employees and/or agents have engaged in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated as described under O.C.G.A. §§ 16-14-3 (4)(A), (5)(A).

168.    Specifically, in furtherance of violating O.C.G.A. § 16-14-4, Defendants and their employees/agents have committed, attempted to commit, solicited, coerced, or intimated other persons to commit multiple offenses of theft by deception and wire fraud.

169.    Defendants have committed multiple acts of theft by deception by unlawfully obtaining Plaintiffs money by any deceitful means or artful practice with the intent of depriving Plaintiffs of said money in violation of O.C.G.A. § 16-8-3.

170.    Defendants and their directors, managers, members, agents and/or employees have deceived Plaintiffs in violation of O.C.G.A. §16-8-3 when they:

    (a)    Created or confirmed Plaintiffs' impression of an existing fact or past event which is false and which Defendants know or believe to be false.  O.C.G.A. §16-8-3(b)(1).

    (b)    Failed to correct a false impression of an existing fact or past event which Defendants have previously created or confirmed.  O.C.G.A. §16-18-3(b)(2).

    (c)    Prevented Plaintiffs from acquiring information pertinent to the disposition of the property involved.  O.C.G.A. §16-18(b)(3).

    (d)    Promised performance of services which Defendants do not intend to perform or

know will not be performed. O.C.G.A. §16-18-3(b)(5).

171. Specifically, Defendants and their directors, managers, members, agents and/or employees committed theft by deception in violation of O.C.G.A. § 16-18-3 as follows:

(a) Defendants have intentionally and deceptively created Plaintiffs' impression that Defendants provide their services to and work for Plaintiffs' sole benefit in exchange for Plaintiffs' payment to Defendants of agreed upon and disclosed flat rate compensation. Defendants know this is false and that Defendants actually work to benefit themselves by persuading Plaintiffs to accept a higher interest rate which in turn allows Defendants to secretly increase their compensation beyond that which Plaintiffs agreed to pay via the resulting yield spread premium. O.C.G.A. §16-18-3 (b)(1).

(b) Defendants have intentionally and deceptively thereafter failed to correct this false impression which they have created and/or confirmed. (*See e.g.,* Exhibits 21, 22 and 23, letters to/from Defendants re yield spread premium). O.C.G.A. § 16-18-3 (b)(2).

(c) Defendants have intentionally and deceptively prevented Plaintiffs from acquiring information pertinent to the disposition of the property involved—*e.g.*, whether Defendants intend to sell the loan to investors at a premium in order to enhance their compensation via the "trade premium" or marketing gain; the true interest rate (par rate) the investors were willing to loan money for; the amount of extra compensation or "profit margin" shared by Defendants resulting from Plaintiffs payment of the higher interest rate and/or the identity of the investor who purchases the loan. O.C.G.A. §16-18-3 (b)(3). (*See e.g.,* Exhibit 24, Decl. of Marie Head, discussing the top-secret nature of the profit margin at which companies analogous to Red generate and then sell multifamily loans and referring to this intentional and deceptive practice

as the "industry standard").

(d) Defendants have intentionally and deceptively promised Plaintiffs that they would work to find Plaintiffs the best available interest rate for their loan while not intending to do so and/or knowing that promise will not be performed. Instead, Defendants intend to provide Plaintiffs with a loan at a higher interest rate that will provide the most financial benefit to Defendants via the resulting yield spread premium.

O.C.G.A. § 16-8-3 (b)(5).

172.    Defendants have committed multiple acts of wire fraud by unlawfully devising or intending to devise a scheme to defraud Plaintiffs of their money and, in connection therewith, transmitting and/or causing to be transmitted communications and information via wire (telephone and other electronic means) for the purpose of effectuating the fraudulent scheme in violation of 18 U.S.C. §1343.

173.    Defendants and their directors, managers, members, agents and/or employees committed wire fraud in violation of 18 U.S.C. § 1343 when they transmitted and/or caused to be transmitted communications and information via the following wire transmissions (telephone and/or other electronic means) for the purpose of effectuating the fraudulent scheme:

(a)    Solicitations and other advertising materials transmitted via the internet wherein Defendants promise to work for the sole and exclusive benefit of the Borrower and to provide the Borrower with the best available interest rate (*See supra*, ¶¶ 145-148);

(b)    Telephone calls between Plaintiffs and Defendants, and Defendants employees and agents.

(c)    Emails between Plaintiffs and Defendants, and Defendants employees and agents. This includes, but is not limited to, the electronic mail transmission of the "rate

37

lock" authorization documents, which contain Defendants' intentionally and materially false representations concerning the available interest rate (*See supra,* ¶¶ 125-132 and Exhs. 14, 15 and 16).

174.    Defendants have committed multiple acts of false swearing by knowingly and willfully making false statements in the execution of documents while knowing they purport to be an acknowledgment of a lawful oath or affirmation in violation of O.C.G.A. § 16-10-71. (*See supra,* ¶¶ 80-86). Specifically, Defendants routinely falsely swear that they have fully disclosed all loan fees and charges associated with providing the financing to the Borrower but, in fact, Defendants intentionally and deceitfully fail to disclose the indirect compensation Defendants receive via yield spread or trade premium.

175.    Defendants have a pattern and practice of committing these predicate acts as a routine part of each individual loan transaction they have with Plaintiffs and others.

176.    Plaintiffs have suffered damages as a direct and proximate result of Defendants' intentional and wrongful conduct and these damages flow directly from Defendants' commission of the predicate acts detailed above.

COUNT TWO
FRAUD

177.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 176 as if fully set forth herein.

178.    Defendants and their employees and/or agents have acted intentionally to defraud Plaintiffs by misrepresenting facts to Plaintiffs on which Plaintiffs have relied to their detriment.

179.    Defendants routinely falsely promised Plaintiffs that in exchange for a certain disclosed and agreed upon fee that Defendants and their agents and/or employees would work for the sole and exclusive benefit of Plaintiffs to secure a HUD-guaranteed loan at the best available interest rate for Plaintiffs.

38

180.   Defendants intended Plaintiffs to rely and act upon these false representations and Plaintiffs did, in fact, rely and act upon these false representations by signing an "Application letter" or "Engagement letter" binding Plaintiffs to deal exclusively with the Red enterprise and preventing Plaintiffs from dealing with any other lenders to procure the necessary financing for their projects.

181.   Plaintiffs were justified in their reliance for various reasons including, but not limited to, Defendants repeated verbal and written representations that Defendants and their employees and/or agents were working to secure the best available interest rate for Plaintiffs and that all fees and charges associated with the financing are fully disclosed to Plaintiffs within the loan documents.

182.   As a proximate result of Plaintiffs' reasonable and detrimental reliance on Defendants' misrepresentations, Plaintiffs are bound to pay interest rates in excess of what they otherwise would have agreed to pay and which results in hundreds of thousands of dollars in excess interest paid over the life of the loans.

## COUNT THREE
## BREACH OF CONTRACT

183.   Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 182 as if fully set forth herein.

184.   Defendants have breached the terms of its contracts with Plaintiffs and HUD—including, but not limited to, the terms of the initial engagement agreement with Plaintiffs, the terms of the Requests for Endorsement of Credit and Certificate of Lender (HUD-92455M), and the Program Obligations which include various HUD regulations and which bind all Parties to the multifamily lending transaction.

39

## COUNT FOUR
## ATTORNEYS' FEES

185.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 184 as if fully set forth herein.

186.    Defendants have acted in bad faith, have been stubbornly litigious and have caused Plaintiffs unnecessary trouble and expense thereby entitling Plaintiffs to attorneys' fees and expenses under O.C.G.A. § 13-6-11.

187.    Plaintiffs are also entitled to recover attorneys' fees and expenses as provided under O.C.G.A. § 16-14-6 (c).

## COUNT FIVE
## PUNITIVE DAMAGES

188.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 187 as if fully set forth herein.

189.    Defendants are liable for punitive damages under O.C.G.A. § 51-12-5.1 for their willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences and for its specific intent to cause harm to Plaintiffs.

## COUNT SIX
## TREBLE DAMAGES

190.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 189 as if fully set forth herein.

191.    Plaintiffs are entitled to recover treble damages in accordance with Georgia RICO, O.C.G.A. § 16-14-6 (c).

WHEREFORE Plaintiffs pray that they recover the following:

(1) Actual damages;

(2) Expenses of litigation, including attorneys' fees;

40

(3) Punitive damages;

(4) Treble damages;

(5) Such other damages as are appropriate in this case; and

(6) Trial by jury.

Respectfully submitted this ___10___ day of April, 2017.

CHARLES A. GOWER, P.C.

CHARLES A. GOWER
Georgia Bar No. 303500
charlie@cagower.com
MIRANDA J. BRASH
Georgia Bar No. 475203
miranda@cagower.com
SHAUN P. O'HARA
Georgia Bar No. 749503
shaun@cagower.com

*Attorneys for Plaintiffs*

1425 Wynnton Road
P.O. Box 5509
Columbus, GA  31906
Tel. (706) 324-5685
Fax (706) 322-2964

# Overlook Gardens Properties, LLC et al. v. Orix USA, LP, et al.

## Volume 1

## Exhibits 1 - 17

# Overlook Gardens Properties, LLC et al. v. Orix USA, LP, et al.

## Table of Contents

EXHIBIT LIST

1  Orix USA Official Web Page

2  Business Wire news press release re Orix's acquisition of Red Capital Group from PNC Bank

3  Orix page for Mike Moran

4  Mike Moran LinkedIn Page

5  Press release announcing Mike Moran to serve as Chairman of Red Capital Group while simultaneously maintaining his responsibilities with Orix

6  Multifamily Executive Magazine story re Red Capital Group joint venture

7  Red Capital Group "About Red" webpage

8  February 6, 2017 Emails from HUD re yield spread premium disclosure requirements

9  March 26, 2013 Letter from Red to Paul Hinman and attached Application Letter for Overlook

10  Red Capital Group "The Face of Lending" webpage

11  Red Capital Group "We Provide It" webpage

12  Commitment to Insure for Overlook

13  Lender's Commitment Letter for Overlook

14  Rate Lock Letter for Overlook

15  Emails re Rate Lock

16  Emails re Rate Lock for Overlook and Rate Lock Confirmation Letter (sent electronically)

17  HUD Commitment to Insure (Amended)

18  December 1, 2013 Letter from Red to HUD concerning funding financing for Overlook via GNMA mortgage-backed securities

19  Closing Document List for Overlook deal

20  Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower- Overlook deal

21  December 8, 2015 letter to James Croft re Yield Spread Premium

22  James Croft response letter to December 8, 2015 Yield Spread Premium inquiry

23  December 16, 2015 response letter to James Croft re his response (Exh. 22)

# Overlook Gardens Properties, LLC et al. v. Orix USA, LP, et al.

## Table of Contents
## Continued

EXHIBIT LIST CONTINUED

25 *Hausfeld v. Love Funding Corp.*, C.A. No. TDC-14-0142, United States District Court, District of Maryland, Sept. 17, 2015 Order on Cross Mot. for Summary Judgment [Pacer Doc. 36]

26 Mr. Hausfeld's Employment Agreement with Love Funding

27 Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower- Creekwood deal

28 MAP Guide Excerpts

29 NAMB 2/24/2009 published position re YSP

30 PNC 10/13/2009 engagement letter

31 Sample Lender's Certificate

32 HUD Mortgagee Letters and Multifamily Notices

33 Samples of Objection Letters

34 MAP Closing Guide Excerpts

35 Sample Sources and Uses Worksheet

36 December 14, 2016 Letter from Jim Croft

37 Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower—Inverness deal

38 Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower—Greystone Farms deal

# Exhibit 1



# OUR FIRM

## OUR BUSINESS

Founded in 1981 as the U.S. subsidiary of ORIX Corporation, ORIX USA has transformed into a diversified financial company with the ability to provide investment...

READ MORE

## SENIOR LEADERSHIP

ORIX USA's executive leadership team guides a family of companies with more than 1,500 knowledgeable employees throughout the firm's Dallas headquarters and nearly 20 offices across the U.S. and Brazil.

READ MORE

## BUSINESS UNIT LEADERSHIP

An elite team of financial industry experts and leaders drives our firm's innovation and oversees the development and execution of ORIX USA's comprehensive capital solutions offering.

READ MORE

## OUR PARENT COMPANY

ORIX Corp., our parent company, is a publicly owned Tokyo-based global financial services company founded in 1964.  Operating in 36 countries and regions, ORIX Corp. is investment grade rated with more than $90 billion in assets and more than $300 billion of assets under management.

READ MORE

# Exhibit 2



A Berkshire Hathaway Company



# ORIX USA Increases Ownership of RED Capital Group to 100 Percent

## *RED Capital Group becomes wholly-owned subsidiary*

# red capital group

March 02, 2016 02:30 PM Eastern Standard Time

DALLAS--(BUSINESS WIRE)--Dallas-based ORIX USA Corporation (ORIX) is proud to announce that it has reaffirmed its commitment to RED Capital Group, LLC (RED) by purchasing the minority interests in RED that it did not already own. On Feb. 22, 2016, ORIX USA's ownership of RED grew from 88% to 100%, underlying the importance of the relationship, which dates back to ORIX's original investment in 2010.

"Increasing ORIX's investment in RED has been a strategic objective of mine for the last few years, as I have seen firsthand the strength of the RED team and their platform," said Hideto Nishitani, Chairman, President, and CEO of ORIX USA. "This is an attractive investment opportunity and signals ORIX's belief in the strength of the multifamily, seniors housing and affordable housing markets."

RED's executive management team will remain in place and continue to operate RED as an independent entity based in Columbus, Ohio.

"I am extremely excited about ORIX furthering their commitment to our business," said Ted Meylor, Chairman and CEO of RED. "With this investment, RED is well-positioned for strategic growth. This transaction—combined with the addition of the Freddie Mac Small Balance Loan Seller/Servicer program, as well as adding several high-performing originators to the team—has given us tremendous momentum as we look to push to the next level in our industry."

**RED Capital Group**

Recognized for its industry expertise, innovative and comprehensive structures, and consistently high rankings, RED CAPITAL GROUP, LLC has provided over $72 billion of integrated debt and equity capital since 1990 to the seniors housing and health care, multifamily, affordable, and student housing industries through three operating companies.

RED Mortgage Capital, LLC is a leading Fannie Mae DUS®, MAP- and Lean-approved FHA, and Freddie Mac small balance lender with a mortgage servicing portfolio near $16 billion.

RED Capital Markets, LLC (Member FINRA / SIPC) is a leader in the distribution of Fannie Mae and Ginnie Mae Project MBS, and provides structuring, underwriting, placement, and advisory services for tax-exempt and taxable housing and health care bonds.

RED Capital Partners provides proprietary debt and equity solutions and asset management in a

range of forms including subordinated gap and bridge loans.

RED Capital Group is a subsidiary of ORIX USA Corporation.

**ORIX USA Corporation**

ORIX USA provides innovative capital solutions that clients need to propel their business to the next level. Based in Dallas, ORIX USA has a team of more than 500 employees spanning 20 offices across the U.S. and Brazil. ORIX USA and its family of companies offer investment capital and asset management services to clients in the corporate, real estate, municipal and energy sectors, while holding $6 billion of assets and managing an additional $29 billion, approximately. Its parent company, ORIX Corporation, is a Tokyo-based, publicly owned international financial services company with operations in 36 countries and regions worldwide. ORIX Corporation is listed on the Tokyo (8591) and New York Stock Exchanges (IX). For more information on ORIX USA, visit www.orix.com.

Contacts
**RED Capital Group, LLC**
Lisalynne Quinn, +1-469-385-1434
Director of Marketing
llquinn@redcapitalgroup.com
or
**for ORIX USA**
Amanda Gleason, 972-770-5083
agleason@marketwave.biz

# Exhibit 3



### MIKE MORAN
*Head of Special Projects*

Mr. Moran is currently Head of Special Projects at ORIX USA. Prior to his current position he spent 3 years as Chairman & CEO of RED Capital Group, LLC., a subsidiary of ORIX USA. At RED he was responsible for the expansion of the company's presence and reputation in the seniors housing & health care, multifamily, affordable and student housing finance arenas.

Mr. Moran formerly served as CEO, COO and General Counsel of ORIX Capital Markets, Managing Director of Corporate Development at ORIX USA Corporation, and General Counsel of ORIX Real Estate Capital, Inc.

Prior to ORIX, he served as Vice President and General Counsel of Inland Retail Real Estate Trust, Inc., where he was responsible for all legal matters relative to a publicly registered real estate investment trust owning in excess of $4 billion in real estate assets.

Mr. Moran has also been with Prime Group Realty Trust and Rudnick & Wolfe (now DLA Piper).

Mr. Moran earned his law degree from the DePaul University College of Law with honors in 1993 and a BS in Accountancy from the University of Illinois-Urbana in 1990. He passed the CPA exam in 1991.

# Exhibit 4

What is LinkedIn?    Join Today    Sign In

## Michael Moran
CEO at RED Capital Group
Southlake, Texas | Financial Services

**1**
connection

| Current | RED Capital Group |
| Previous | ORIX USA Corporation, ORIX USA, Inland Retail Real Estate Trust |
| Education | DePaul University College of Law |

# View Michael's full profile.
# It's free!

Your colleagues, classmates, and 400 million other professionals are on LinkedIn.

**View Michael's Full Profile**

Experience

**CEO**
RED Capital Group
2012 – Present (4 years)



---

**CEO - ORIX Capital Markets**
ORIX USA Corporation
2010 – 2012 (2 years)

---

**COO and General Counsel ORIX Capital Markets/Managing Director Corporate Development ORIX USA**
ORIX USA Corporation
2009 – 2012 (3 years)

---

**General Counsel - ORIX Real Estate Capital**
ORIX USA
2005 – 2008 (3 years)

---

**General Counsel**
Inland Retail Real Estate Trust
2003 – 2005 (2 years)

Education

**DePaul University College of Law**

**Find a different Michael Moran**

| First Name | Last Name | 🔍 |

**Example:** Michael Moran


**Michael Moran**
Principal, Control Risks; Visiting Fellow, Carnegie Corporation of New York
United States

**Michael Moran, PRC**
@TalentNerd and Purple Squirrel Hunter
United States


**Michael Moran**
Correctional Lieutenant at Connecticut Department of Corrections
United States


**Michael Moran**
ilos videos
United States

**Michael Moran**
Chef Instructor at Lincoln Culinary Institute
United States

More professionals named Michael Moran

**Public profile badge**

Include this LinkedIn profile on other websites

**View profile badges**

**People Also Viewed**

**James Scribner**
Managing Director at Red Capital Group

**Brigette Burnell**
General Counsel and Corporate Secretary at The Gorman Rupp Company

**Jonathan Temps**
Director, Capital Markets and Legal

**Misty Leeth**
Director at Red Capital Group

**Molly Haywood**

**Matt McClure**
Vice President at Red Capital Group

**Diana Wagner**
Experienced Business and Healthcare Management, Visionary Entrepreneur, Process Innovator

Juris Doctorate
1990 – 1993

Activities and Societies: Order of the Coif Law Review

**University of Illinois at Urbana-Champaign**
Bachelor's of Science, Accountancy
1986 – 1990

**Maureen Gainer Ohle**
What's on LinkedIn? Members Today LinkedIn Sign In
General Counsel at Illinois Housing
Development Authority

**James Bartholomew**
Legal Counsel, Investments Team,
UniSuper (Secondment)

## View Michael's full profile to...

- See who you know in common
- Get introduced
- Contact Michael directly

**View Michael's Full Profile**

Not the Michael you're looking for? View more

## Hire independent Insurance Agents like Michael

**Post your project – It's free →**
See Insurance Agents available for hire

LinkedIn member directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more ┊ Browse members by country

© 2016 ┊ User Agreement ┊ Privacy Policy ┊ Community Guidelines ┊ Cookie Policy ┊ Copyright Policy ┊ Unsubscribe

# Exhibit 5

# Red Capital Group Announces Founder's Retirement and Names Beisler/Moran to Lead

- Apr 10, 2012

- News
- People
- National

Apr102012
Red Capital Group recently announced the retirement of its founder, chairman and CEO William E. Roberts.
Share

- Facebook
- Twitter
- Google+
- LinkedIn
- Email

Columbus, Ohio—Red Capital Group LLC (Red) recently announced the retirement of its founder, chairman and CEO William E. Roberts. Roberts came out of retirement in 2010 to lead the acquisition of Red from PNC, has succeeded in restoring the firm's independent existence, and has placed it on track to continued leadership and growth in multifamily, seniors housing and healthcare finance. Leadership of Red is passing from Bill Roberts to Mark C. Beisler, who will serve as president and to Mike Moran, who will assume the role of chairman. Under their leadership, Red will continue to expand its presence and reputation in the multifamily, seniors housing, and heath care finance arenas. Roberts will serve as a senior advisor to the RCG Holdings LLC Board.

Mark Beisler has been an employee of RED and its predecessor businesses since 1986 and most recently served as CEO of Red Mortgage Capital LLC, a position which he will continue to hold. Mike Moran served as CEO of ORIX USA's real estate business, ORIX Capital Markets, and as head of ORIX Corporate Development. Mike will maintain his corporate development responsibilities with ORIX.

# Exhibit 6



BUSINESS & FINANCE    PROPERTY MANAGEMENT    DESIGN & DEVELOPMENT    TECHNOLOGY    RESOURCES

Home > Business & Finance > Debt & Equity > Red Capita, Returns to the Fo.

Posted on: May 12, 2010    Like 0    0    0



# Red Capital Returns to the Fold

**By Jerry Ascierto**

Red Capital Group has come back to its roots as an entrepreneurial firm after being acquired by an investment group led by ORIX USA Corp. and Stonehenge Partners.

Red Capital had been the property of PNC Bank since December 2008, when PNC acquired Red Capital's parent company, National City Corp. But there was significant overlap between Red Capital and PNC's agency lending efforts, and as a result, the two units made for strange bedfellows.

"I expected that at some point, PNC would look to divest itself of Red," says William Roberts, who was named Red Capital's CEO after the transaction closed. "It never seemed to me that Red could be integrated effectively with PNC Real Estate, which, when it comes to agency executions, is organized around the business formerly known as ARCS."

Roberts founded Red Capital and served as its CEO from 1995 to 2007. And the deal's other players were also very familiar with the firm, which began life as a subsidiary of Banc One Corp. in 1990.

During his 10-year tenure at Banc One Capital Markets, Roberts worked with David Meuse, who is now a principal at Columbus, Ohio-based Stonehenge Partners. And while at Banc One, Roberts and Meuse arranged a joint venture with ORIX, called Banc One Mortgage Capital, where Roberts served as co-chairman along with Jim Thompson, who is now CEO of ORIX USA.

"The opportunity to co-invest with Stonehenge Partners in the transaction was especially meaningful as ORIX Capital Markets was at one time a joint venture involving many of the principals of Stonehenge and Banc One," Thompson says.

Now freed from PNC, the Columbus, Ohio-based Red Capital plans to expand on its deep background in seniors, healthcare, and affordable housing debt and equity transactions, including Fannie Mae, FHA, and tax-exempt bond deals. The firm currently employs about 200 individuals, with origination offices in San Diego; Newport Beach, Calif.; Chicago; Dallas; Boston; Charlotte, N.C.; Nashville, Tenn.; and Reston, Va.

"We will look to expand in certain geographies and will look to re-launch certain activities that were shuttered over the past year or two," Roberts says.

Red Capital did stay busy during its time at PNC, however. In 2009, the company processed about $1.6 billion in Fannie Mae loans, and another $417 million in FHA transactions. So far this year, Red Capital has done about $89 million in Fannie Mae and $150 million in FHA loans.

But the company hopes to ramp back up quickly and originate about $1 billion in Fannie Mae and another $1.2 billion in FHA this year. Red Capital also hopes to close more than $100 million in tax-exempt bond deals, a historical expertise, as the 4 percent tax-credit market slowly begins to see more activity after a rough couple of years.



**Jerry Ascierto**

Jerry Ascierto
at Large for the
Residential Construction Group at F
Wood. Based in the New York City a
has been covering the multifamily c
single-family industries since 2006
be reached at jascierto@hanleywoo
follow him on Twitter @JAscierto.


New Apps to
Apartments o


Catering to th
of Tomorrow

Stat of the W
Premium
Unconvention


2016's Top M
Rent Growth

Beyond Fannie Mae and FHA originations, RED will offer balance sheet executions and also plans to establish proprietary mezzanine and equity capabilities housed in two discreet funds, one focused on multifamily and the other focused on seniors and health care.

For Roberts, the transaction signifies the dawn of a new chapter for Red Capital as it returns to the fold. "Little has changed from the standpoint of office locations, people, and capabilities," Roberts says. "Yet, everything has changed, in that Red Capital returns to its independent roots, renews its entrepreneurial ... spirit, secures strong financial backing and sheds the limitations inherent in commercial banking."

Terms of the transaction were not disclosed, and a PNC spokesman said the company had no comment.

---

Keywords:

Subject:
Debt    Lenders    Mortgages and Banking    Government Entities

Location:
Columbus, OH

People:
William Roberts

Organization:
Red capital    Red Mortgage Capital    ORIX    Stonehenge Partners    PNC    Fannie Mae
Federal Housing Administration

## MORE FROM MFE



Senate Passes Condo Legislation



GOP Platform Calls for Housing Finance Revamp



Perm Loan Update: Lenders Chip Away at GSEs' Dominance



Tighten Up: Construction Loans Are Growing Constricted



Walker & Dunlop Reports Purchase of $3.8 Billion HUD Servicing Portfolio



FHA to Cut Multifamily Insurance Rates

## JOIN THE DISCUSSION

Please read our Content Guidelines before posting

    Write a comment

0 Comments                                                      Subscribe  RSS

BUSINESS & FINANCE    PROPERTY MANAGEMENT    DESIGN & DEVELOPMENT    TECHNOLOGY    RESOURCES    

Firm Rescue 2

Revamp Your Interiors With Five Fresh Products

5 Flat-Pack Furniture Companies That Might Be Cooler Than IKEA

Dream of Working From Your Backyard Fuels Brooklyn Garden Studio Trend

White Is the New Black for Luxury Real Estate

**FINANCE**

Preservation Development Partners Buys Sec. 8 Portfolio

OCCH Closes Record $306 Million Fund

Jonathan Rose to Keynote AHF Live

People on the Move 7.28.16

Michigan Awards $11.8 Million in LIHTCs

Richman Group Develops Senior Housing in California

Townhouse Construction Is Growing

It's Harder Than Ever To Find An Affordable Home

Lewis Acquires Golf Course in Rancho Cucamonga, Calif.

From Builder to Realtor

U.S. GDP Grew Just 1.2% In Q2, Far Worse Than Expected

New Home Reports $2.5 Million Profit



2016 DIGITAL EDITION

MIAMI TWICE: Developers like Shear wonder Will South Florid Resurgent Condo Market Stay :

———

Subscribe

**MULTIFAMILY EXECUTIVE Relevant Sites** | Housing Finance | eBuild | Architect | EcoBuilding Pulse | Metrostudy | residential architect

Copyright © 2016 Hanley Wood Media, Inc. All rights reserved.

About | Magazine | Contact Us | Advert

# Exhibit 7



redconnect | +1.800.837.5100

SUBMI'

**ABOUT**    FINANCING SOURCES    PROPERTY SPECIALTIES    SMALL BALANCE LOANS    LOAN SERVICING & ASSET MANAGEMENT    CONTACT

# ABOUT RED

LEADERSHIP

RESEARCH

RESOURCES

**PROPERTY SPECIALITIES**

Seniors Housing & Health Care

Multifamily Housing

Affordable Housing

Student Housing

**Newsletter**

Email address

**SUBSCRIBE**



**About RED**

Recognized for its industry expertise, innovative and comprehensive structures, and consistently high rankings, RED CAPITAL GROUP, LLC has provided over $72 billion of integrated debt and equity capital since 1990 to the seniors housing and health care, multifamily, affordable, and student housing industries through three operating divisions.

RED Mortgage Capital, LLC is a leading Fannie Mae DUS® and MAP- and Lean-approved FHA and Freddie Mac small balance lender with a mortgage servicing portfolio near $16 billion.

RED Capital Markets, LLC (Member FINRA / SIPC) is a leader in the distribution of Fannie Mae and Ginnie Mae Project MBS, and provides structuring, underwriting, placement, and advisory services for tax-exempt and taxable housing and health care bonds.

RED Capital Partners, LLC provides proprietary debt and equity solutions, and asset management in a range of forms, including subordinated gap and bridge loans. /p>



RED Capital Group, LLC is a wholly-owned subsidiary of ORIX USA Corporation. For more information on RED Capital Group, LLC, visit www.redcapitalgroup.com.

**About ORIX USA Corporation**

ORIX USA provides innovative capital solutions that clients need to propel their business to the next level. Based in Dallas, ORIX USA has a team of more than 500 employees spanning 20 offices across the U.S. and Brazil. ORIX USA and its family of companies offer investment capital and asset management services to clients in the corporate, real estate, municipal and energy sectors, while holding $6 billion of assets and managing an additional $29 billion, approximately. Its parent company, ORIX Corporation, is a Tokyo-based, publicly owned international financial services company with operations in 36 countries and regions worldwide. ORIX Corporation is listed on the Tokyo (8591) and New York Stock Exchanges (IX). For more information on ORIX USA, visit www.orix.com.

**The Face of Lending**

RED Capital Group offers comprehensive financing solutions to specialty housing properties across the country and provides industry leading loan servicing and asset management to our clients. Thanks to our access to capital resources, RED has the financial backing your property needs, no matter the scale. With more than two decades of highly specialized industry experience, the team at RED leverages their knowledge and lending industry expertise to deliver accurate and efficient results every time.

Over the past two decades, RED Capital Group has financed and supported thousands of clients and facilitated the construction, renovation, expansion or refinancing of properties throughout the nation. Among other real estate experience, RED has been recognized for:

- Originating multifamily and health care property loans guaranteed by the Federal Housing Administration (FHA) since 1991.
- Providing $6 billion in our financing pipeline since Mortgage Accelerated Processing (MAP) was created in 2001, and financing Section 221(d)(4) new construction on more than 96 multifamily properties since 2000.
- Leading in the Fannie Mae DUS® program in product development and procedural excellence, providing billions in housing capital to the multifamily housing industry since 1995.
- Shining as a top FHA Section 232 Lean lender and ranking among the top five Fannie Mae DUS lenders for seniors housing & health care.

**Financing Sources**

Combined with the $6 billion in funding on the balance sheet of our parent company, ORIX USA, RED Capital Group finances specialty housing properties by taking advantage of our partnerships with the lending industry's most respected capital sources, including:

- Balance Sheet Lending
- Bond Financing*
- Commercial Mortgage-Backed Securities (CMBS)
- Fannie Mae DUS®
- Federal Housing Administration (FHA)
- Sales & Trading*

**Property Specialties**

Since 1991, RED Capital Group's expert team of bankers and loan services has gained experience financing and managing loans for a variety of specialty housing properties. Our team is uniquely qualified to provide creative financing solutions to borrowers for:

- Seniors Housing & Health Care
  — Assisted Living Communities
  — Independent Nursing Communities
  — Skilled Nursing Facilities (SNF)
  — Continued Care Retirement Communities (CCRC)
  — Hospitals
- Multifamily Housing
- Affordable Housing
- Student Housing

For related collateral materials, click here.

**Loan Servicing & Asset Management**

RED Capital Group partners with our clients to efficiently close their loans then manage their long-term servicing. With extensive lending industry knowledge and guidance, our dedicated loan servicing and asset management team will work carefully through each detail and every step in the process. RED provides direct access to our loan servicing specialists, who will answer your most complicated financial questions. We've worked hard to earn our reputation as The Face of Lending.



**RESEARCH**
*click here...*



**RECENT EXPERIENCE**
*click here...*



**CONTACT US**
*click here...*

## THE FACE OF LENDING

**ABOUT**
Leadership
Research
Resources

**FINANCING SOURCES**
Balance Sheet
Bond Financing*
CMBS
Fannie Mae DUS®
FHA
Sales & Trading*

**PROPERTY SPECIALTIES**
Seniors Housing &
Health Care
Multifamily Housing
Affordable Housing
Student Housing

**LOAN SERVICING &
ASSET MANAGEMENT**
redconnect
**CONTACT**
Join The Team

**INSIGHTS &
NEWS**
**SITEMAP**

**+1.800.837.5100**

©2014 RED Capital Group. All Rights Reserved. Privacy Policy
*Services provided by RED Capital Markets, LLC (Member FINRA/SIPC) and its registered representatives. DUS® is a registered trademark of Fannie Mae.

# Exhibit 8

## Charlie Gower

**From:** Charlie Gower
**Sent:** Monday, February 06, 2017 10:21 AM
**To:** Austin Gower
**Subject:** FW: Your Question Regarding Form 92455M

fyi

**From:** Grantling, Jessica V [mailto:Jessica.V.Grantling@hud.gov]
**Sent:** Monday, February 06, 2017 10:19 AM
**To:** Charlie Gower <Charlie@cagower.com>
**Subject:** RE: Your Question Regarding Form 92455M

YOU ARE WELCOME☺

**From:** Charlie Gower [mailto:Charlie@cagower.com]
**Sent:** Monday, February 06, 2017 10:18 AM
**To:** Grantling, Jessica V <Jessica.V.Grantling@hud.gov>
**Cc:** Bernaciak, Thomas A <Thomas.A.Bernaciak@hud.gov>
**Subject:** RE: Your Question Regarding Form 92455M

Thank you so much. charlie

**From:** Grantling, Jessica V [mailto:Jessica.V.Grantling@hud.gov]
**Sent:** Monday, February 06, 2017 10:09 AM
**To:** Charlie Gower <Charlie@cagower.com>
**Cc:** Bernaciak, Thomas A <Thomas.A.Bernaciak@hud.gov>
**Subject:** Your Question Regarding Form 92455M

Hi Mr. Gower,

Thank you for your email questions regarding 92455M listed in the box below:

**Your Questions:**

Is the "yield spread premium" (also sometimes called rate premium, trade premium, loan premium, trade profit or premium fee) which is collected by the lender or collected by an affiliate of the lender from the sale to a third-party investor of a Ginnie Mae security (see paragraph 21(1)) required to be disclosed on HUD form 92455M?

If not required, why isn't it required to be disclosed on HUD form 92455m since it is a "Financing Charge" as defined in paragraph 21 of HUD form 92455M?

**HUD's Answer:**

In reference to your question, the answer is yes. HUD does recognize "yield spread premium," is an earned financing fee, therefore it is recorded on Form HUD-94255M Section 21, along with

the other financing charges by the MAP Lenders.  Below is an excerpt from the January 2016 MAP Guide which supports Multifamily Housing Production's procedures on loan fees.

**MAP Guide Chapter 11 Section 11.5 Loan Fees -**
11.5.A. Loan Fees. Lenders may charge loan origination and placement fees, both of which are mortgageable, and the combination of which cannot exceed 3.5% of the mortgage amount (or 5.5% for tax-exempt bond financing) for Section 223(f) refinancing transactions and new construction or substantial rehabilitation transactions. The maximum fees for Section 223(a)(7) loans is 2% for loans greater than $2 million, and up to $40,000 for loan amounts less than $2 million. In addition to loan origination and placement fees, lenders may realize trade profit (also known as marketing gain) on the sale of Ginnie Mae or other mortgage backed securities.

We appreciate your interest in our programs and glad that we were able to assist you on this matter.

Thank you.

Sincerely,


Thomas A. Bernaciak
Director Technical Support Division

# Exhibit 9

 *RED*

Red

red

COPY

**VIA ELECTRONIC MAIL**

March 26, 2013

Mr. Paul Hinman
Sun Valley Properties, LLP
P.O. Box 5809
1320 Wynnton Road
Columbus, GA 31906

RE:     Section 223(f)
        Overlook Gardens
        Macon, GA

Dear Mr. Hinman:

Enclosed please find our original application letter for the above captioned project. If you find the attached application letter acceptable, please return one (1) executed copy **to my attention at the address on this letterhead** along with your check for $19,750 on or before Wednesday, April 3, 2013.

My colleagues and I look forward to working with you on this transaction.

                        Respectfully yours,

                        **Red Mortgage Capital, LLC**


                        _____
                        Kevin M. Korn, Director

Enclosures

cc:     Scott Taccati (Trillium Capital Resources, LLC)



Red

red

APPLICATION LETTER

March 26, 2013

Mr. Paul Hinman
Sun Valley Properties, LLP
P.O. Box 5809
1320 Wynnton Road
Columbus, GA 31906

Re:   FHA Section: 223(f)                    Estimated Loan Amount: $5,249,600
      Project: Overlook Gardens              Loan Term: Approximately 35 years
      Location: Macon, GA                    Loan Amortization: Approximately 35 years
      Number of Units: 184                   Estimated Mortgage Rate: 3.50%

Dear Mr. Hinman:

  Red Mortgage Capital, LLC ("RMC") is pleased to accept your application for a loan to be insured by the U.S. Department of Housing and Urban Development ("HUD" or "FHA"), in the manner, to the extent and on the terms as are set forth below in this Application Letter.

  It is hereby agreed that RMC, as mortgagee, shall have the exclusive right to process an application to FHA (the "FHA Application") for a Firm Commitment (the "FHA Commitment") to insure a first mortgage loan (the "Loan") to be secured by the referenced project (the "Project"). As compensation for its services, you agree to pay RMC a fee (the "Origination Fee") in an amount equal to 1.00% of the Loan that FHA endorses for insurance. The Origination Fee shall be fully earned upon the issuance of an FHA Commitment on terms substantially equivalent to those you requested in the FHA Application or on terms otherwise accepted by you (in either instance, an "Acceptable FHA Commitment"). A draft of the Lender's Commitment and the General Conditions are attached to this Application Letter and are incorporated herein by reference. It is understood that this Origination Fee is earned solely for services rendered in obtaining an Acceptable FHA Commitment. The Origination Fee shall be due and payable on the first to occur of (a) the date FHA endorses the loan for insurance (the "Closing Date") or (b) the sixtieth (60th) day subsequent to the date of an Acceptable FHA Commitment.

  In addition to the Origination Fee, RMC will require an application fee (the "RMC Application Fee") equal to $19,750 payable upon your acceptance of this Application Letter. The RMC Application Fee includes a $5,000 non-refundable processing retainer which will be applied against the Origination Fee and/or RMC's actual costs (as defined below), when due. The transaction has the following *estimated* processing costs:

|  |  |
|---|---|
| $7,800 | Appraisal |
| $3,600 | Physical Needs Assessment (Engineering Reports) |
| $2,550 | Environmental Site Assessment (including HUD 4128) |
| $800 | Other (Permits & Approvals) |
| $5,000 | RMC Processing Retainer |
| $19,750 | Total |

  Actual amounts payable to third party providers in excess of the above estimated amounts, if any, shall be paid by the Borrower. Unexpended funds (other than the RMC Processing Retainer, which shall be earned upon our receipt of this Application Letter) will be returned or credited to you at the time of loan closing. You shall also be responsible for paying (or reimbursing RMC for) the following costs and expenses:

Overlook Gardens
March 26, 2013
Page 2 of 3

(i)      All application fees to FHA prior to RMC submitting the FHA Application to HUD;

(ii)     The cost of third party reports not listed above, if applicable, prior to ordering of these reports by RMC;

(iii)    Other out-of pocket costs and expenses, such as credit reports, inspection costs, and the like (the "Actual Costs"), estimated by RMC not to exceed $7,500; and

(iv)     Costs and expenses associated with closing the Loan, e.g., title insurance premiums, survey costs, attorney fees, etc., all of which will be estimated and/or quantified subsequent to the issuance of an Acceptable FHA Commitment.

You will be called upon to provide certain information and documentation in support of the FHA Application. You are responsible for all costs and expenses incurred in obtaining and providing that information and documentation.

If for any reason (a) FHA fails to issue an Acceptable FHA Commitment or (b) you terminate this Application Letter or otherwise instruct us to withdraw your FHA Application; you nonetheless shall (i) pay or reimburse RMC for Actual Costs; (ii) abandon the pursuit of FHA mortgage insurance for the project and (iii) forfeit the RMC Processing Retainer identified above. If, upon issuance of an Acceptable FHA Commitment, you fail or refuse to close the Loan, for any reason, you nonetheless shall pay (i) the Origination Fee to RMC and (ii) Actual Costs. The foregoing amounts shall be immediately due and payable upon your receipt of an itemized billing from RMC, time being of the essence.

While we cannot guarantee the results of our efforts, nor that FHA will actually issue an Acceptable FHA Commitment, based upon the information you have provided to us, current market data, the criteria generally applied by FHA, and our experience in financings of this nature, we believe it reasonable to expect that FHA will issue an Acceptable FHA Commitment.

It is understood and agreed that the undertaking RMC has agreed to in this Application Letter and your payment of the fees described herein, does not obligate RMC or any of its affiliates to make a loan to you or to assure the issuance of an Acceptable FHA Commitment. RMC's sole obligation hereunder is to provide the services that we have described.

You understand that the mortgage rate at which your FHA Application is processed may or may not be the applicable mortgage rate at the time of funding. If FHA issues an Acceptable FHA Commitment, it is agreed that RMC shall have the exclusive right to fund and service the Loan. Prior to funding the Loan, RMC shall provide you with "Pricing Terms" (mortgage interest rate, prepayment provisions, etc.) for your consideration. If and when those Pricing Terms are formally accepted by you and RMC, RMC will issue a Confirmation Letter describing and confirming the Pricing Terms.

Unless required by law or legislative process, neither this Application Letter, any of the information contained herein, any financial or other advice rendered by RMC pursuant hereto, nor any of the terms hereof may be disclosed by you or your representatives to any competitor or potential competitor of RMC, to any client or potential client of RMC, or to any other party (except to representatives of HUD) in any manner without the prior written approval of RMC.

Nothing in this Application Letter creates or is intended to create a joint venture or any agency or fiduciary relationship, duty or obligation between the parties.  Borrower hereby agrees and acknowledges that the commitments and services of RMC are being provided as an independent contractor at arm's length.

This agreement shall be binding upon the heirs, successors and assigns of the parties and upon the successors to and assigns of the FHA Commitment and the real property site to which it pertains. The parties have made and executed this agreement in exchange for the mutual commitments made herein. By executing this

Overlook Gardens
March 26, 2013
Page 3 of 3

COPY

Application Letter, you represent that the mortgagor has the power and authority to enter into this Application Letter and the Loan. The mortgagor is under no obligation to any other mortgagee or other prospective lender with respect to the transactions contemplated by this Application Letter. If you sell the Project or any interest therein, it is agreed that any rights RMC has hereunder will be honored and assumed by the acquiring party.

Borrower hereby gives permission to RMC to issue press releases and advertising relating to the Loan and RMC's participation in the transaction. Such media and marketing materials may include, among other things, information about the location of the Property, the number of units, the amenities associated with the Property, and the Loan terms (including economic terms such as the interest rate and amortization terms).

If this agreement is acceptable to you, please so indicate below and return one (1) originally executed copy of this agreement to us on or before Wednesday, April 3, 2013, along with your check in the amount of $19,750 for the RMC Application Fee made payable to Red Mortgage Capital, LLC. These funds will be applied against the Origination Fee and/or RMC's "Actual Costs", which will be due to RMC as described earlier in this agreement. We look forward to working with you in this endeavor.

Sincerely,

**Red Mortgage Capital, LLC**

By: _____
         Kevin M. Korn, Director

**AGREED AND ACCEPTED BY:**

OVERLOOK GARDENS PROPERTIES, LLC, a
  Georgia limited liability company

By SUN VALLEY PROPERTIES, LLP, a Georgia
  limited liability partnership, its sole member

By _____
  Charles A. Gower, Partner

By _____
  Kelsey Kennon, Partner

Date: _MAR 28, 2013_

FHA-Standard 2.28.11

**DRAFT**

LENDER'S COMMITMENT LETTER

Date


Name
Address
City, State Zip

Dear :

  We are in receipt of a Firm Commitment for mortgage insurance (the "FHA Commitment") from the Department of Housing and Urban Development ("FHA"), a copy of which is attached hereto as Exhibit 1. This letter (the "Commitment Letter" or "Lender's Commitment") constitutes the commitment of **Red Mortgage Capital, LLC**, a Delaware limited liability company (the "Lender") to make the below described loan (the "Loan") to the below described Borrower (the "Borrower"), which FHA has committed to insure, pursuant to the FHA Commitment, on the terms and conditions set forth herein and in the Exhibits that are identified below, attached hereto and are incorporated herein as an integral part of this Commitment Letter.

  A.  The following specific information is incorporated herein:

| | |
|---|---|
| Borrower Name: | _____ |
| Borrower Address: | _____ |
| Project Name: | _____ |
| Project Address: | _____ |
| FHA Project No. | _____ |
| Estimated Loan Amount: | $ _____ |
| Processed Interest Rate: | ____% |
| Section of the National Housing Act under which the Loan is to be insured | Section _____ |
| Loan Term: | _____ |
| Origination Fee: | _____ % of Loan Amount |
| Good Faith Deposit: | 0.50 % of Loan Amount |

  B.  The following describes the procedures pursuant to which the final loan amount and final interest rate will be determined:

Name of Borrower
Date
Page 2 of 4

(1)     FHA processed the Loan and issued the FHA Commitment on the basis of the Processed Interest Rate. The Processed Interest Rate is an assumed rate that may or may not be the final interest rate (the "Final Interest Rate") upon which the Loan will be made by the Lender and insured by FHA. To the extent that the Final Interest Rate is higher or lower than the Processed Interest Rate, the Loan amount may have to be adjusted to reflect the debt service requirements of the Final Interest Rate. Once the Final Interest Rate is established, it is likely that the Lender will have to obtain an amendment to the FHA Commitment, which amendment will reflect, among other things, the Final Interest Rate, a revised Loan amount and revised Loan payment terms. Although FHA will consider the effect of such Final Interest Rate upon debt service requirements, Lender is solely responsible for the determination of such Final Interest Rate. The Lender shall not be obligated to make the Loan until this amendment to the FHA Commitment has been issued.

(2)     The Borrower understands that changing conditions in the financial market will impact upon the Final Interest Rate and the "Pricing Terms" of the Loan. Upon direction from the Borrower and the prior receipt by the Lender of the "Good Faith Deposit" described below, the Lender shall offer Pricing Terms to the Borrower in the form of a "Rate Lock Letter". These Pricing Terms shall include but not be limited to an interest rate, discount points, prepayment penalties and restrictions and extension fees. Upon receipt of the Rate Lock Letter, the Borrower may accept or reject the Pricing Terms described in the Rate Lock Letter. If the Borrower elects to accept those Pricing Terms, the Borrower shall evidence that acceptance by executing and returning a duplicate copy of the Rate Lock Letter to the Lender, which acceptance shall be binding and irrevocable and constitute the Borrower's agreement to a mandatory closing obligation, in the event that the Lender is able to confirm the Pricing Terms. Upon the receipt by the Lender of this fully executed and accepted Rate Lock Letter, the Lender shall use its best efforts to confirm those Pricing Terms, i.e., notwithstanding its acceptance of the Rate Lock Letter, the Borrower understands and agrees that the Pricing Terms are not final, nor binding on the Lender, until such time as the Lender issues to the Borrower its "Confirmation Letter", which Confirmation Letter, and only this Confirmation Letter, shall constitute the final and binding agreement between the Borrower and the Lender as to the Pricing Terms that will apply to the Loan.

(3)     It is a condition precedent to the Lender's obligation to offer Pricing Terms, i.e., issue its Rate Lock Letter to the Borrower, that the Borrower first remit to the Lender, in immediately available funds, the "Good Faith Deposit" in an amount stated in Section A above. In the event that either (a) Pricing Terms are not accepted by the Borrower, i.e., the Borrower never accepts the Rate Lock Letter or (b) the Lender is unable to confirm the Pricing Terms evidenced by the issuance of its Confirmation Letter, then the Good Faith Deposit shall be returned to the Borrower. If the Rate Lock Letter is accepted by the Borrower and a Confirmation Letter is issued by the Lender, then the Good Faith Deposit will be (i) forfeited in the event the Loan is not funded or (ii)

Name of Borrower
Date
Page 3 of 4

returned to the Borrower in the event the Loan is funded on the basis of the Pricing Terms described in the Confirmation Letter and upon RMC's receipt of the GNMA mortgage backed securities ("MBS") obtained for the Loan (usually within 30 days of the Closing).

     C.    The Borrower agrees to the following deposits, fees and expenses:

        (1).    The Borrower shall pay to the Lender, in immediately available funds:

           (a)    The Good Faith Deposit;

           (b)    The Origination Fee;

           (c)    Any extension or other fees and deposits required pursuant to the terms of the Confirmation Letter;

           (d)    An amount sufficient to reimburse the Lender for the costs and expenses incurred in issuing the GNMA mortgage backed securities, if applicable (estimated at $_____);

           (e)    The amount of the Lender's legal fees (estimated at $_____); and

           (f)    The Lender's out-of-pocket costs and expenses, such as credit reports, inspection costs, courier and copying charges, and the like (estimated not to exceed $7,500).

        (2).    In addition to the deposits, fees and expenses itemized above, the Borrower shall also pay all costs and expenses for such normal closing items as title insurance premiums and charges, recordation and filing fees, FHA fees, deposits and mortgage insurance premiums, Borrower legal fees, survey costs and the like.

     The following Exhibits are attached hereto, incorporated herein and made a part hereof:

     1.    Exhibit 1:    FHA Commitment

     2.    Exhibit 2:    General Conditions to Lender's Commitment

     3.    Exhibit 3:    Special Conditions to Lender's Commitment

     4.    Exhibit 4:    Form of Rate Lock Letter

Name of Borrower
Date
Page 4 of 4

If this Lender's Commitment is acceptable to you, please execute a duplicate copy of this Commitment Letter in the space provided below, initial the first page of each Exhibit attached hereto and return this Commitment Letter to the undersigned, along with a **Good Faith Deposit in the amount of $**_____. This Lender's Commitment shall expire and be of no further force and effect if it is not executed and returned to the Lender along with the **Good Faith Deposit by 3:00 p.m. on** _____.

The Borrower acknowledges that this Commitment Letter is a commitment from a Lender to make a loan to a Borrower and describes the terms under which a debtor-creditor relationship will be established in this transaction. Nothing in this Commitment Letter, creates or is intended to create a joint venture or any agency or fiduciary relationship, duty or obligation between the parties. Borrower hereby agrees and acknowledges that the commitments and services of RMC are being provided as an independent contractor at arm's length.

We appreciate the opportunity to participate with you in this financing and look forward to a successful closing of the transaction as described by this Lender's Commitment.

Very truly yours,

**Red Mortgage Capital, LLC**

By: _____
           Name, Title

**ACCEPTANCE:**

The undersigned hereby accepts the foregoing Lender's Commitment and agrees to (i) perform all of the Borrower obligations contained therein; (ii) be bound by all of the terms, provision and conditions thereof; and (iii) cause the transactions that are described therein to be consummated at the earliest possible date.

[Borrower Name]

By: _____

Name: _____

Date: _____

## EXHIBIT 2

## GENERAL CONDITIONS TO
## LENDER'S COMMITMENT
## FOR FHA INSURED FINANCINGS

These General Conditions are incorporated in and form an integral part of the Lender's Commitment to which they are attached. These General Conditions constitute conditions precedent to the Lender's obligations to make the Loan described in the Lender's Commitment (the "Lender's Commitment").

1.      **FHA Commitment**. The FHA Commitment and all amendments thereto, that have been issued as of the date of the Lender's Commitment, are attached to the Lender's Commitment as Exhibit 1. All obligations imposed on the Borrower and all conditions precedent to FHA's obligation to insure the Loan pursuant to the FHA Commitment are incorporated herein and made a part hereof.  Any and all Amendments to the FHA Commitment (issued or to be issued) shall be incorporated into and made a part of this Commitment.

2.      **HUD Mortgage Insurance**. The Loan described in the Lender's Commitment shall be evidenced by a Mortgage or Deed of Trust Note (the "Note") on a form prescribed by the Secretary of Housing and Urban Development ("FHA" or "HUD"). It is a condition precedent to the Lender's obligation to make the Loan evidenced by the Note that the Note first be endorsed for mortgage insurance by HUD (the "Endorsement").

3.      **HUD Requirements**. The Borrower and the Project shall be and remain in full compliance with all HUD requirements both at the time of Endorsement and for the full term of the Loan. These HUD requirements include but are not limited to requirements set out in the (a) National Housing Act, as amended from time to time (the "Act"); (b) the applicable HUD Regulations that implement the Act; (c) the FHA Commitment; and (d) rules, instructions and administrative requirements imposed on the Project and the Borrower by HUD.

4.      **Borrower**.  The Borrower shall be a duly authorized, single purpose, single asset entity organized and in good standing both in its organizational jurisdiction (the "Organizational Jurisdiction") and the jurisdiction in which the Project is located (the "Property Jurisdiction").

5.      **Loan Amount**.  The Loan amount set out in both the Lender's Commitment and the FHA Commitment is subject to adjustment at the time the final interest rate is established, pursuant to the "Rate Lock" procedures described in the Lender's Commitment.

6.      **Term**. The term of the Loan shall be the term described in the FHA Commitment.

7.      **Amortization**. The Loan shall commence amortization at the time set forth in the FHA Commitment, which Loan shall fully amortize over the term of the Loan.

8.      **Interest Rate**. The interest rate on the Loan will be finally determined pursuant to the Rate Lock procedure described in the Lender's Commitment. Interest shall be calculated

on the daily outstanding principal balance of the Loan and shall be paid monthly, in arrears, commencing on the first day following the date of Endorsement.

9.      **Prepayment Restrictions and Rights; Late Payment Penalties**.  The Note shall be subject to such prepayment restrictions as shall be contained in the Confirmation Letter and prepayment rights as shall be required by HUD. All Note payments are due on the first (1st) day of the month. A late payment penalty, in the amount of two percent (2%) of the delinquent payment, becomes due on all payments received after the [tenth (10th)(Multifamily) / fifteenth (15th) (LEAN)] day of the month.

10.      **Collateral for Loan**.  The Loan shall be collateralized and secured by a first mortgage lien on the land, improvements and fixtures that constitute the Project, as well as by a first lien security interest in all Borrower and Project personal property, inclusive of funds, and accounts receivable.

11.      **Prohibition on Secondary Financing**.   The Borrower shall not have any indebtedness other than the Loan. Accordingly, all secured or unsecured Borrower or Project borrowings are strictly prohibited.

12.      **GNMA Funding**.  The Lender reserves the right, at its election, to securitize and fund the Loan by the issuance of GNMA mortgage backed securities.

13.      **Loan Documents**.  The Loan will be documented and evidenced by such loan documents as shall be required by FHA or the Lender and shall include, but not be limited to the Note, a Mortgage or Deed of Trust, a Regulatory Agreement between the Borrower and FHA, a Security Agreement, UCC Financing Statements, possible Escrow Agreements of various kinds, a Lender's Title Insurance Policy with certain required Endorsements, ALTA survey, property and liability insurance policies,  a flood insurance policy (if applicable), evidence of utility availability and zoning compliance, along with a HUD promulgated form of Borrower's attorney's opinion. A final list of required Loan Documents and exact title and survey requirements will be provided to the Borrower by the Lender's counsel. All Loan Documents must be acceptable to HUD, the Lender and their respective legal counsel.

14.      **Letters of Credit**.  In the event that one or more letters of credit are required by FHA and/or the Lender, as will be set forth in the FHA Commitment and/or the Lender's Commitment, such Letters of Credit must be unconditional, irrevocable and issued on the exact form promulgated by GNMA for use in transactions of this nature. The issuer of the Letter of Credit is subject to the credit approval of the Lender.

15.      **Insurance**.

The Borrower shall provide the Lender with:

A.      Property and Liability Insurance.  An "all perils" hazard insurance policy which meets all Lender and FHA requirements. All policies must also contain endorsements providing that (i) the policy cannot be cancelled without thirty (30) days' prior written notice to

the Lender and (ii) insuring compliance with all co-insurance requirements. Any zoning non-conformance uses must be insured by a "law and ordinance" endorsement insuring against demolition and increased cost of construction risks.

B.    Rent Loss.  Rent loss or business interruption insurance covering not less than twelve (12) months of total Project income.

C.    Flood Insurance.  As applicable, in form and content satisfactory to the Lender and FHA.

D.    Professional Liability Insurance.  As applicable for health care facilities, in form and content satisfactory to the Lender and FHA.

Blanket policies covering more than one property or operator shall be subject to review and approval by the Lender, which approval may be granted or withheld in the sole determination of the Lender.

16.    **Closing and Endorsement.**

A.    Upon satisfaction of each and every condition precedent contained in the FHA Commitment and the Lender's Commitment, the Lender shall schedule a "Closing" with FHA to be held at the FHA Area Office on a mutually agreeable date (the "Closing Date"). The Closing Date shall be not later than (a) the fifth (5th) business day prior to the expiration of the FHA Commitment, as that date may be extended by FHA; (b) the date the Lender determines to be the date that Closing must be effected in order to meet the loan delivery date or otherwise satisfy the time constraints described in the Confirmation Letter (the earliest of such date being the "Closing Deadline"). Depending on the terms of the Confirmation Letter, it may be possible to extend the Closing Deadline by payment of a monthly extension fee, the amount and other terms of which will be set forth in the Confirmation Letter.

B.    In the event that the Closing does not occur by the Closing Deadline (as that Closing Deadline may be extended pursuant to subparagraph A above), the Borrower shall have breached its mandatory closing obligation and, accordingly, shall forfeit all moneys previously paid to the Lender, including, but not limited to, the Good Faith Deposit (which forfeiture shall NOT constitute Liquidated Damages) and the Borrower shall be liable to the Lender for such other and additional damages as the Lender shall have suffered or incurred as a result of this breach by the Borrower of its mandatory closing obligation.

C.    Lender shall be represented by the Law Firm of [Vorys, Sater, Seymour and Pease LLP]/[Krooth and Altman & Altman LLP], which firm shall conduct the Closing, prepare and review the Loan Documents and represent the Lender in all matters relating to the Loan. You will be contacted directly by the attorney handling this transaction.

D.    The following are additional and specific conditions precedent to Closing:

1.  The FHA Commitment must be in full force and effect;

2. The Borrower and all of its principals must be in full compliance with all FHA requirements;

3. The Confirmation Letter must have been issued and be in full force and effect; and

4. All amounts then due the Lender hereunder must have been paid.

17. **Financial Information**. The Borrower shall provide the Lender, during the entire term of the Loan, with annual audited financial statements of the Project, prepared by an independent CPA in accordance with FHA requirements, which statements must be submitted in a timely manner at the time set forth in the Loan Documents, time being of the essence. Upon request, the Borrower shall also provide the Lender with copies of interim financial statements, operating reports, rent rolls and other financial information routinely prepared by or for the benefit of the Borrower in the ordinary course of its business. The Borrower shall maintain its books and records, all of which shall be subject to Lender inspection upon reasonable notice, in full compliance with FHA requirements.

18. **Project Inspections**. The Lender shall cause site inspections of the Project to be performed in accordance with FHA regulations and requirements. The results of these inspections may be provided to FHA and to other parties with a financial interest in the Loan. The Borrower shall cooperate and assist the Lender in these inspections. The Lender shall also perform inspections related to reconstruction and restoration following condemnation or a casualty. The Borrower shall reimburse the Lender for its reasonable corporate and third-party expenses related to these latter inspections.

19. **FHA Debentures**. The Borrower agrees that the Lender has the option of paying FHA mortgage insurance premiums with FHA Debentures the Lender may own or acquire and the Borrower shall assert no claim to any benefit the Lender may achieve by the use of such Debentures.

20. **Borrower Representations and Warranties**. The Borrower represents and warrants to the Lender that:

A. The Borrower is duly organized, existing and in good standing in both the Organizational Jurisdiction and the Property Jurisdiction.

B. The Borrower has full authority to execute and deliver the Lender's Commitment and to perform all of the obligations contained therein and in the FHA Commitment.

C. The Lender's Commitment evidences the Borrower's valid, binding and enforceable agreement.

D.     Neither the execution of the Lender's Commitment, nor the consummation of the transactions described herein and in the FHA Commitment violate the Borrower's organizational documents and authorizations or any other contract, agreement, covenant judgment, order, law, rule or regulation by which it may be bound.

21.     **Brokerage Indemnification**. Unless otherwise stated in the Commitment Letter to which these General Conditions are attached, the Borrower and Lender represent to each other that neither have engaged nor have any financial liability for the services of a broker or third party who was instrumental in the issuance of the Lender's Commitment or the FHA Commitment and each holds the other harmless from and against any claims, demands and liabilities for any brokerage or similar fees which arise under an asserted contractual arrangement with the party against whom this indemnification is sought.

22.     **Use of Funds**. Borrower agrees that, subject to the Lender's obligation to hold and apply funds in accordance with FHA requirements and the Loan Documents, once it makes payment to the Lender or its agent (or the Lender receives payment on behalf of the Borrower) for interest, principal, escrows, deposits, late fees, prepayment penalties or otherwise in connection with the Loan, the Borrower thereafter has no right, title or interest whatsoever (either directly or indirectly) to receive any benefits which may accrue to the Lender or any other party as a result of its having received, exchanged, or otherwise sold such funds, securities or other valuables in connection with the Insured Loan.

23.     **Additional Services**.  The Lender's scope of services are strictly limited to those set forth in the Lender's Commitment and the compensation the Lender receives hereunder is solely to compensate the Lender for this limited scope of services. Any additional services the Lender is called upon to provide, e.g., processing a mortgage loan increase, participation in the resolution of post-Closing problems with HUD or other parties to the transaction, shall be the subject of a separate retainer agreement and separate and additional compensation.

24.     **Assignment and Waiver**.  This Lender's Commitment when executed by the parties hereto, and the Confirmation Letter, when issued by the Lender, contains the complete and entire terms, conditions and understandings of the parties hereto of the Lender's agreement to provide the Loan as indicated, and no changes will be recognized as valid unless they are reduced to writing and similarly executed. No specific waiver of any of the terms hereof shall be considered as a general waiver.  This Commitment may not assigned by the Borrower without the written consent of the Lender.  The Lender may assign this Commitment to an assignee that is financially capable of performing the Lender's obligations hereunder in accordance with the express terms hereof.

25.     **Interpretation.**

A.     In this Commitment, unless the context otherwise requires, any certificate, letter or opinion required to be given pursuant to this Commitment shall mean a signed document attesting to or acknowledging the circumstances, representations, opinions of law or other matters therein stated or set forth.

B.      Nothing in this Commitment expressed or implied is intended or shall be construed to confer upon, or give to, any person, other than the Lender and the Borrower any right, remedy or claim under or by any reason of this Commitment or any covenants.  Promises and agreements herein contained by and on behalf of the Lender shall be for the sole and exclusive benefit of the Borrower.

C.      If any one or more of the covenants or agreements provided herein on the part of the Borrower to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Commitment.

D.      The Borrower agrees to comply with all applicable FHA Requirements in connection with the Project.

26.     **Applicable Law**.  By its acceptance of the Lender's Commitment, the Borrower agrees that (a) it shall be deemed to be a contract entered into pursuant to the laws of the State of New York; (b) any action brought hereunder shall only be brought in the federal or local courts located within Dallas County, Texas; and (c) the rights and obligations of the parties shall be determined in accordance with applicable federal law and, to the extent that State law applies, the law of the State of New York pursuant to Section 5-1401 of the New York General Obligations Law without regard to principles of conflicts of laws.

27.     **Prior Agreement**.   This Lender's Commitment supersedes any previous or contemporaneous, written or oral, agreement or understanding between the Borrower and the Lender relative to the transactions that are the subject of the Lender's Commitment and the FHA Commitment.

28.     **Severability**.  If any one or more of the provisions of  the Lender's Commitment shall be contrary to law or otherwise unenforceable, such provision(s) shall be deemed severed herefrom and shall not affect the validity and enforceability of the balance of the Lender's Commitment.

29.     **No Material Adverse Change; Lender's Right to Terminate**.  The Lender may terminate the Lender's Commitment at any time, in its sole discretion, without liability or obligation to the Borrower of any kind, upon a good faith determination by the Lender that, subsequent to the date of the Lender's Commitment, (i) it obtains information that makes previous information given to it by or on behalf of the Borrower, its principals or the Project materially inaccurate or misleading; (ii) there has been a material adverse change in the financial condition of the Borrower or its principals; (iii) there has been a material adverse change in real estate market conditions affecting the Project or in the estimated value of the Project; (iv) the Lender obtains information that would have a material and adverse affect on the amount of the Loan or the conditions under which the FHA Commitment was underwritten or issued; and/or (v) there have been changes or modifications in the FHA, GNMA or other statutory, regulatory or administrative requirements which result in additional Lender costs and expenses or materially

and adversely affects the Lender's ability or willingness to make the Loan under the terms of the Lender's Commitment and/or the FHA Commitment.

30.     **Right of Set-Off**.  The Lender shall have the right to set-off any amounts that may be due and owing to the Lender by the Borrower (and any Guarantor(s)) hereunder against (i) interest earned on deposits or investments made by the Lender on behalf of the Borrower; (ii) any deposit held by the Lender in connection with a requirement of FHA, but only after either (x) said deposit is no longer required under the FHA closing document to which it pertains or (y) said deposit has been approved by FHA for return to the Borrower or other party providing the same; and (iii) any refund or reimbursement of any other monies to which the Borrower or any Guarantor may be entitled.

31.     **Inconsistencies**.  In the event of any inconsistencies between the terms   and conditions of this Lender's Commitment (inclusive of all Exhibits) and the terms   and conditions of the FHA Commitment or of the Loan Documents, the terms and conditions of the FHA Commitment or the Loan Documents shall supersede the terms and conditions of this Commitment.  Notwithstanding anything in this Commitment to the contrary, any requirements necessary to conform to the terms of the FHA Commitment or to secure the issuance of the Certificates, though not specifically mentioned herein, shall be deemed a requirement hereunder.

32.     **Survival**. All of the terms and provisions set forth in this Commitment shall survive Final Endorsement and shall continue in full force and effect until the Lender shall have received payment in full of the Loan, and all interest thereon, all fees due and payable from the Borrower as set forth in this Commitment, and all other sums provided for in the Loan Documents.

33.     **Borrower's Obligation to Close**.  The Lender is extending this Commitment to the Borrower in reliance upon the Borrower's representation that the Borrower will effectuate the Closing of the Loan.  Should the Borrower fail to effectuate the Closing of the Loan, or close a mortgage loan for the Project with any other lender, then the Borrower and the Guarantor(s) shall be fully liable for all actual damages sustained by the Lender and the Investor in the event of such failure.

## RATE LOCK LETTER

Date

Name
Company
Street Address
City, State ZIP

Re:     Project Name
        Location

Dear _____:

      At your request and pursuant to the terms, conditions and procedures described in the Lender's Commitment for the referenced Project, **dated _____**, Red Mortgage Capital, LLC ("RMC") is irrevocably authorized to lock the Pricing Terms for the loan as set forth in the text and in Attachment A hereto. This Rate Lock Letter can be executed up to and including _____**p.m. on _____**, at which time this Rate Lock Letter will terminate. Once executed, returned to and received by RMC, this Rate Lock Letter will supersede and terminate any Rate Lock Letter(s) that may have been executed previously in this transaction.

      If RMC is able to provide the Pricing Terms set forth in Attachment A to this letter, which attachment is incorporated herein by reference, RMC will issue to you the Confirmation Letter. Provided that RMC issues the Confirmation Letter, you will be unconditionally obligated to close the Loan on the Pricing Terms within the time constraints set out in the Confirmation Letter and the Lender's Commitment. In the event you fail or refuse to do so, you shall be subject to the liabilities and forfeitures described in the Lender's Commitment, including but not limited to the forfeiture of the Good Faith Deposit and all sums previously paid to us, which forfeitures shall not constitute liquidated damages.

      You understand that RMC's ability to confirm Pricing Terms set forth in this Rate Lock Letter is subject to constantly changing market conditions. Accordingly, by our acceptance of this Rate Lock Letter, RMC is not representing that the Pricing Terms can or will be provided.  You acknowledge that this Rate Lock Letter may only be amended by a written document executed by both you and RMC.

      Nothing in the Engagement Letter, the Application Letter, the Lender's Commitment or this letter creates or is intended to create a joint venture or any agency or fiduciary relationship, duty or obligation between the parties.  Borrower hereby agrees and acknowledges that the commitments and services of RMC are being provided as an independent contractor at arm's length.

      Based upon the foregoing, please authorize RMC to proceed by (i) signing below; (ii) initialing each page of Attachment A; (iii) faxing one copy to the attention of_____ *or calling 614 857-xxxx*; and (iv) mailing one executed original to the attention of the undersigned, for our records.  By execution hereof, you agree that the fax copy constitutes an irrevocable authorization to proceed, upon which RMC may unconditionally rely.

                      Sincerely,

                      **Red Mortgage Capital, LLC**


                      By: _____
                          Edward H. R. Tellings, Senior Managing Director

AGREED AND ACCEPTED:

By:     Name of Borrower

By:     _____

Name:   _____

Date:   _____

Revised 9.15.10

ATTACHMENT A
TO RATE LOCK LETTER
Taxable Refinance/Acquisition

- Project Name:

- FHA Project Number:

- Project location:

- Type of Project:                        Apartments

- Borrower:

- FHA Program:

- Loan Amount:                           $_____

- Mortgage Term:                         ____ months

- Amortization Period:                   ____ months

- Interest Rate:                         _____ % (does not include M.I.P.)

- Interest Rate Convention:              30/360

- Initial/Final Endorsement Deadline:    _____, 2010 (the "Closing Deadline")

- Prepayment Penalty:                    The loan cannot be prepaid for a period of TBD years from
                                         Commencement of Amortization, thereafter, the Loan
                                         can be prepaid beginning in year TBD at TBD%, declining TBD% per year.

- Closing Deadline Date and
    Extension Fees:                      The Closing Deadline Date can be extended, at the sole discretion of the
                                         Lender and subject to the provisions of the Loan Commitment, up to three
                                         (3) extensions of 30 days each for an extension fee equal to three-eighths of
                                         one percent 0.375%) of the Loan Amount for each 30 day extension.  After
                                         three extensions, our obligation to fund the Loan on these terms shall
                                         terminate.

- Good Faith Deposit Required:           0.50% ($_____)

Remainder of this page blank except for initials below

Borrower or Sponsor's Initials _____

Revised 9.15.10

# Exhibit 10

# RED CAPITAL GROUP, LLC

Comprehensive capital provider
to the multifamily, affordable,
student and seniors housing and
health care industries.



Two Miranova Place_Columbus, Ohio_43215
t 614.857.1400_toll free 800.837.5100_f 614.857.1660
www.redcapitalgroup.com

Offices: Columbus, OH_Charlotte, NC_Chicago, IL_Dallas, TX
Dana Point, CA_Fairfield, CT_Reston, VA_Salem, OR_San Diego, CA

©2012 RED CAPITAL GROUP, LLC (11/1/12)  COR-BR-001

redcapitalgroup.com

red capital group

# THE FACE
## OF LENDING



# THE FACE OF LENDING

RED views our clients as partners, not transactions. We guide our clients through the complex details of the loan process drawing from a wealth of financing sources to help build the most advantageous solution for each client. And we don't stop there. RED continues to deliver premium in-house loan servicing and asset management for our clients for the life of the loan.

Like few in the industry, RED Capital Group acts as both a lender and as a broker-dealer through our subsidiary, RED Capital Markets, LLC (Member FINRA/SIPC). Bringing all the pieces together in a straightforward solution helps our clients focus on what's most important for their business.

Finding the right solution for our clients is our guiding principle. At RED, we believe that we don't succeed until our clients do.

RED Capital Group is a direct provider of debt and equity capital to a variety of specialized property industries, including:

- Seniors Housing & Health Care
- Multifamily Housing
- Affordable Housing
- Student Housing

For more than two decades, RED has forged lasting relationships with our clients by delivering creative financing solutions and managing every aspect of their loan as if it was our own. We've earned our reputation as The Face of Lending.



## AFFORDABLE HOUSING

With our extensive multifamily background, decades of affordable housing experience, and strong partner relationships, we are uniquely positioned to provide comprehensive debt and equity capital for affordable housing properties nationwide. Properties qualifying for affordable housing financing are rent-restricted and subsidized by local, state and federal government. We work closely with non-profit organizations, public entities and for-profit sponsors to devise customized capitalization that helps our clients secure the most profitable financing available. RED has worked with borrowers and issuers across the country to develop financial packages in the form of:

- Bond Financing*
- Construction Financing
- Permanent Financing

## STUDENT HOUSING

RED Capital Group's mortgage and investment banking subsidiaries, RED Mortgage Capital, LLC and RED Capital Markets, LLC, provide debt and equity capital to facilitate financing of student housing properties throughout the country. RED provides a wealth of industry experience along with a premier network of lenders to deliver to our clients the most advantageous financing available.

redcapitalgroup.com
+1.800.837.5100



> **RED has built our industry leadership from a strong financial foundation.**

### FANNIE MAE DUS®

RED Capital Group is an approved Fannie Mae Delegated Underwriting and Servicing (DUS®) mortgage lender. We underwrite, fund and service first and second lien mortgage loans, structure credit facilities, and provide bond credit enhancement for properties and communities nationwide.

### FEDERAL HOUSING ADMINISTRATION (FHA)

**RED financed more than $2.2 billion in FHA loans in 2013 alone.**

RED Capital Group originates multifamily and seniors housing & health care mortgage loans guaranteed by the Federal Housing Administration (FHA). Since closing its first project loan in 1991, RED Mortgage Capital has consistently been recognized as a top lender for FHA Section 232 Lean loans for health care facilities, and has gained significant experience as a MAP-approved lender with Section 221(d)(4) new construction, having financed more than $2.2 billion in FHA loans in 2013 alone.

### SALES & TRADING*

RED's full service Sales & Trading Desk, a registered broker/dealer, sells directly to institutional accounts, thus providing you with the best available price and execution. Our dedicated professionals are involved on a daily basis in the underwriting, distribution, remarketing and trading of both rated and non-rated securities.

redcapitalgroup.com
+1.800.837.5100



## MORTGAGE BANKING SERVICES FOR CORRESPONDENTS

RED is proud of the relationships we build with our clients and respects the relationships our clients have built with their borrowers. Our dedicated team of bankers will work with you to build a partnership that best fits your needs. Each partnership we build is unique. Our level of involvement and the specific services that we provide can be set up to be as transparent or as client facing as you feel is appropriate. At RED, we don't succeed until you do. RED's mortgage banking solutions and services include:

- FHA Insured Loan Funding and Servicing
- GNMA and Fannie Mae MBS Distribution
- Loan Warehousing for FHA and Fannie Mae Loans

- FHA MAP & Lean Loan Processing and Underwriting Assistance
- Fannie Mae Loan Options
- Bridge and Acquisition Loans
- Multifamily Market Research



**You worked hard to build your business and customer relationships. Now is not the time for costly or time consuming mistakes.**

redcapitalgroup.com
+1.800.837.5100



# KNOWLEDGEABLE, PROFESSIONAL, AND AT YOUR SERVICE. **THE TEAM AT RED WORKS HARD TO MAKE YOUR FINANCING EASIER.**

**DEDICATED TO SOLVING PROBLEMS.**
In our collective centuries of industry experience, the team at RED Capital Group has solved highly complex financing dilemmas for thousands of unique clients. Our goal is to provide a seamless loan origination and closing process from initially structuring your loan to working through the underwriting process to ensuring a timely closing. Throughout the whole process, we will proactively identify possible issues and work to alleviate them.

**YOUR TRUSTED PARTNER FOR COMPLEX PRODUCTS.**
We support our clients' interests from start to finish. We recognize that your property's finances are nuanced and complex, and RED is committed to working through your options and guiding you toward the best decisions for your specific situation. RED Capital Group functions as your advocate and advisor at every step of the way, and always keeps our focus on our clients' concerns. At RED, we don't succeed until our clients do.

**THE INDUSTRY KNOWLEDGE LEADERS.**
Building on our experience in financing thousands of highly specialized housing properties, RED Capital Group has earned our reputation as the industry expert in loan products and servicing for the markets we serve. Our focus is to get your property the exact financing solution that's right for your goals. Our team at RED is recognized for its thoroughness and attention to detail, and for securing the most beneficial financing solutions for our clients.

RED is The Face of Lending.