# EXHIBIT A

Complaint (with Exhibits)

Part 3 of 7

# Exhibit 17

FHA FORM No. 2453-M     DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
June 1975                              FEDERAL HOUSING ADMINISTRATION

**COMMITMENT TO INSURE UPON COMPLETION**
**SECTION 207**
*(Pursuant to Section 223(f))*
*AMENDMENT No. 1*

**TO:**

Red Mortgage Capital, LLC                          Project Number:  061-11283
  (Mortgagee)

Two Miranova Place                                 Overlook Gardens Properties, LLC
  (Street)                                           (Name Mortgagor)

Columbus, OH 43215                                 1605 Clinton Road, Macon, GA 31211
  (City and State)                                   (Address)

**DEAR SIRS:**

We understand that you, as Mortgagee, have agreed to make a loan to **Overlook Gardens Properties, LLC** herein after called the "Mortgagor"), in an amount not exceeding the sum of **Five Million Five Hundred Twenty Thousand Dollars ($5, 520,000)** to be secured by a credit instrument and security instrument (hereinafter jointly called the "Mortgage") covering real property with existing building(s) thereon, (hereinafter called the "Project"), situated in **Bibb County** and State of Georgia at **1605 Clinton Road** in **Macon, GA 31211** shown on the As-built Survey, Surveyor's Certificate, and legal description of the property.

It is your intention to present the said Mortgage to this Administration for mortgage insurance under the provisions of Section 223(f) of the National Housing Act, and the Regulations there under now in effect.

The Federal Housing Commissioner acting herein on behalf of the Secretary of Housing and Urban Development hereby agrees to insure said Mortgage under the provisions of said Act and Regulations upon the following conditions:

Upon endorsement of the Mortgage for insurance, critical repairs, if any, shall have been completed in accordance with narrative underwriting narrative submitted by **Red Mortgage Capital, LLC** on **July 3, 2013.**

1. During the course of repairs listed in attached Exhibit "A", the Commissioner and his representatives shall at all times have access to the property and the right to inspect the progress of the repairs. In addition, if required by the Commissioner, the Mortgagor will furnish at the Project site all necessary facilities for the use of the Commissioner's inspector such as, office space, use of a telephone, typewriter, etc. The inspection of the repairs by a representative or representatives of the Commissioner shall be for the benefit and protection of the Secretary of Housing and Urban Development. If deviations from the Work Write-up and Specifications (and Drawings, if applicable) or unsatisfactory workmanship or defective materials are not corrected to the satisfaction of the Commissioner prior to the completion of repairs, the Mortgage will not be considered eligible for insurance.

2. Prior to endorsement of the Mortgage for insurance, the Mortgagor shall present to the Commissioner a title policy or title evidence in conformity with the Regulations above mentioned which shall show that title to the property on the date of endorsement of the Mortgage for insurance is vested in the Mortgagor free of all encumbrances other than said Mortgage and all exceptions to title (either junior or prior to said Mortgage) except such as are specifically determined to be acceptable by the Commissioner. The Mortgagor shall also furnish satisfactory proof that there exist no unpaid obligations contracted in connection with the Mortgage transaction, the purchase of the mortgaged property or refinancing of existing indebtedness, or the completion of the repairs, except such obligations as may be approved by the Commissioner. If such title

evidence is in the form of a title insurance policy, it shall be its terms inure to the benefit of the Mortgagee and/or the Secretary of Housing and Urban Development, as their interests may appear. If under the laws of the jurisdiction in which the Project is located the chattels and personal property of the Mortgagor required in the operation of the Project are not covered by and subject to the terms of the Mortgage, the Mortgagee must require and receive from the Mortgagor a chattel mortgage or such other security instrument as may be necessary covering such personal property and chattels.

4. The Mortgage shall bear interest at the rate **4.28** percent per annum payable on the first day of each month on the outstanding balance of principal. The first payment to principal (Commencement of amortization) shall be due not later than the first day of the second month following the date of endorsement of the Mortgage for insurance. The Mortgage shall be payable on a level annuity basis by **420** monthly payments of principal and interest in the amount of **$25,376.81**. The maturity and final payment date shall be **34 years and 11 months** following the due date of the first payment to principal.

5. The credit instrument and the security instrument to be insured shall be in the form prescribed by the Commissioner for use in connection with Section 223(f) loans in the locality in which the property is situated.

6. The Mortgagor must possess the powers necessary for operating the Project and meeting all the requirements of the Commissioner for insurance of the Mortgage. Prior to endorsement of the Mortgage for insurance, there shall be filed with the Commissioner a copy of the instrument under which the Mortgagor entity is created (unless the Mortgagor is an individual) together with copies of all instruments or agreements necessary under the laws of the applicable jurisdiction to authorize execution of the Mortgage and the other closing documents, and a Regulatory Agreement or other instrument as will permit the Commissioner's regulation of the Mortgagor as to rents, charges and methods of operation. Such instrument shall provide, among other things, for the establishment of a Reserve Fund for Replacements by payment of **$115,920** per annum/**$9,660** per month to accumulated monthly under the control of the Mortgagee, commencing on the date of the first payment to principal as established in the insured Mortgage unless a later date is agreed to by the Commissioner. In addition to the per annum amount required to be accumulated monthly under control of the Mortgagee for the Reserve Fund for Replacements, a new Reserve Fund for Replacements account must be established prior to endorsement of the Mortgage for insurance by depositing the balance of the existing reserve account which is approximately **$00.00**. An initial deposit to the Reserve Fund for Replacements in the amount of **$358,800** will be made at initial closing.

7. If any repairs are to be made to an existing Project which require additional sewer, water, gas or electrical facilities, evidence satisfactory to the Commissioner shall be submitted prior to endorsement of the Mortgage for insurance showing that adequate sewer, water, gas, and electrical facilities have been fully installed and that necessary public streets, sidewalks and curbing outside the Project site have been completed. All off-site facilitates or utilities required by the special conditions under this commitment shall be included in such evidence.

8. Prior to the endorsement of the Mortgage for insurance, evidence shall be submitted to the Commissioner that the buildings, including electric wiring, plumbing, gas, and other appliances therein have been inspected and approved by all departments, boards, or agencies of the municipality, county or State, or other government bureaus or departments having jurisdiction thereof, and by the rating or inspection organization, bureau, association or body performing similar functions and that such certification as may be required with respect to the approval of the said buildings for occupancy and otherwise as may be required by the Commissioner have been issued to the Mortgagor.

9. Prior to the endorsement of the Mortgage for insurance, the Commissioner shall be furnished with a current As-built survey duly certified by a registered surveyor satisfactory to the Commissioner and an up-dated Surveyor's Certificate showing that there are no easements or encroachments upon the subject property except those approved by the Commissioner and that the improvements of the Project are contained upon the land covered by the Mortgage and within the building restriction lines, if any, on said land and do not encroach upon or overhang any land not covered by the Mortgage or beyond the said building restriction

lines, if any, nor any easement or right-of-way. The survey shall also show the exact location of water, sewer, gas and electric mains, and all easements for such utilities then existing.

10. Upon endorsement of the Mortgage for insurance, the Mortgage must be current with respect to all payments required to be made by its terms, including all deposits required to be made with the Mortgagee for mortgage insurance premium, fire, and other property insurance premiums, ground rents, water rates, taxes and other assessments; and there shall be in full force and effect fire and other property insurance as required by the insured Mortgage.

11. Upon endorsement of the Mortgage for insurance, the Mortgagee shall pay to the Commissioner in advance, a mortgage insurance premium equal to one per centum of the principal amount of the insured Mortgage to cover the first mortgage insurance premium and shall continue to make payments thereafter as required by the aforesaid Regulations.

12. In the case of a Project (1) on which construction was commenced prior to June 30, 1974, (2) which was completed prior to December 31, 1975, (3) on which an application was filed after completion and prior to December 31, 1975, and (4) which is less than one year old at the time of endorsement of the Mortgage for insurance, the Mortgagor shall furnish satisfactory evidence that the work of the General Contractor is covered by a guarantee acceptable to the Commissioner, running for a period of least one year, following endorsement of the mortgage, against latent defects and faulty workmanship and defective materials in the construction of the building, which guarantee will be secured by (a) a valid surety bond (FHA Form Number 3259) in an amount not less than ten percent (10%) of the cost of construction, running for a period of not less than two years following endorsement of the mortgage, with the Mortgagee and Mortgagor named as obligees on the bond with the Mortgagee's interest assignable to the Commissioner; or (b) a sum equal to two and one-half percent (2.5%) of the face amount of the Mortgage to be held in escrow and subject to the control of the Mortgagee for a period of 15 months following endorsement of the Mortgage, which sum, upon failure of such corrections being made as are assigns, for making such required corrections or, with the consent of the Commissioner, may be applied to the last maturing installments of principal of the indebtedness evidenced and secured by the Mortgage.

13. Prior to endorsement of the Mortgage for insurance, the Mortgagor must certify under oath that in selecting tenants for the property covered by the Mortgage, the Mortgagor will not discriminate against any family by reason of the fact that there are children in the family, unless the Commissioner determines that the Project is intended primarily for occupancy by the elderly or handicapped and is not compatible for occupancy by families with children, and that the Mortgagor will not sell the property while mortgage insurance is in effect unless the purchaser also so certifies and files such certification with the Commissioner.

14. Prior to endorsement of the Mortgage for insurance, the Mortgagor must certify under oath that so long as the Commissioner has any interest in the Mortgage transaction no part of any building will be rented for a period of less than 30 days or operated in such a manner as to offer any hotel service to any tenant in the building or buildings; and that the property will not be sold so long as the Commissioner retains any interest therein, unless the purchaser files with the Commissioner a like certification executed by such purchaser under oath.

15. The Mortgagor shall not be required to pay to the Mortgagee an initial service charge in excess of two percent (2%) of the original amount of the Mortgage.

16. This commitment shall expire 60 days from the date hereof, unless duly extended in writing by the Commissioner. Upon such expiration, all rights and obligations of the respective parties shall cease. Prior to any extension of this commitment, the Commissioner may, at his/her option, reexamine the commitment to determine whether it shall be extended, shall be extended in the same amount, or shall be amended to include a lesser amount.

17. Prior to the execution of any repair contracts relative to the subject Project, the Mortgagor, Mortgagee, shall execute the Agreement and Certification Form Number FHA 3306 and the Federal Housing

Commissioner and the Mortgagor shall be bound thereby with respect any subsequent contracts or subcontracts. The commitment amount herein above is subject to appropriate reduction in accordance with the terms of the Agreement and Certification.

18. The reopening of an expired commitment must be accompanied by a reopening fee of $.50 per $1,000 of the loan amount.

19. It is a condition of this commitment that the Mortgagee on behalf of the proposed substitute sponsor(s) must indicate any change in sponsorship upon which this commitment was predicated in writing and the Commissioner must approve such request in writing.

20. In the event additional code requirements are imposed by any state or local authority after the issuance of this commitment that would cause the total cost of all required repairs to exceed fifteen percent (15%) of the total HUD/FHA estimate of value after repairs, this commitment shall be null and void.

21. The following language shall be inserted in the mortgage Note:

"The debt evidenced by this Note may not be prepaid either in whole or in part for a period of five (5) years from the date of endorsement hereof except in cases where the prior written approval of the Federal Housing Commissioner is obtained and such written approval is expressly based upon the mortgagor entering into a Rental Use Agreement with the Commissioner to maintain the property as rental housing for the remainder of the specified five (5) year period."

22. A repair escrow of **$26,770** for completion of the non-critical repairs shown on the attached "Exhibit A" will be established in cash for any repairs not completed prior to loan closing at 100% of the Commissioner's estimate of the cost to complete same and **20%** of the repair cost estimate in the amount of **$5,354.00** must also be placed in escrow. These funds are a part of the developer's fee and all repairs not completed before endorsement must be completed within 12 months of initial/final endorsement. If the mortgagor has not completed all repairs by the end of the repair period, the mortgagee will complete the repairs using the funds in escrow. The mortgagee will provide the mortgagor a breakdown of the repairs and the cost of completion.

23. Funds remaining in the escrow account must be placed in the reserve fund for replacement when: (1) all repairs have been completed to HUD's satisfaction. (2) A supplemental cost certification has been submitted to and approved by the HUD office; (3) evidence of clear title has been provided to the HUD Office; and (4) latent defects assurances have been provided.

The latent defects assurance will be in the form of: (1) Cash or letter of credit (at the option of the mortgagee) in an amount equal to 2 1/2% of the repair cost and must be maintained for 15 months from completion of repairs; (2) A Surety Bond for at least 10% of the repair cost which runs for a period of two years from the date of completion of repairs. All repairs must be completed within 12 months of endorsement (unless an extension is approved by HUD).

24. Tax and Insurance Escrows must remain with the project.

25. Prior to initial/final endorsement, the mortgagee must provide a certified loan closing statement signed by the mortgagee and mortgagor, detailing the amount of any promissory notes made by the mortgagor, and itemizing the disbursement of mortgage proceeds and of the mortgagor's cash contribution, if any.

26. A HUD Form 93479, Monthly Report for Establishing Net Income, Schedule A, B and C, will be provided beginning the first month following closing for a minimum of six months.

27. At least 15 days prior to anticipated date for endorsement of the mortgage note, three draft copies of all documents and exhibits for closing shall be submitted to the Commissioner. After review, the place and

date of the closing will be designated, at which time the documents and exhibits in final form shall be delivered to the Commissioner for approval.

28. The Mortgagee shall submit, 15 days prior to initial/final endorsement, evidence that a commitment has been received for a permanent loan, or other firm written assurance demonstrating that permanent financing will be available at the rate shown in the firm commitment application. The form of assurance must address, but is not limited to: (1) source of financing, (2) term, (3) interest rate, (4) extension provisions, (5) dates for delivery of the permanent mortgage, and (6) any conditions that are, will be part of, or will impact on the permanent financing arrangements.

29. Prior to final endorsement, the Mortgagee must provide the Field Office with: (1) Form FHA-2455, Request for Endorsement of Credit Instrument Certificate of Mortgagee, Mortgagor and General Contractor, and (2) a certified loan closing statement signed by the mortgagee. The statement must also itemize the disbursement of mortgage proceeds and mortgagor's cash contribution, if any. The statement regarding the disbursements must be specific and list the amounts to be paid to satisfy the mortgagor's obligations for: (1) existing or other indebtedness in a refinancing transaction, (2) repairs, (3) discounts, (4) financing fees, (5) legal expenses, (6) organizational expenses, (7) title and recording costs, and (8) any mortgagee required escrows for GNMA, taxes, or insurance.

30. The owner must provide certification that the property is in compliance with statutory and regulatory requirements, including but not limited to concerns associated with lead-based paint, asbestos-containing materials, and that smoke detectors are installed and fully functional for each living unit.

31. A cost certification must be submitted, on Form 2205-A, for review 15 days prior to initial/final endorsement. It must include total actual costs incurred in the acquisition or refinancing of the property along with receipts or other support for these costs.

32. If any portion of the indebtedness will be forgiven, verification from the appropriate lender(s) must accompany the plan.

33. The sponsor must notify the Project Management Division when work on repairs items is to begin and advise if any of the repairs made prior to initial/final endorsement. Also, the sponsor must notify the Project Management Division when all repairs have been completed to arrange for a final inspection.

34. Prior to endorsement of the mortgage, the mortgagor shall submit an inspection report by a certified pest control company stating that there is no damage by wood destroying organisms or infestation of the property.

35. The composition of the mortgagor entity is:

    Mortgagor: Overlook Gardens Properties, LLC (100%)
    Sun Valley Properties, LLP (Managing Member – 100% Owner of Mortgagor)
    Charles A. Gower (50% Owner of Managing Member)
    Kelsey L. Kennon (50% Owner of Managing Member)

    * **Charles A. Gower and Kelsey L. Kennon**, have been identified to execute Section 50 of the Regulatory Agreement in their individual capacity.

36. The HUD Exam fee is $16,560

37. The Borrower must submit an updated, certified rent roll detailing the occupancy level at the project. The rent roll must be dated no more than 30 days prior to endorsement. If HUD determines that the updated rent roll shows significant change in occupancy from that submitted at time of application and that was assumed in loan approval, this Commitment shall be of no force or effect and will be cancelled by HUD.

38. Any loans and/or accounts payable for project operating expenses will be required to be paid in full before closing or be converted to a "Surplus Cash" note at closing (including any accrued interest). (Surplus Cash Notes may be established for payables to a related entity only)

39. At the time of initial/final endorsement the Mortgagee and HUD will sign a rider to the Mortgagee's Certificate that states the following:

    (a) The Mortgagee must obtain a new PCNA every ten (10) years, which covers the next ten (10) years or the remaining term of the mortgage plus two (2) years.

    (b) Replacement Reserve funds may be used to pay for the additional PCNA.

**Special Conditions:**

40. The Borrower must submit an updated, certified rent roll detailing the occupancy level at the project. The rent roll must be dated no more than 30 days prior to endorsement. If HUD determines that the updated rent rolls shows a significant change in occupancy from that submitted at the time of application and that was assumed in the loan approval, then this Commitment shall be of no force or effect and will be cancelled by HUD.

41. Fifty per cent (50%) of any cash out proceeds after funding transaction costs, including the assurance of completion requirements, must be held in escrow by the Mortgagee until the required non-critical repairs are completed and HUD approves the release.

**[Signatures on Next Page]**

This commitment and exhibits referred to herein together with the applicable Federal Housing Administration Regulations constitute the entire agreement between us, and acceptance of the terms hereof is evidenced by the signature and seals of the Mortgagor and Mortgagee upon the lines provided therefore below.

Secretary of Housing and Urban Development
By: Federal Housing Commissioner

_____
Authorized Agent

Linda F. Preston
Director, Project Management
Atlanta Multifamily Hub

Dated ___11/18/2013___

The above commitment to insure is hereby acknowledged by the undersigned, and we hereby agree to be bound by its terms.

Overlook Gardens Properties, LLC _____
                Mortgagor

BY: _____

        Dated _____

Red Mortgage Capital, LLC _____
                Mortgagee

BY: _____

        Dated _____

Overlook Gardens Firm Commitment – Amendment #1
FHA Project # 061-11283

MORTGAGOR
OVERLOOK GARDENS PROPERTIES, LLC

By:  Sun Valley Properties, LLP,
A Georgia limited liability partnership
Its:  Sole Member

By: _____          Date:   November 19, 2013
        Charles A. Gower
        Partner

LENDER
RED MORTGAGE CAPITAL, LLC

By: _____          Date:   November 19, 2013
        Jeffrey N. Leeth
        Director

**NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION)**
**MULTI-FAMILY APARTMENTS**

Inspection Date: April 29, 2013 and April 30, 2013
Project: Overlook Gardens
Address: 1400 Gray Highway
City, State: Macon, GA 31211

Gross Square Footage: 203,827
Year Built: 1988
Number of Parking Spaces: 368
Number of Units: 184

| SECT | NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION) | # OF UNITS | UNIT OF MEASURE | UNIT COST | TOTAL |
|------|-----------------------------------------------------|------------|------------------|-----------|-------|
| 3.2.3 | 1. A board was observed to be coming loose at the top of the stairs near apartment # 1213. Securing the board in place is recommended. | 1 | Each | $ 10.00 | $ 10.00 |
| 3.2.6 | 2. Bare soil was observed at the picnic pavillion, the north side of Building 10, the northeast side of Building 3 and the south side of Building 10. Establishing growth in these areas is recommended to prevent erosion. | 3 | Each | $ 500.00 | $ 1,500.00 |
| 3.2.6 | 3. Trees were observed to be overhanging or touching select buildings and debris was observed to be collecting in the gutters. The select areas are Building 12 and the areas near apartments # 915, # 1005, # 1114 and # 1214. Cutting back the trees is recommended to prevent future moisture damage. | 5 | Each | $ 500.00 | $ 2,500.00 |
| 3.2.6 | 4. The concrete retaining wall in front of Apartment # 509 was observed to be seperating from the stairs. Refurbishing the damaged area is recommended. | 1 | Each | $ 1,000.00 | $ 1,000.00 |
| 3.2.7 | 5. A crack was observed in the concrete pool deck near the gate entrance. Repairing the damaged area to prevent future damage is recommended. | 1 | Each | $ 300.00 | $ 300.00 |
| 3.3.3 | 6. Damaged siding was observed at the entry door to apartment # 615. Damaged siding was also observed at the south side of Building 1, west side of Building 3 and near apartments # 416 and # 804. Repairing the damaged siding is recommended. | 5 | Each | $ 140.00 | $ 700.00 |
| 3.3.3 | 7. Exterior circulation vents were observed to be damaged outside of apartment # 102. Replacing the damaged vents is recommended. | 2 | Each | $ 17.50 | $ 35.00 |
| 3.3.3 | 8. Damaged fascia was observed at the west side of Building 12 and near apartment # 706. Replacing the damaged areas of fascia is recommended. | 2 | Each | $ 175.00 | $ 350.00 |

## NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION)
### MULTI-FAMILY APARTMENTS

Inspection Date: April 29, 2013 and April 30, 2013        Gross Square Footage:    203,827
Project: Overlook Gardens        Year Built:    1988
Address: 1400 Gray Highway        Number of Parking Spaces:    368
City, State: Macon, GA 31211        Number of Units:    184

| SECT. | NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION) | # OF UNITS | UNIT OF MEASURE | UNIT COST | TOTAL |
|---|---|---|---|---|---|
| 3.3.3 | 9. The soffit at the southwest corner of Building 6 was observed to be not secured. Securing the soffit in place is recommended. | 1 | Each | $ 50.00 | $ 50.00 |
| 3.3.3 | 10. Deteriorated or rotted wood trim was observed on the corner of the buildings near the patios of apartment # 704 and # 1012 as well as the window of apartment #912. Replacing the damaged areas of wood is recommended. | 2 | Each | $ 165.00 | $ 330.00 |
| 3.3.3 | 11. The balconies at the rear of Building 9 were all observed with deteriorating paint. Repairing the balconies is recommended. | 4 | Each | $ 115.00 | $ 460.00 |
| 3.3.3 | 12. The soffit and gutter at apartment # 110 were observed to be damaged and not attached to the roof. Repairing the damaged area is recommended. | 1 | Each | $ 150.00 | $ 150.00 |
| 3.4.3 | 13. The dryer vents near the patio of apartment # 1211 were observed to be clogged. Cleaning the vents is recommended to allow for the proper air flow for ventilation. | 2 | Each | $ 50.00 | $ 100.00 |
| 3.7.2 | 14. A open penetration in the wall was observed around the piping that runs from the hot water heater in apartment # 1001. Sealing the open penetration is recommended. | 1 | Each | $ 35.00 | $ 35.00 |
| 3.7.2 | 15. The ceilings in the bathrooms above the showers in apartments # 1009 and # 404 were observed with deteriorating paint that was observed to be peeling off of the ceiling.The ceilings above the air handlers in apartments # 1203 and # 812 were observed to be damaged. Repairing those select damaged areas is recommended. | 5 | Each | $ 100.00 | $ 500.00 |

## NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION)
### MULTI-FAMILY APARTMENTS

Inspection Date: April 29, 2013 and April 30, 2013
Project: Overlook Gardens
Address: 1400 Gray Highway
City, State: Macon, GA 31211

Gross Square Footage: 203,827
Year Built: 1988
Number of Parking Spaces: 368
Number of Units: 184

| SECT | NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION) | # OF UNITS | UNIT OF MEASURE | UNIT COST | TOTAL |
|---|---|---|---|---|---|
| 3.7.2 | 16. A hole was observed in the Gypsum Wall Board (GWB) of apartment # 806 in the dining area and damaged GWB in the family room near the kitchen in apartment # 404. Repairing the damaged sections of wall is recommended. | 2 | Each | $ 175.00 | $ 350.00 |
| 3.2.8 | 17. Exposed wiring was observed on the east side of Building 4. Enclosing the exposed wiring is required to alleviate any future issues. No cost has been associated and the repair should be performed by the local provider. | 1 | Each | $ - | No Cost |
| | OWNER PROPOSED IMPROVEMENTS AND UPGRADES | | | | |
| 3.2.4 | 18. The property is going to have work performed in the asphalt parking lot that includes; eight (8) areas of patching and sealcoating/re-striping. Macon Asphalt Paving provided an estimate to complete the work. Please see the estimate located in the Exhibit 11.9 of this report for details.* | 1 | Lump Sum | $ 18,400.00 | $ 18,400.00 |
| 3.3.4 | 19. The owner has elected to make repairs to select areas of roofing. Alan Frank Commercial Roofing submitted a bid to perform the work and it has been scheduled at a cost of $ 1,753 per area . The roofing repairs have been funded and no cost has been associated with this repair.* | 1 | Lump Sum | $ - | No Cost |
| | | | | TOTAL: | $ 26,770.00 |

Costs have been provided by using RS Means Building Construction Cost Data
* Owner Provided Cost, which D3G finds reasonable

## CRITICAL REPAIRS (IMMEDIATE NEEDS)
### MULTI-FAMILY APARTMENTS

Inspection Date: April 29, 2013 and April 30, 2013
Project: Overlook Gardens
Address: 1400 Gray Highway
City, State: Macon, GA 31211

Gross Square Footage: 203,827
Year Built: 1988
Number of Parking Spaces: 368
Number of Units: 184

| SECT. | | CRITICAL REPAIR (IMMEDIATE NEEDS) | # OF UNITS | UNIT OF MEASURE | UNIT COST | TOTAL |
|---|---|---|---|---|---|---|
| 3.4.4 | 1. | The property does not feature GFI protection in the kitchens of the apartments. During the inspection a select few of the bathrooms had GFI protected outlets. The installation of GFI protected outlets in the kitchens and bathrooms is required. A cost has been based on a per unit basis to fix the outlets where there is no protection. | 184 | Each | $ 70.00 | $ 12,880.00 |
| 3.6.2 | 2. | Dwelling units contain hard-wired smoke detectors located within the immediate vicinity of the sleeping areas. Per HUD MAP Guidelines; according to Life Safety Code (NFPA 101), paragraph 31.3.4.5.1, smoke alarms must be installed outside every sleeping area in the immediate vicinity of the bedrooms and on all levels of the dwelling unit, including basements. In addition to the NFPA requirements, the regulation in 24 CFR 200.76 requires that smoke detectors must also be installed inside each sleeping area; therefore, the installation of compliant smoke detectors within all bedrooms is required. The smoke detectors can be either hard wired or battery powered. Battery powered smoke detectors must have the following features, according to the HUD MAP Guidelines: the cell must be tamper-resistant; the cells cannot be used in any other toy or appliance; the cells must have a ten-year life; the smoke detector may have a manual silencing device to clear unwanted alarms such as cooking smoke. For the purpose of this report we have budgeted battery powered smoke detectors, allowable by the HUD MAP Guidelines. It is recommended to contact the local municipality to determine if battery-operated smoke detectors are allowable. If further clarification is needed regarding smoke detector compliance, please contact the local reviewing HUD office. | 368 | Each | $ 35.00 | $ 12,880.00 |
| 3.7.2 | 3. | Light globes or fixtures were observed to be missing and leaving the bulbs exposed in the bedroom of apartment # 103 and the bathroom and laundry room of apartment 403. Installing the protective covering is required in order to comply with the National Electrical Code (NEC). | 3 | Each | $ 20.00 | $ 60.00 |
| 3.2.5 | 4. | A trip hazard was observed at the concrete sidewalk in front of apartment # 1204. Repairing the damaged area is required to alleviate the trip hazard. | 1 | Each | $ 185.00 | $ 185.00 |

**CRITICAL REPAIRS (IMMEDIATE NEEDS)**
**MULTI-FAMILY APARTMENTS**

Inspection Date: April 29, 2013 and April 30, 2013
Project: Overlook Gardens
Address: 1400 Gray Highway
City, State: Macon, GA 31211

Gross Square Footage: 203,827
Year Built: 1988
Number of Parking Spaces: 368
Number of Units: 184

| SECT. | CRITICAL REPAIR (IMMEDIATE NEEDS) | # OF UNITS | UNIT OF MEASURE | UNIT COST | TOTAL |
|---|---|---|---|---|---|
| | ACCESSIBILITY | | | | |
| 7.0 5. | The office / pool building features two (2) restrooms. The Men's room features clear floor space at the fixtures, the appropriate grab bars at the toilet and a roll under accessible sink. However, the sink does not have levered hardware or scald and abrasion protection at the exposed plumbing pipes. The Women's room features the clear space at the fixtures. However, the Women's accessible toilet was missing the required grab bars, levered hardware was missing at the sink and scald and abrasion protection was missing at the exposed sink plumbing. Correcting the noted deficiencies is required in order to comply with Americans with Disabilities Act Accessibilities Guidelines (ADAAG). | 1 | Lump Sum | $ 820.00 | $ 820.00 |
| 7.0 6. | Based upon the three hundred sixty eight (368) standard parking spaces available at the site, eight (8) handicapped accessible parking spaces inclusive of one (1) van accessible space are required by the Americans with Disabilities Act Accessibility Guidelines (ADAAG). The property currently features eight (8) non-compliant handicapped parking spaces and two (2) compliant handicapped parking spaces located at Building 2. Some of the designated parking spaces currently feature vertical signage and pavement markings; however, do not feature the required access aisles and curb access at each location. Standard handicapped spaces require a 60" wide access aisles and vertical and horizontal identification. Van accessible handicapped spaces require a 96" wide access aisle, vertical signage identifying the space as van accessible, and horizontal identification. The designated handicapped parking spaces should be located at the closest accessible route to the building entrances and two (2) spaces may share a single access aisle. The property does not receive federal funding and does not feature any handicapped designated dwelling units; therefore, D3G only recommends the installation of one (1) compliant "Van Accessible" space installed at the office building and the non-compliant spaces should be labeled as "Reserved". | 1 | Each | $ 400.00 | $ 400.00 |
| | | | | TOTAL: | $ 27,225.00 |

Costs have been provided by using RS Means Building Construction Cost Data

## REPLACEMENT RESERVE ANALYSIS FUNDING SCHEDULE
### MULTI-FAMILY APARTMENTS

Inspection Date: April 29, 2013 and April 30, 2013
Project: Overlook Gardens
Address: 1400 Gray Highway
City, State: Macon, GA 31211

Gross Square Footage: 203,827
Year Built: 1988
Number of Parking Spaces: 368
Number of Units: 184

| | |
|---|---|
| Initial Deposit RR: $ | 356,800 | $1,950 /Unit |
| Annual Deposit RR: $ | 115,920 | $630 /Unit |
| Annual Deposit Increase | 3.5% | |
| Interest Applied to Account Balance | 1.00% | |
| Minimum Yr 1 Balance (5% of 20 yr un-inflated total) $ | 110,190 | |
| 105% of 20-year Replacement Needs (inflated): $ | 2,534,058 | |
| Total Deposits to Reserve Replacements: $ | 3,430,615 | |

[2] This Funding Schedule has been completed in accordance with the Mortgagee Letter 2013-20 Section B(9)2 that states: "The minimum Reserve for Replacement deposit is $250 per unit, per year or such higher amount as is indicated by the PCNA," and Section V(D) that states "the lender's proposed schedule of deposits must provide for a minimum balance in the Reserve for Replacement escrow at the end of each year in the Estimate Period (including the last year) that is at least 5% of the total, aggregate, inflation adjusted projection of capital needs for the Estimate Period. Accordingly, the total deposits to the Reserve for Replacement should not be less than 105% of the total estimated costs of component replacements and major maintenance for the Estimate Period. In addition, this funding schedule has also been prepared in accordance with the FAQ-PCNA Guidance - ML 2012-25 & HN 2012-27.

### 1-10 YEAR TERM COSTS

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | 1-10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Inflated Annual Replacement Reserve Needs: | | | | | | | | | | | |
| Beginning Annual Balance (Equals 1DRR in Year 1): | $ 356,800 | $ 428,588 | $ 556,394 | $ 624,331 | $ 676,130 | $ 734,881 | $ 766,509 | $ 746,432 | $ 740,139 | $ 701,461 | |
| Annual Deposit: | $ 115,920 | $ 119,518 | $ 121,788 | $ 124,813 | $ 127,954 | $ 131,153 | $ 134,432 | $ 137,792 | $ 141,237 | $ 144,768 | |
| Beginning Balance Plus Annual Deposit: | $ 474,720 | $ 507,706 | $ 678,182 | $ 749,044 | $ 804,084 | $ 866,034 | $ 900,941 | $ 884,215 | $ 881,376 | $ 846,229 | |
| Interest (Average Outstanding Balance): | $ 4,168 | $ 5,153 | $ 5,874 | $ 6,469 | $ 7,030 | $ 7,470 | $ 7,567 | $ 7,386 | $ 7,172 | $ 6,562 | |
| Remaining RR Balance/year: | $ 478,886 | $ 506,994 | $ 624,231 | $ 676,130 | $ 734,881 | $ 766,509 | $ 746,432 | $ 740,139 | $ 701,461 | $ 617,571 | |
| Minimum Balance Required (Includes 2% Inflation Adjustment Annually) | $ 110,190 | $ 112,394 | $ 114,642 | $ 116,934 | $ 119,273 | $ 121,659 | $ 124,092 | $ 126,574 | $ 129,105 | $ 131,687 | |

### 11-20 YEAR TERM COSTS

| | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20 | 11-20 Year Total | 20 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inflated Annual Replacement Reserve Needs: | | | | | | | | | | | | |
| Beginning Annual Balance: | $ 617,571 | $ 513,431 | $ 377,417 | $ 347,191 | $ 203,176 | $ 330,438 | $ 392,465 | $ 468,234 | $ 542,105 | $ 636,921 | |
| Annual Deposit: | $ 148,387 | $ 152,097 | $ 155,900 | $ 159,797 | $ 163,792 | $ 167,887 | $ 172,084 | $ 176,386 | $ 180,796 | $ 185,316 | |
| Beginning Balance Plus Annual Deposit: | $ 765,958 | $ 665,528 | $ 533,316 | $ 506,988 | $ 491,968 | $ 498,325 | $ 564,549 | $ 644,720 | $ 722,900 | $ 822,237 | |
| Interest (Average Outstanding Balance): | $ 5,477 | $ 4,430 | $ 3,605 | $ 3,360 | $ 3,277 | $ 3,397 | $ 4,383 | $ 5,027 | $ 5,866 | $ 6,799 | |
| Remaining RR Balance/year: | $ 513,431 | $ 377,417 | $ 347,191 | $ 338,176 | $ 330,438 | $ 392,465 | $ 468,234 | $ 542,105 | $ 636,921 | $ 729,635 | |
| Minimum Balance Required (Includes 2% Inflation Adjustment Annually) | $ 134,321 | $ 137,007 | $ 139,747 | $ 142,542 | $ 145,393 | $ 148,301 | $ 151,267 | $ 154,292 | $ 157,378 | $ 160,525 | |

# Multifamily Summary Appraisal Report

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0029
(exp. 10/31/2012)

This form is in compliance with the requirements of the Uniform Standards of Professional Appraisal Practice for written reports, except where the Jurisdictional Exception is invoked to allow for minor deviations, as noted throughout.
Additional technical direction is contained in the HUD Handbooks referenced in the lower right corner.

| Application Processing Stage: | ☐ SAMA | ☐ Feasibility (Rehab) | ☑ Firm |
|---|---|---|---|
| Property Rights Appraised: | ☑ Fee Simple | ☐ Leasehold | |

| Project Name | Project Number |
|---|---|
| Overlook Gardens | 061-11283 |

**Purpose.** This appraisal evaluates the subject property as security for a long-term insured mortgage. Included in the appraisal (consultation for Section 221) are the analyses of market need, location, earning capacity, expenses, taxes, and warranted cost of the property.
**Scope.** The Appraiser has developed, and hereunder reports, conclusions with respect to: feasibility; suitability of improvements; extent, quality, and duration of earning capacity; the value of real estate proposed of existing as security for a long-term mortgage; and several other factors which have a bearing on the economic soundness of the subject property.

### A. Location and Description of Property

| 1. Street Nos. 1605 | 2. Street Clinton Road | 3. Municipality Macon |
|---|---|---|

| 4a. Census Tract No. 0110.00 | 4b. Placement Code | 4c. Legal Description (Optional) | 5. County Bibb | 6. State and Zip Code GA, 31211 |
|---|---|---|---|---|

| 7. Type of Project | | | | 8. No. Stories | 9a. Foundation | | 9b. Basement Floor: |
|---|---|---|---|---|---|---|---|
| ☐ Elevator(s) | ☐ Highrise | ☑ Walkup | ☐ 2-5 sty. Elev. | | ☑ Slab on Grade | ☐ Full Basement | ☐ Structural Slab |
| ☐ Detached | ☐ Semi-Detached | ☐ Row House | ☐ Town House | 2 | ☐ Partial Basement | ☐ Crawl Space | ☑ Slab on Grade |

| 10. ☐ Proposed ☑ Existing | 11. Number of Units | | 12. No. of Bldgs. | 13a. List Accessory Bldgs. and Area |
|---|---|---|---|---|
| | Revenue 184 | Non-Rev 0 | 12 | Office / Pool Building (1,720 SF), Maintenance Building (1,350 SF) |

**13b. List Recreation Facilities and Area**

| | |
|---|---|
| Swimming Pool | Playground |
| Volley Ball Court | Car Wash Station |
| Picnic Pavilion | |

**13c. Neighborhood Description**

| Location | ☐ Fully Developed | ☐ Urban ☑ Suburban ☐ Rural | Present Land Use | 50 % 1 Family | % 2 to 4 Family |
|---|---|---|---|---|---|
| Built Up | | ☑ Over 75% ☐ 25% to 75% ☐ Under 25% | | 15 % Multifamily | % Condo/Coop |
| Growth Rate | | ☐ Rapid ☑ Steady ☐ Slow | | 25 % Commer. | 5 % Industrial |
| Property Values | | ☑ Increasing ☐ Stable ☐ Declining | | 5 % Vacant | |
| Demand/Supply | | ☐ Shortage ☑ In Balance ☐ Oversupply | Change in Use | ☑ Not Likely ☐ Likely ☐ Taking Place | |
| Rent Controls | | ☐ Yes ☑ No ☐ Likely | | From ___ to ___ | |
| | | | Predominant Occupancy | ☑ Owner ☐ Tenant | < 20 % Vacant |

Description of Neighborhood: (Note: Race and racial composition of the neighborhood are not appraisal factors.) (Describe the boundaries of the neighborhood and those factors, favorable or unfavorable, that affect marketability, including neighborhood stability, appeal, property conditions, vacancies, rent control, etc.)
The subject is located in the eastern portion of Macon. The property is within a retail node and adjacent to significant residential and residential support area that includes a Wal-Mart, neighborhood retail and a high school. Rental apartments and single family homes abut a portion of the subject site. The neighborhood is moderate income in nature.

### Site Information

| 14. Dimensions | 695,653 sq. ft. | 15a. Zoning (if recently changed, submit evidence) R-3 (Residential District) | |
|---|---|---|---|

| 15b. Zoning Compliance | ☑ Legal | ☐ Illegal | ☐ Legal nonconforming (Grandfathered use) | ☐ No Zoning |
|---|---|---|---|---|

| 15c. Highest and Best Use as Improved | ☑ Present Use | ☐ Proposed use | ☐ Other use (explain) |
|---|---|---|---|

15d. Intended M/F Use (summarize: e.g., Market Rent: Hi - Med - Lo-End; Rent Subsidized; Rent Restricted with or without Subsidy; Applicable Percentages)
Market rent medium

### Building Information

| 16a. Yr. Built | 16b. ☐ Manufactured Housing ☐ Modules | ☑ Conventionally Built ☐ Components | 17a. Structural System | 17b. Floor System | 17c. Exterior Finish | 18. Heating A/C System |
|---|---|---|---|---|---|---|
| 1988 | | | Wood Frame | Wood Joist | Vinyl Lap Siding | Heat I/E / A/C I/E |

Trever M. Smith, Managing Director     Paul C. Martin, Associate Underwriter

Overlock Gardens

## B. Additional Information Concerning Land or Property

| 19. Date Acquired | 20. Purchase Price | 21. Additional Costs Paid or Accrued | 22. If Leasehold Annual Ground Rent | 23a. Total Cost | 23 b. Outstanding Balance |
|---|---|---|---|---|---|
| 12/11/1997 | $ - | $ - | $ - | $ - | $ 3,989,195 |

| 24a. Relationship (Business, Personal, or Other) Between Seller and Buyer | 24b. | Has the Subject Property been sold in the past 3 years? ☐ Yes ☑ No If "Yes," explain |
|---|---|---|
| NA | | |

| 25. Utilities | Public | Community | Distance from Site | 26. Unusual Site Features |
|---|---|---|---|---|
| Water | ☑ | ☐ | _____ ft. | ☐ Cuts  ☐ Fills  ☐ Rock Formations  ☐ Erosion  ☐ Poor Drainage  ☑ None |
| Sewers | ☑ | ☐ | _____ ft. | ☐ High Water Table  ☐ Retaining Walls  ☐ Off Site Improvements |
| | | | | ☐ Other  specify |

## Section C - Estimate of Income (Attach forms HUD-92273, 92264-T, as applicable)

| 27. No. of Each Family Type Unit | Rentable Living Area (Sq. Ft.) | Composition of Units | | | | Unit Rent per Mo. ($) | Total Monthly Unit Rent ($) |
|---|---|---|---|---|---|---|---|
| (a) | 48 | 733 | 1 | BR | 1 | Bath | 520 | 24,960 |
| (b) | 28 | 971 | 2 | BR | 1 | Bath | 570 | 15,960 |
| (c) | 60 | 1,094 | 2 | BR | 2 | Bath | 620 | 37,200 |
| (d) | 48 | 1,255 | 3 | BR | 2 | Bath | 715 | 34,320 |
| (e) | 0 | 0 | 0 | BR | 0 | Bath | 0 | 0 |
| (f) | 0 | 0 | 0 | BR | 0 | Bath | 0 | 0 |
| (g) | 0 | 0 | 0 | BR | 0 | Bath | 0 | 0 |
| (h) | 0 | 0 | 0 | BR | 0 | Bath | 0 | 0 |
| (i) | 0 | 0 | 0 | BR | .0 | Bath | 0 | 0 |

| 28. Total Estimated Rentals for All Family Units | | | | | | | $ 112,440 |

| 29. ☑ Need Back ☐ Attached Parking Spaces | | Offstreet Parking and Other Non-Commercial Ancillary Income (Not included in Unit Rent) | | | | |
|---|---|---|---|---|---|---|
| Open Spaces | 0 | | 368 | @ $ - | per month = $ | 0 |
| Covered Spaces | | | 0 | @ $ - | per month = $ | 0 |
| Laundry | 368 | | 0 | sq. ft. or Living Units @ - | per month = $ | 0 |
| Utility Reim | | | 1 | @ 4,600.00 | per month = $ | 4,600 |
| Misc Revenue | | | 1 | @ 2,760.00 | per month = $ | 2,760 |
| Total Spaces | 368 | Total Monthly Ancillary Income | | | | $ 7,360 |

## 30. Commercial Income (Attach Documentation)

| Area Ground Level | 0 | sq. ft. @ | $ - | per sq. ft/month = | $ 0 | = Total Monthly | |
|---|---|---|---|---|---|---|---|
| Other Levels | 0 | sq. ft. @ | $ - | per sq. ft/month = | $ 0 | Commercial Income | $ 0 |

| 31. Total Estimated Monthly Gross Income at 100 Percent Occupancy | $ 119,800 |
|---|---|
| 32. Total Annual Rent (Item 6 times 12 months) | $ 1,437,600 |

| 33. Gross Floor Area | 34. Net Rentable Residential Area | 35. Net Rentable Commercial Area |
|---|---|---|
| 203,827 Sq. Ft. | 188,252 Sq. Ft. | 0 Sq. Ft. |

## 36. Non-Revenue Producing Space

| Type of Employee | No. Rms | Composition of Unit | | | Location of Unit in Project |
|---|---|---|---|---|---|
| | | - | BR - | Bath | |
| | | - | BR - | Bath | |
| | | - | BR - | Bath | |

36a Personal Benefit Expense (PBE) (May produce additional revenue and expenses to be considered above and below.)

| Tenant Employee-Paid Utilities | Type(s) | _____ | Monthly Cost | $ _____ |
|---|---|---|---|---|
| Landlord Employer-Paid Utilities | Type (s) | _____ | Monthly Cost | $ _____ |

Trever M. Smith, Managing Director          Paul C. Martin, Associate Underwriter

Overlook Gardens

**D. Amenities and Services Included in Rent (Check and circle appropriate items; fill-in number where indicated)**

**37a. Unit Amenities**
- ☑ Ranges (Elec.)
- ☑ Refrig. (Elec.)
- ☐ Micro Wave
- ☑ Carpet
- ☑ Balcony/Patio
- ☑ Laundry hookups (in units)
- ☐ Washer/Dryer (in units)
- ☐ Other (Specify)

- ☑ Disposal/Compactor
- ☑ Air Conditioning (central)
- ☑ Dishwasher
- ☑ Window treatment (blinds)
- ☐ Fireplace(s)  No.
- ☐ Upper level vaulted ceiling/Skylight(s)
- ☐ Security System(s)  (Describe)

**37b. Project Amenities**
- ☐ Guest room(s) No.
- ☐ Sauna/Steam room(s) No.
- ☐ Exercise room(s) No.
- ☐ Tennis Court(s) No.
- ☑ Laundry Facilities (coin)
- ☐ Jacuzzies/Community Whirlpool(s) No.
- ☑ Other Volley ball court, common grilling areas, car wash station

- ☑ Community room(s) No. 1
- ☑ Swimming Pool(s) No. 1
- ☐ Racquetball court(s) No.
- ☑ Picnic/Play area(s) No. 1
- ☐ Project Security System(s) (Describe)

**37c. Unit Rating**

| | Good | Aver. | Fair | Poor |
|---|---|---|---|---|
| Condition of Improvement | | ☑ | | |
| Room Sizes and Layout | | ☑ | | |
| Adequacy of Closets and Storage | | ☑ | | |
| Kitchen Equip., Cabinets, Workspace | | ☑ | | |
| Plumbing - Adequacy and Condition | | ☑ | | |
| Electrical - Adequacy and Condition | | ☑ | | |
| Soundproofing - Adequacy and Condition | | ☑ | | |
| Insulation - Adequacy and Condition | | ☑ | | |
| Overall Livability | | ☑ | | |
| Appeal and Marketability | | ☑ | | |

**37d. Project Rating**

| | Good | Aver. | Fair | Poor |
|---|---|---|---|---|
| Location | | ☑ | | |
| General Appearance | | ☑ | | |
| Amenities & Rec. Facilities | | ☑ | | |
| Density (units per acre) | | ☑ | | |
| Unit Mix | | ☑ | | |
| Quality of Construction (Matl. & finish) | | ☑ | | |
| Condition of Exterior | | ☑ | | |
| Condition of Interior | | ☑ | | |
| Appeal to Market | | ☑ | | |
| Soundproofing - Vertical | | ☑ | | |
| Soundproofing - Horizontal | | ☑ | | |

**38. Services**

Gas: ☐ Heat ☐ Hot Water ☐ Cooking   ☐ Air Conditioning
Elec: ☐ Heat ☐ Hot Water ☐ Cooking   ☐ Air Conditioning ☐ Lights/etc.
Other: ☐ Heat ☐ Hot Water ☐ Water   ☑ Other Trash

**39. Special Assessments**
a. ☐ Prepayable ☐ Non-Prepayable
b. Principal Balance $
c. Annual Payment $
d. Remaining Term _____ years

**E. Estimate of Annual Expense**

**Administrative**
| | | |
|---|---|---|
| 1. Advertising | $ | 30,228 |
| 2. Management | $ | 53,479 |
| 3. Administrative | $ | 34,951 |
| 4. Total Administrative | $ | 118,658 |

**Operating**
| | | |
|---|---|---|
| 5. Elevator Maintenance Exp. | $ | 0 |
| 6. Fuel - Heating and Domestic Hot Water | $ | 0 |
| 7. Lighting and Misc. Power | $ | 34,951 |
| 8. Water | $ | 58,566 |
| 9. Gas | $ | 0 |
| 10. Garbage and Trash Removal | $ | 17,003 |
| 11. Payroll | $ | 198,120 |
| 12. Other | $ | 0 |
| 13. Total Operating | $ | 308,640 |

**Maintenance**
| | | |
|---|---|---|
| 14. Decorating | $ | 47,231 |
| 15. Repairs | $ | 141,692 |
| 16. Exterminating | $ | 4,723 |
| 17. Insurance | $ | 30,228 |
| 18. Ground Expense | $ | 51,009 |
| 19. Other | $ | 5,668 |
| 20. Total Maintenance | $ | 280,551 |
| 21. Replacement Reserve (0.006 x total structures Line G41) or (0.004 x MTG. for Rehab) | $ | 55,200 |
| 22. Total Operating Expense | $ | 763,049 |

**Taxes**
| | | |
|---|---|---|
| 23. Real Estate: Est. Assessed Value $ 0 at $ 0.00 per 1000 | $ | 75,440 |
| 24. Personal Prop. Est. Assessed Value $ 0 at $ 0.00 per 1000 | $ | 0 |
| 25. Employee Payroll Tax | $ | 30,228 |
| 26. Other | $ | 0 |
| 27. Other | $ | 0 |
| 28. Total Taxes | $ | 105,668 |
| 29. Total Expenses (Attach form HUD-92274, as necessary) | $ | 868,717 |

Trever M. Smith, Managing Director          Paul C. Martin, Associate Underwriter

Overlook Gardens

## F. Income Computations

| | | | | | | |
|---|---|---|---|---|---|---|
| 30a. Estimated Residential Project Income (Line C28 x 12) | $ | 1,349,280 | c. Effective Gross Commercial Income (Line 32a. x Line 32b.) | $ | 0 |
| b. Estimated Ancillary Project Income (Line C29 x 12) | $ | 88,320 | d. Total Commercial Project Expenses (From Attached Analysis) | $ | 0 |
| c. Residential and Ancillary Occupancy Percentage* | | 93% | 33. Net Commercial Income to Project | | |
| d. Effective Gross Residential and Ancillary Income (Line 30c. x (Line 30a. plus Line 30b.)) | $ | 1,336,968 | (Line 32c. minus Line 32d.) | $ | 0 |
| e. Total Residential and Ancillary Project Expenses (Line E29) | $ | 868,717 | 34. Total Project Net Income (Line 31 plus Line 33) | $ | 468,251 |
| 31. Net Residential and Ancillary Income to Project (Line 30d. minus Line 30e.) | $ | 468,251 | 35a. Residential and Ancillary Project Expense Ratio (Line E29 divided by Line 30d.) | | 64.98% |
| 32a. Estimated Commercial Income (Line C30 x 12) | $ | 0 | 35b. Commercial Expense Ratio | | |
| b. Commercial Occupancy * (80% Maximum) (See Instructions) | | 90% | (Line 32d. divided by 32c.) | | 0.00% |

* Vacancy and collection loss rates and corresponding residential and commercial occupancy percentages are analyzed through market data, but subject to Jurisdictional Exception to overall HUD underwriting mandates.

## G. Estimated Replacement Cost

| | | | |
|---|---|---|---|
| 36a. Unusual Land Improvements | $ | | |
| b. Other Land Improvements | $ | 1,597,000 | |
| c. Total Land Improvements | | $ | 1,597,000 |
| **Structures** | | | |
| 37. Main Buildings | $ | 12,392,751 | |
| 38. Accessory Buildings | $ | 157,896 | |
| 39. Garages | $ | 72,631 | |
| 40. All Other Buildings | $ | | |
| 41. Total Structures | # | $ | 12,623,278 |
| 42. General Requirements | | $ | 466,425.12 |
| **Fees** | | | |
| 43. Builder's Gen. Overhead at | 2.00% | $ | 293,734 |
| 44. Builder's Profit at | 6.00% | $ | 881,202 |
| 45. Arch. Fee-Design at | 2.07% | $ | 326,338 |
| 46. Arch. Fee - Supvr. at | 0.52% | $ | 82,481 |
| 47. Bond Premium | | $ | 156,616 |
| 48. Other Fees | | $ | 317,233 |
| 49. Total Fees | | $ | 2,061,602 |
| 50. Total All Improvements Lines 36c. plus 41 plus 42 plus 49) | | $ | 16,748,305 |
| 51. Cost Per Gross Sq. Ft. | | $ | 82.17 |
| 52. Estimated Construction Time (Months) | | | 12 |

| Carrying Charges & Financing | | | | | |
|---|---|---|---|---|---|
| 53. Interest: | 14 Mos. at | 4.280% | | | |
| | on $ | 5,520,000 | | $ | 137,816 |
| 54. Taxes | | | | $ | 20,000 |
| 55. Insurance | | | | $ | 10,000 |
| 56. FHA Mtg. Ins. Prem. | ( 1.00% ) | | | $ | 55,200 |
| 57. FHA Exam. Fee | ( 0.30% ) | | | $ | 16,560 |
| 58. FHA Inspec. Fee | ( 0.50% ) | | | $ | 27,600 |
| 59. Financing Fee | ( 2.00% ) | | | $ | 110,400 |
| 60. AMPO (N. P. only) | ( 0.00% ) | | | $ | 0 |
| 61. FNMA/GNMA Fee | ( 1.50% ) | | | $ | 82,800 |
| 62. Title & Recording | | | | $ | 35,000 |
| 63. Total Carrying Charges & Financing | | | | $ | 495,376 |
| **Legal, Organization & Audit Fee** | | | | | |
| 64. Legal | | | | $ | 12,000 |
| 65. Organization | | | | $ | 8,000 |
| 66. Cost Certification Audit Fee | | | | $ | 8,000 |
| 67. Total Legal, Organization & Audit Fees (64+65+66) | | | | $ | 28,000 |
| 68. Builder and Sponsor Profit and Risk | | | | $ | 1,727,168 |
| 69. Consultant Fee (N. P. only) | | | | $ | 0 |
| 70. Initial Deposit to Reserve for Replacement | | | | $ | 0 |
| 71. Contingency Reserve & Relocation Expenses (Sec. 202 or Rehab only) | | | | $ | 0 |
| 72. Total Est. Development Cost (Excl. of Land or Off-site Cost) (50 plus 63 plus 67 thru 71 minus depreciation) | | | | $ | 18,998,849 |
| 73a. Warranted Price of Land J-14(3)(New Constr) | | | | | |
| 695,653 sq. ft. @ $ 1.44 sq. ft. $ | | | 1,000,000 | | * see note at left |
| 73b. As Is Property Value (Rehab only) | $ | | | | * see note at left/below |
| 73c. Off-Site (if needed, Rehab only) | $ | | | | * see note at left |
| 74. Total Estimated Replacement Cost of Project (72 plus 73a or 73b and 73c) | | | | $ | 19,998,800 |

* Note: Jurisdictional Exception: In HUD programs, land, and/or existing improvements are not valued for their "highest and best use," but instead, for their intended multifamily use (Section J analysis below). (Exception: Title II or VI Preservation). Offsite improvements are assumed completed in new construction land valuations (See Line M17 for estimated cost). Unusual costs of site preparation are deducted from the "Value of the Site Fully Improved" to determine "Warranted Price of Land Fully Improved."

## H. Remarks

(Note: For Rehab only: Estimated Value of land without improvements $ _____
Estimated Value of land and improvements "As Is" by Residual Method, i.e., After Rehabilitation Correlated Value minus line G 72 Cost of Rehabilitation Improvements equals $ _____ ; line G 73b is the lesser of this residual amount, and the amount estimated by Supplemental form HUD-92264 "As Is".)

## I. Estimate of Operating Deficit

| Periods | Gross Income | Occup. % | Effec. Gross | Expenses | Net Income | Debt Serv. Reqmt. | Deficit |
|---|---|---|---|---|---|---|---|
| 1. 1st ( ) Mos. | $ | | $ - | $ | $ - | $ | $ 0 |
| 2. 2nd. ( ) Mos. | $ | | $ - | $ | $ - | $ | $ 0 |
| 3. Total Operating Deficit | | | | | | | $ |

Trever M. Smith, Managing Director          Paul C. Martin, Associate Underwriter

**J. Project Site Analysis and Appraisal** (See Chapter 2, Handbook 4465.1)

1. Is Location and Neighborhood acceptable?   ☑ Yes   ☐ No
2. Is Site adequate in Size for proposed Project?   ☑ Yes   ☐ No
3. Is Site Zoning permissive for intended use?   ☑ Yes   ☐ No
4. Are Utilities available now to serve the Site?   ☑ Yes   ☐ No
5. Is there a Market at this location for the Facility  at the proposed Rents?   ☑ Yes   ☐ No
6. ☑ Site acceptable for type of Project proposed under Section   FHA 223(f)  (If checked, acceptance subject to qualifications listed at bottom of page 6.)
7. ☐ Site not acceptable for reasons stated below.

Date of Inspection   4/25/2013   Note: The Effective Date of all land valuations is the date of inspection.

| 8. Value Fully Improved | Location of Project Macon , GA | | | | Size of Subject Site 184 Units |
|---|---|---|---|---|---|
| | Comparable Sales Address No 1 | Comparable Sales Address No 2 | Comparable Sales Address No 3 | Comparable Sales Address No 4 | Comparable Sales Address No 5 |
| | Wembly at Overlook 5486 Riverside Drive | Riverstone Park 3990 Riverstone | Ansley Village 6435 Zebulon Rd | | |
| Date of Sale | Sep-11 | Aug-11 | Oct-05 | | |
| Sales Price | $1,583,434 | $1,430,000 | $1,952,845 | | |
| Size (SF) | 1,070,269 | 986,634 | 592,416 | | |
| Number of Units | 238.00 | 220.00 | 294.00 | | |
| Price Per SF | $1.48 | $1.45 | $3.30 | | |
| Price Per Unit | $6,653 | $6,500 | $6,642 | | |
| Adjustments (%) | | | | | |
| Time | 0.00% | 0.00% | 0.00% | | |
| Location | -20.00% | -20.00% | -20.00% | | |
| Zoning | 0.00% | 0.00% | 0.00% | | |
| Plottage | 0.00% | 0.00% | 0.00% | | |
| Demolition | 0.00% | 0.00% | 0.00% | | |
| Piling, Etc. | 0.00% | 0.00% | 0.00% | | |
| Other | 0.00% | 0.00% | 0.00% | | |
| Total Adjustment Factor | -20.00% | -20.00% | -20.00% | | |
| Adjusted Per Unit Price | $5,322 | $5,200 | $5,314 | | |
| Indicated Value by Comparison | $979,334 | $956,800 | $977,751 | | |
| | | | | 9. Value of Site Fully Improved $ | 1,000,000 |

| 10. | Value "As Is" No 1 | Value "As Is" No 2 | Value "As Is" No 3 | | |
|---|---|---|---|---|---|
| Date of Sale | | | | | |
| Sales Price | | | | | |
| Size per Sq.Ft. | | | | | |
| Price Per Sq.Ft. | | | | | |
| | | | | | |
| Adjustments (%) | | | | | |
| Time | | | | | |
| Location | | | | | |
| Zoning | | | | | |
| Plottage | | | | | |
| Demolition | | | | | |
| Piling, Etc. | | | | | |
| Other | | | | | |
| Total Adjustment Factor | | | | | |
| Adjusted Sq.Ft. Price | | | | | |
| Indicated Value by Comparison | | | | | |
| | | | | 11. Value of Site Fully Improved | |

Previous editions are obsolete

form HUD-92264 (8/95)
ref Handbook 4465.1

**12. Acquisition Cost (Last Arms-Length Transaction)**

| Buyer | Address |
|---|---|
| Seller | Address |
| Date | Price<br>$ |

Source

**13. Other Costs:**

| | | |
|---|---|---|
| (1) | Legal Fees and Zoning Costs | $ |
| (2) | Recording and Title Fees | $ |
| (3) | Interest on Investment | $ |
| (4) | Other | $ |
| (5) | Acquisition Cost (From 12 above) | $ |
| (6) | Total Cost to Sponsor | $ |

**14. Value of Land and Cost Certification**

| | | | |
|---|---|---|---|
| (1) | Fair Market Value of land fully improved (From 9 above) | $ | 1,000,000 |
| (2) | Deduct unusual items from Section G. Item 36a. | $ | 0 |
| (3) | Warranted price of land fully improved (Replacement Cost items excluded) (Enter G-73) | $ | 1,000,000 |
| | For Cost Certification Purposes | | |
| (3a) | Deduct cost of demol. $ _____ and required off -sites $ _____ <br> to be paid by Mtgor. or b to be paid by Mtgor. or by special assessments | $ | - |
| (4) | Estimated of "As Is" by subtraction from improved value | $ | 1,000,000 |
| (5) | Estimate of "As Is" by direct comparison with similar unimpr    12 | $ | - |
| (6) | "As Is" based on acquisition cost to sponsor (From 13 above) | $ | |
| (7) | Commissioner's estimated value of land "As Is" (The lesser of [4] or [5] above)* | $ | 0 |

*Where land is purchased from LPA or other Governmental authority for specific reuse, use the lesser of 4, 5, or 6.

**K. Income Approach to Value**

| | | | |
|---|---|---|---|
| (1) | Estimated Remaining Economic Life | 50 | Years |
| (2) | Capitalization Rate Determined By (See Chapter 7. Handbook 4465.1):<br>☐ Overall Rate From Comparable Projects<br>☐ Rate From Band of Investment<br>☐ Cash Flow to Equity | | |
| (3) | Rate Selected | | 6.75% |
| (4) | Net Income (Line F 34) - Appraiser's Concluded Net Income for Valuation Purposes | $ | 468,251 |
| (5) | Capitalized Value (Line 4 divided by Line 3) | $ | 6,900,000 |
| (6) | Value of Leased Fee (See Chapter 3. Handbook 4465.1)<br>Ground Rent  $ _____   divided by Cap Rate    6.75% equals Value of Leased Fee | $ | - |

Remarks: (See item 6 and 7 on page 5)

NOI used for criteria 3 is based on appraiser's concluded NOI of $468,251, whereas Criteria 5 NOI is based on the Lender's underwritten NOI of $407,531. The difference in NOI is related to the Lender using a higher RfR of $630/unit, versus the appraiser using a market rate RfR of $300/unit.

Overlook Gardens

**L. Comparison Approach to Value**

7. The undersigned has recited three sales of properties most similar and proximate to the subject property and has described and analyzed these in this analysis. If there is a significant variation between the subject and comparable properties, the analysis includes a dollar adjustment reflecting the market reaction to those items or an explanation supported by the market data. If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus(-) adjustment is made, thus reducing the indicated value of the subject property. If a significant item in the comparable property is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the indicated value of the subject property. *[(1) equals the Sales Price divided by Gross Annual Rent]

| Item | Subject Property | | Comparable Sale No. 1 Pinnacle Place | | | Comparable Sale No. 2 Camden Sweetwater | | | Comparable Sale No. 3 Lodge at Sandy Springs | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | 1400 Gray Highway Macon , GA, 31211 | | 500 Caldwell Drive Hephzibah, GA | | | 3355 Sweetwater Drive Lawrenceville, GA | | | 6925 Rosewell Road Atlanta, GA | | |
| Proximity to subject | | | | | | | | | | | |
| Sales Price | $ | | ☑ Unf. ☐ Furn. $ | 4,382,500 | | ☑ Unf. ☐ Furn. $ 25,215,000 | | | ☑ Unf. ☐ Furn. $ 28,300,000 | | |
| Sales Price per GBA | $ | | $ | 37.06 | | $ | | 72.08 | $ | | 51.42 |
| Gross annual rent | $ | 1,437,600 | $ | 886,785 | | $ | | 3,234,000 | $ | | 3,725,250 |
| Gross rent multiplier (1)* | | | | 4.94 | | | | 7.80 | | | 7.60 |
| Sales price per unit | $ | | $ | 36,521 | | $ | | 81,867 | $ | | 58,471 |
| Sales price per room | $ | | $ | 6,087 | | $ | | 15,009 | $ | | 10,695 |
| Data source | | | | Broker | | | | Broker | | | Broker |
| Adjustments | Description | | Description | | +(-) $ Adjust | Description | | +(-) $ Adjust | Description | | +(-) $ Adjust |
| Sales or financing concessions | | | Cash to Seller | | | Cash to Seller | | | Cash to Seller | | |
| Date of sale/time | | | April-11 | | | November-12 | | | April-12 | | |
| Location | Good | | Similar | | | Superior | | -25% | Superior | | -15% |
| Site/view | Good | | Similar | | | Similar | | | Similar | | |
| Design and appeal | Good | | Average | | | Average | | | Average | | |
| Quality of construction | Good | | Average | | | Average | | | Average | | |
| Year built | 1988 | | 1987 | | | 1999 | | -10% | 1987 | | |
| Condition | Average | | Similar | | | Superior | | -10% | Similar | | |
| Gross Building Area | 203,827 | Sq. ft. | 118,200 | Sq. ft. | | 349,826 | Sq. ft. | -5% | 550,360 | Sq. ft. | -10% |
| Unit Breakdown | No. of Units | Room count Tot. Br Ba. Vac. | No. | No. of Units | Room count Tot. Br Ba. Vac. | No. | No. of Units | Room count Tot. Br Ba. Vac. | No. | No. of Units | Room count Tot. Br Ba. Vac. | No. |
| | ### | | | ### | | | 308 | | | 484 | | |
| Basement description | N/A | | | | | | | | | | |
| Functional utility | Good | | Similar | | | Similar | | | Similar | | |
| Heating/cooling | Electric | | Similar | | | Similar | | | Similar | | |
| Parking on/off site | On Site | | Similar | | | Similar | | | Similar | | |
| Project amenities and fee (if applicable) | Typical | | Similar | | | Similar | | | Similar | | |
| Other (Average Unit Size) | 1,023 SF | | 985 SF | | 5% | 1,136 SF | | | 1,137 SF | | |
| Net Adjustment (Total) | | | ☑ + ☐ - | | 5% | ☐ + ☑ - | | -50% | ☐ + ☑ - | | -25% |
| Adjusted sales price of comparables | | | $ | | 38,347 | $ | | 40,934 | $ | | 43,853 |

8. Indicated Value of Sales Comparison Approac  $  7,360,000

**Reconciliation**

Capitalization $ ____6,900,000____   Summation $ ____0____   Comparison $ ____7,000,000____

9. The market value (or replacement cost) of the property, as of the effective date of the appraisal, is ____6,900,000____   ** see note below

** Note: For Section 221 mortgage insurance application processing, acceptance risk analysis produces a supportable replacement cost estimate, and the estimate reflected here is the replacement cost new/summation approach result. In effect, such "appraisals" are in fact USPAP "consultations" concerning economically supportable cost limits. For Section 207 and 223 processing, all three approaches to value are included in the appraisal, but the subject property is appraised for its intended multifamily use, not necessarily its "highest and best use." The definition provided in USPAP for "market value" is generally observed, but see Handbook 4465.1, paragraph 8.4, for qualifications.

Effective Dates: For new construction or substantial rehabilitation proposals, the effective date of the improvements component cost estimation is the Line G53 month estimate added to the report and certification date below. The land component is valued as of the inspection date. For Section 223, the effective date of the appraisal is the same as of the inspection date. For Section 223, the effective date of the appraisal is the same as the reporting date, but assumes (hypothetically) the completion of all required repairs/work write-up items.

Comments on:
1. Sales comparison (including reconciliation of all indicators of value as to consistency and relative strength and evaluation of the typical investors'/purchasers' motivation in that market).
2. Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within three years of the date of appraisal.

**M. To Be Completed by Construction Cost Analyst**

| Cost Not Attributable to Dwelling Use | | | Total Est. Cost of Off-Site Requirements | |
|---|---|---|---|---|
| 10. Parking | $_____ | 16. Off-Site | | Est. Cost |
| 11. Garage | | | | $ ____ |
| 12. Commercial | | | | |
| 13. Special Ext. Land Improvements | | | | |
| 14. Other | | | | |
| 15. Total | $ __0.00%__ | | | |
| | | 17. Total Off-Site Costs | | $ ____ |

**N. Signatures and Appraiser Certification**

| Architectural Processor | Date | Architectural Reviewer | | Date |
|---|---|---|---|---|
| Cost Processor | Date | Cost Reviewer | | Date |

I certify that to the best of my knowledge and belief:

o   the statements of fact contained in this report are true and correct.

o   the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

o   I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

o   my compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated re        12

o   my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice; HUD Handbook 4465.1, The Valuation Analysis Handbook for Project Mortgage Insurance; HUD Handbook 4480.1, Multifamily Underwriting Forms Catalog; and other applicable HUD handbooks and Notices.

o   I have made a personal inspection of the property that is the subject of this report.

o   no one provided significant professional assistance to the appraisers signing this report, except for the Architectural and Engineering, and Cost Estimation professionals signing above. These professionals' estimations of the subject property's dimensions and "hard" replacement costs have been relied upon by the Appraiser and Review Appraiser.

| Appraiser Kay Kauchick, MAI | Date 4/25/2013 | Review Appraiser | Date 11 | 15 | 2013 |
| State Certification Number GA 261355 | State GA | State Certification Number | State | | |

The review appraiser certifies that he/she   ☐ Did   ☐ Did Not   Inspect the subject property

| Chief Housing Program Branch | Date | Director, Housing Development | Date 11 | 18 | 2013 |
| Field Office Manager/Deputy | Date | | | | |

O.  Remarks and Conclusions (continue on back page of page if necessary.  Appraisal reports must be kept for a minimum of five years.)
MAP Guide Section 7.12(B)(10)

a)   The appraiser's statement of actual occupancy, based on the owner's rent roll.
The appraiser has concluded a market occupancy of 93.0% for the project. This is based on the project's actual occupancy the date of site visit (93%), comparable occupancies and historical performance at the project.

b)   The required amount of the initial deposit into the Reserve for Replacement.
$ 358,800   $   1,050   per unit

c)   The estimated cost of required repairs as provided in the inspection report.
Critical          $   27,225
Non-Critical   $   26,770
Total             $   53,995

d)   The estimated amount of legal, organization (if applicable), title and recording expenses based on the maximum insurable loan.
GNMA/Lender Legal       $   19,000
Borrower Legal            $   10,000
Organizational            $   5,000
Title/Recording           $   16,000

MAP Underwriter

Grover M. Smith, Managing Director          Date  11/7/13

MAP Underwriter Trainee

Paul M. Martin, Associate Underwriter        Date  11/8/13

Public Reporting Burden for this collection of information is estimated to average 114 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment. Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

| Supplement to<br>Project Analysis | U.S. Department of Housing<br>and Urban Development<br>Office of Housing<br>Federal Housing Commissioner | OMB Approval No. 2502-0029<br>(exp. 10/31/2012) |
|---|---|---|

Section or Title Number    FHA 223(f) , Refinance
☐ Valuation Trial    ☐ Conditional    ☑ Firm    See last page for Public Reporting burden statement before completing this form

Privacy Act Notice: The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| Name of Mortgagor (Borrower) | Project Number |
|---|---|
| Overlook Gardens Properties, LLC | 061-11283 |

Name of Project:
Overlook Gardens

Location of Project (street, city & state)
1605 Clinton Road, Macon , GA

Type of Borrower
☑ Private    ☑ Profit    ☐ Public    ☐ Nonprofit    ☐ State or Federal Instrumentality, etc.
☐ Management Coop    ☐ Sales Coop.    ☐ Investor-Sponsor    ☐ Builder-Seller    ☐ Limited Distribution

Type of Project
☑ Rental Housing    ☐ Mobile Home Court    ☐ Board and Care    ☐ New Construction    ☑ Non-Elevator
☐ Cooperative    ☐ Nursing Home    ☐ Single Rm. Occupancy    ☐ Rehabilitation    ☐ Elevator
☐ Condominium    ☐ Intermediate Care Facility    ☐ Redevelopment    ☑ Existing
☐ Capital Advance 202/811    ☐ Housing for the Elderly    ☐ Supplement Loan    ☐ Other

## I. Determination of Maximum Insurable Mortgage

| Criteria | 12 | | | column 1 | column 2 | column 3 |
|---|---|---|---|---|---|---|
| 1. Mortgage or Loan Amount Requested in Application | | | | | | $ 5,520,000 |
| 2. Reserved | | | | | | $ N/A |
| 3. Amount Based on Value or Replacement Cost: | | | | | | |
| a. Value (Replacement Cost) in Fee Simple | $ 6,900,000 | X | 83.3% | | $ 5,747,700 | |
| b. (1) Value of Leased Fee | $ 0 | | | | | |
| (2) Grant/Loan funds attributable to R.C. Items | $ 0 | | | | | |
| (3) Excess Unusual Land Improvement | $ 0 | | | | | |
| (4) Cost Containment Mortgage Deduction | $ 0 | | | | | |
| (5) Total lines (1) to (4) | $ 0 | X | 83.3% | $ 0 | | |
| c. Unpaid Balance of Special Assessment | | | | $ 0 | | |
| d. Total line b plus line c | | | | | $ 0 | |
| e. Line a minus line d | | | | | | $ 5,747,700 |
| 4. Amount based on Limitations Per Family Unit | | | | | | |
| a. Number of no Bedroom Units | 0 | X $ | 109,372 | $ 0 | | |
| Number of one Bedroom Units | 48 | X $ | 121,155 | $ 5,815,430 | | |
| Number of two Bedroom Units | 88 | X $ | 144,716 | $ 12,735,008 | | |
| Number of three Bedroom Units | 48 | X $ | 178,372 | $ 8,561,851 | | |
| Number of four or more Bedroom Units | 0 | X $ | 201,938 | $ 0 | | |
| b. Cost not Attributable to Dwelling Use | $ 0 | X | 83.3% | $ 0 | | |
| c. Warranted Price of Land | $ 0 | X | 100.0% | $ 0 | | |
| d. Total lines a through c | | | | | $ 27,112,290 | |
| e. Total Number of Spaces | 0 | X | 0 | | $ 0 | |
| f. Sum: Value of Leased Fee and Unpaid Balance of Special Assessment (s) | | | | | $ 0 | |
| D. · g. Line d or line e, whichever is applicable, minus line f | | | | | | $ 27,112,200 |
| 5. Amount Based on Debt Service Ratio: | | | | | | |
| a. Mortgage Interest Rate | | | | 4.280000% | | |
| b. Mortgage Insurance Premium | | | | 0.600000% | | |
| c. Initial Curtail Rate | | | | 1.236897% | | |
| d. Sum of Above Rates | | | | | 6.1167% | |
| e. Net Income | $ 407,531 | X | 83.3% | | $ 339,474 | |
| f. Annual Ground Rent | $ 0 | + Annual Spec. Assmt. | $ 0 | | $ 0 | |
| g. Line e minus line f | | | | | $ 339,474 | |
| h. Line g divided by line d | | | | | | $ 5,549,900 |
| i. Annual Tax Abatement | Savings $ 0 | divided by | 0% | | | $ 0 |
| j. Line h plus line i. | | | | | | $ 5,549,900 |

Previous editions are obsolete

form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

**I. Determination of Maximum Insurable Mortgage (cont.)**

| Criteria | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| 6. Amount Based on Estimated Cost of Rehabilitation Plus: | | | | |
| (i) "As Is" Value, or (ii) Acquisition Cost, | | | | |
| or (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation: | | | | |
| a. Total Estimated Development Costs | | $ N/A | | |
| b. Estimated Cost of Off-site Construction | | $ N/A | | |
| c. Sum of lines a & b | | | $ N/A | |
| d. Grant/Loan funds attributable to R.C. items | | $ N/A | | |
| e. Line c minus line d | | | $ N/A | |
| f. "As-Is" Value of Prop. Before Rehab. | $ ____ X ____ % | $ N/A | | |
| g. Existing Mortgage Indebtedness (Property owned) or Purchase Price of Property (to be Acquired) | | N/A | $ | |
| h. Line e plus line f or line g, whichever is less | | | $ N/A | |
| i. Line h X ____ | | | | $ N/A |
| 7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f) | | | | |
| a. Purchase Price of Project | | $ N/A | | |
| b. Repairs and improvements, if any | | $ N/A | | |
| c. Other fees | | $ N/A | | |
| d. Loan Closing Charges * | | $ N/A | | |
| e. Sum of lines a through d | | | $ N/A | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and | | | | |
| Major Moveable Equipment to be purchased as an asset of the project | | | $ N/A | |
| g. Line e minus line f | | | $ N/A | |
| h. Line g X ____ NA | | | | $ N/A |
| 8. Amount Based on Sum of Unit Mortgage 12 | | | | $ N/A |
| 9. Amount Based on Estimated Cost to Borrower | | | | |
| a. Total Estimated Cost (Exclusive of Site and Required Construction Off the Site) | | $ N/A | | |
| b. Purchase Price of Site | | $ N/A | | |
| c. Total Cost of Clearing Site, if any | | $ N/A | | |
| d. Expense of Relocating Occupants, if any | | $ N/A | | |
| e. Cost of Off-Site Construction, if any | | $ N/A | | |
| f. Sum of line a through line e | | | $ N/A | |
| g. Line f X ____ % | | | | $ N/A |
| 10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f) | | | | |
| a. Total Existing Indebtedness | | $ 3,989,195 | | |
| b. Required Repairs | | $ 53,995 | | |
| c. Other Fees | | $ 28,738 | | |
| d. Loan Closing Charges * | | $ 534,760 | | |
| e. Sum of line a through line d | | | $ 4,606,680 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and | | | | |
| Major Moveable Equipment on Deposit | | | $ 0 | |
| g. Line e minus line f | | | $ 4,606,600 | |
| h. 80% of Value | $ 6,900,000 X 80% | | $ 5,520,000 | |
| i. Greater of line g or line h | | | | $ 5,520,000 |
| 11. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable items: | | | | |
| D. a. 100% Project (Replacement) Cost * | $ 6,900,000 | | | |
| b. (1) Grants/loans/gifts | $ 0 | | | |
| (2) Tax Credits | $ 0 | | | |
| (3) Value of Leased Fee | $ 0 | | | |
| (4) Excess Unusual Land Improvement Cost | $ 0 | | | |
| (5) Cost Containment Mtge Deduction | $ 0 | | | |
| (6) Unpaid Balance of Special Assessment | $ 0 | | | |
| (7) Sum of Lines (1) through (6) | | $ 0 | | |
| c. Line a. minus line b. (7) | | $ 6,900,000 | | |

\* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f). Project Replacement Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

\* Attach format for computing loan closing charges.

**Maximum Insurable Mortgage** (Lowest of the Foregoing Criteria) | **$ 5,520,000**

## II. Total Requirements for Settlement

| Part A | | | | Part B | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1. Fees Not to be Paid in Cash | | | | 1. a. Existing Indebtedness Including Loan Closing Charges | | $ | 4,552,693 | | |
| a. BSPRA/SPRA | | $ | | b. Adjustment for Contracted Amounts in | | | | | |
| b. Builder's Profit | | $ | | Excess of form HUD-92264 Estimates | | | | | |
| c. Other | | $ | | (1) Construction Contract | | $ | | | |
| Total (enter in part B on line 5) | | $ | | (2) Architect's Contract | | $ | | | |
| 2. Commitment, Mktg., Fees and Discounts and Escrows | | | | (3) Other | | $ | | | |
| a. Fees GNMA | | $ | | c. Total of lines a & b | | | | $ | 4,552,693 |
| Other | | $ | | 2. Required Repairs | | | | $ | 53,995 |
| b. Discounts Permanent Loan | | $ | | 3. Subtotal (lines 1c + 2) | | | | $ | 4,606,688 |
| Construction Loan | | $ | | 4. a. Mortgage Amount | | $ | 5,520,000 | | |
| c. Escrows Debt Service Reserve (Board & Care) | | $ | | b. Grant/Loan, RFR, Major Mov./Other | | $ | 0 | | |
| Other | | $ | | 5. Fees Not to be Paid in Cash | | $ | | | |
| Total (enter in part B on line 9) | | $ | | 6. Subtotal (lines 4a + 4b + 5) | | | | $ | 5,520,000 |
| 3. Working Capital | | | | 7. Cash Investment Required (line 3 minus line 6) | | | | $ | (913,312) |
| a. Working Capital | | $ | | 8. Initial Operating Deficit * | | | | $ | |
| b. Minimum Capital Investment (Sec. 202 & Sec. 811) | | $ | | 9. Commitment, Marketing Fees, Discounts and Escrows | | | | $ | 5,354 |
| c. Non-Realty Items Not Included in Mortgage | | $ | | 10. Working Capital | | | | $ | |
| Total (enter in part B on line 10) | | $ | | 11. Offsite Construction and Demolition Costs | | | | | |
| | | | | ($ + $ ) | | | | $ | |
| | | | | 12. Total Estimated Cash Requirement | | | | | |
| | | | | (sum of lines 7 + 8 + 9 + 10 + 11) | | | | $ | (907,958) |
| | | | | Front Money Escrow, if Any, | | | | | |
| | | | | (subtract line 6 from line 1) | | | | $ | |

12

\* Note: for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Sources of Funds to Meet Cash Requirements

| Source | Funds Available | |
|---|---|---|
| Borrower Cash Out | $ | (907,958) |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| **Total Available Cash for Project** | $ | (907,958) |

## IV. Recommendations, Requirements and Remarks

[✓] Recommend Approval; Subject to Conditions Stated Below, if Any

[ ] Recommend Rejection for Reasons Stated Below (if more space is needed, continue on page 4).

Signature of the Mortgage Credit Examiner
Red Mortgage Capital, LLC                    11/13/13

X  Trever M. Smith, Managing Director
Previous editions are obsolete

Red Mortgage Capital, LLC
X  Raul C. Martin, Associate Underwriter    11/8/13  Date

form HUD-92264-A (03/2010)
ref Handbooks 4480.1

**Remarks:**

## Existing Debt

| $ | 3,989,195 | Existing Debt + Prepayment Penalty (Northmarq Capital) |
|---|---|---|
| $ | 3,989,195 | Total Existing Indebtness / Purchase Price |

## Loan Closing Charges

| $ | 358,800 | Initial Deposit to Replacement Reserve |
|---|---|---|
| $ | 55,200 | Processing Fee |
| $ | 15,000 | Owner Legal & Organizational |
| $ | 15,000 | Title & Recording |
| $ | 16,560 | FHA Exam Fee |
| $ | 55,200 | First Year Mortgage Insurance Premium |
| $ | 515,760 | Total Loan Closing Charges |

## Other Fees

| $ | 1,500 | FHA Inspection Fee |
|---|---|---|
| $ | 19,000 | GNMA Placement Fee |
| $ | 7,800 | Appraisal - ValueTech Realty |
| $ | 3,600 | PCNA Report - Dominion Due Diligence |
| $ | 2,550 | Phase I Environmental Assessment - Dominion Due Diligence |
| $ | 800 | Other (P&A Report - Dominion Due Diligence) |
| $ | 12,488 | Survey |
| $ | 47,738 | Total Other Fees |

## Repair/Replacement/Improvement Costs

| $ | 53,995 | Critical Repairs |
|---|---|---|
| $ | - | Non-Critical Repairs |
| $ | 53,995 | Repair/Replacement Costs |

| $ | 913,312 | Cash to Owner |
|---|---|---|

| $ | 5,520,000 | Total Development Cost |
|---|---|---|

Public Reporting Burden for this project analysis is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to, a collection of information unless that collection displays a valid OMB control number.

This information is being collected under Public Law 101-625 which required the Department of to implement a system of mortgage insurance for mortgages insured under Section 207, 221, 223, 232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property D. Other Fees (Third Party Reports, Survey, Inspection Fee)
In accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

## COMPUTATION OF FEES IN A REFINANCE TRANSACTION

Re:     **Overlook Gardens**

Step 1.   Add the known dollar amounts for:

| | | | | | |
|---|---|---|---|---|---|
| A. Existing Indebtedness + Prepayment Penalty | $ | 3,989,195 | | | |
| B. Repairs (Critical and Non-Critical) | $ | 53,995 | | | |
| C. Initial Deposit to Reserve Fund for Replacements | $ | 358,800 | | | |
| D. Legal | $ | 10,000 | | | |
| E. Organizational | $ | 5,000 | | | |
| F. Title and Recording | $ | 15,000 | | | |
| G. Other Fees (Third Party Reports, Survey, Inspection Fee) | $ | 28,738 | | | |
| H. GNMA Fee | $ | 19,000 | | | |
| TOTAL | | | $ | 4,479,728 | |

Step 2.   Less Escrow on Deposit w/ Current Mortgagee

| | | | |
|---|---|---|---|
| | | $ | - |
| TOTAL | | $ | 4,479,728 |

Step 3.   Add the known percentages for the following:

| | |
|---|---|
| A. Financing Fee | 1.00% |
| B. MIP | 1.00% |
| C. Exam Fee | 0.30% |
| D. FNMA Fee | 0.00% |
| E. Discounts, if Allowable | 0.00% |
| TOTAL | 2.30% |

Step 4.   Subtract the product in step 3 from 100%.         RESULT         97.70%

Step 5    Divide the product from Step 2 by the result from step 4.  The quotient
rounded down to the nearest hundred becomes the mortgage amount.         $    4,585,100

| | | Fees Based on Actual Mtg. $5,520,000 | | Fees Based on Calculated Mtg. $4,585,100 | |
|---|---|---|---|---|---|
| Step 6. | Compute and total the actual fees based on the mortgage amount determined in Step 5. | | | | |
| | A. Financing Fee | $ | 55,200 | $ | 45,851 |
| | B. MIP | $ | 55,200 | $ | 45,851 |
| | C. Exam Fee | $ | 16,560 | $ | 13,755 |
| | D. Permanent Placement Fee | $ | - | $ | - |
| | E. GNMA Fee | $ | 19,000 | $ | 19,000 |
| | F. Discounts, If Allowed | $ | - | $ | - |
| | TOTAL | $ | 145,960 | $ | 124,457 |
| Step 7. | Add to the total derived from Step 6, the following: | | | | |
| | A. Legal and Organizational | $ | 15,000 | $ | 15,000 |
| | B. Initial Deposit to Reserve for Replacement | $ | 358,800 | $ | 358,800 |
| | C. Title and Recording | $ | 15,000 | $ | 15,000 |
| | TOTAL | $ | 388,800 | $ | 388,800 |
| | D. Other Fees (Third Party Reports, Survey, Inspection Fee) | $ | 28,738 | $ | 28,738 |
| | **TOTAL LOAN CLOSING CHARGES AND FEES** | **$** | **563,498** | **$** | **541,995** |

Form HUD 92264A

# Overlook Gardens Properties, LLC et al. v. Orix USA, LP, et al.

## Volume 2

## Exhibits 18 - 28

# Overlook Gardens Properties, LLC et al. v. Orix USA, LP, et al.

## Table of Contents

EXHIBIT LIST

1   Orix USA Official Web Page
2   Business Wire news press release re Orix's acquisition of Red Capital Group from PNC Bank
3   Orix page for Mike Moran
4   Mike Moran LinkedIn Page
5   Press release announcing Mike Moran to serve as Chairman of Red Capital Group while simultaneously maintaining his responsibilities with Orix
6   Multifamily Executive Magazine story re Red Capital Group joint venture
7   Red Capital Group "About Red" webpage
8   February 6, 2017 Emails from HUD re yield spread premium disclosure requirements
9   March 26, 2013 Letter from Red to Paul Hinman and attached Application Letter for Overlook
10  Red Capital Group "The Face of Lending" webpage
11  Red Capital Group "We Provide It" webpage
12  Commitment to Insure for Overlook
13  Lender's Commitment Letter for Overlook
14  Rate Lock Letter for Overlook
15  Emails re Rate Lock
16  Emails re Rate Lock for Overlook and Rate Lock Confirmation Letter (sent electronically)
17  HUD Commitment to Insure (Amended)
18  December 1, 2013 Letter from Red to HUD concerning funding financing for Overlook via GNMA mortgage-backed securities
19  Closing Document List for Overlook deal
20  Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower- Overlook deal
21  December 8, 2015 letter to James Croft re Yield Spread Premium
22  James Croft response letter to December 8, 2015 Yield Spread Premium inquiry
23  December 16, 2015 response letter to James Croft re his response (Exh. 22)

# Overlook Gardens Properties, LLC et al. v. Orix USA, LP, et al.

## Table of Contents
## Continued

EXHIBIT LIST CONTINUED

25 *Hausfeld v. Love Funding Corp.*, C.A. No. TDC-14-0142, United States District Court, District of Maryland, Sept. 17, 2015 Order on Cross Mot. for Summary Judgment [Pacer Doc. 36]

26 Mr. Hausfeld's Employment Agreement with Love Funding

27 Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower- Creekwood deal

28 MAP Guide Excerpts

29 NAMB 2/24/2009 published position re YSP

30 PNC 10/13/2009 engagement letter

31 Sample Lender's Certificate

32 HUD Mortgagee Letters and Multifamily Notices

33 Samples of Objection Letters

34 MAP Closing Guide Excerpts

35 Sample Sources and Uses Worksheet

36 December 14, 2016 Letter from Jim Croft

37 Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower—Inverness deal

38 Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower—Greystone Farms deal

# Exhibit 18



*RED*

A 19 PNC Company

Red

December 1, 2013

U.S. Department of Housing and Urban Development
Atlanta Regional Office
Five Points Plaza Building, 40 Marietta Street
Atlanta, GA 30303-2806

      **Re:**   **Overlook Gardens Apartments**
              **FHA Project No. 061-11283**
              **Project Address: 1400 Gray Highway, Macon, Georgia**

Ladies and Gentlemen:

The purpose of this letter is to provide evidence of the permanent financing to be provided by Red Mortgage Capital, LLC ("Lender") for the above-referenced project.

Lender will provide permanent financing based upon the Commitment to Insure Upon Completion for Section 207, pursuant to Section 223(f) of the National Housing Act, as amended, issued by HUD on October 22, 2013, as amended. The financing terms include a permanent mortgage interest rate of 4.28 percent. The permanent financing will be for a term of 420 months. The financing will be funded through the sale of GNMA mortgage-backed securities.

If you have any questions or require any additional information, please do not hesitate to contact the undersigned at 614-857-1400.

Very truly yours,

RED MORTGAGE CAPITAL, LLC

By: _____
    Jeff N. Leeth
    Director

12/06/2013 1771.3461 V.2

# Exhibit 19

**RED MORTGAGE CAPITAL, LLC**
**OVERLOOK GARDENS APARTMENTS**
FHA Project No. 061-11283
Macon, Georgia
Section 207, pursuant to Section 223(f)
Atlanta, Georgia HUD Office
Closing Date: December 19, 2013

1.  FHA Firm Commitment, as amended

2.  Mortgagor's Organizational Documents

3.  Partnership's Certificate of Sun Valley Properties, LLP

4.  Survey

5.  Surveyor's Report

6.  Title Policy

7.  Title Exception Documents

8.  UCC and Litigation Search Reports

9.  Warranty Deed

10. Evidence of Building Code Compliance

11. Closing Protection Letter

12. Mortgagor's Attorney's Opinions

13. Inspection Fee and MIP Check

14. Certification of Borrower Regarding Rent Roll

15. Owner's Certification re: Completion of Critical Repairs

16. Certification Regarding Lead Based Paint, Asbestos and Smoke Detectors

17. Infestation Inspection Report

18. Attendance Sheet

19. Note (Multistate) and Rider

20. Security Instrument

21. Regulatory Agreement

22. UCC Financing Statement – Bibb County, Georgia

23. UCC Financing Statement – Georgia Central Filing Index

24. Request for Endorsement of Credit Instrument

25. Agreement and Certification

26. Settlement Statement

27. Mortgagor's Certification: Tenant Security Deposits

28. Permanent Financing Letter

29. Owner's Certification re: Completion of Non-Critical Repairs

30. Borrower's Oath

31. EEOC Certification

32. Assurance of Compliance with Title VI

33. Byrd Amendment Certifications

34. LIHTC Certification


**Distribution List:**
Tiffany Ranft (CD)
Sherry Osborne (CD)
Patrick Reardon
George Mize Jr. (2 CDs)
Sylloris Lampkin (2 CDs)

# Exhibit 20

1

**Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower & ~~General Contractor~~**

U.S. Department of Housing and Urban Development
Office of Housing

OMB Approval No. 2502-0598
(Exp. 04/30/2014)

Public Reporting Burden for this collection of information is estimated to average 0.75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| | | | |
|---|---|---|---|
| Project Name: | Overlook Gardens Apartments | Project Number: | 061-11283 |
| Project Address: | 1400 Gray Highway | Date of Commitment: | October 22, 2013 |
| | Macon, Georgia | Borrower: | Overlook Gardens Properties, LLC |
| Lender: | Red Mortgage Capital, LLC | | |

☐ Traditional Application Processing (TAP)
☒ Multifamily Accelerated Processing (MAP)
☐ Other

☐ Insurance upon Completion under Section _____
☒ Refinancing under Section 207, pursuant to Section 223(f)

**To the U.S. Department of Housing and Urban Development (HUD):**

GENERAL

The entities executing this Request for Endorsement of Credit Instrument (**"Request"**) are RED MORTGAGE CAPITAL, LLC, a Delaware limited liability company, Lender under that certain Security Instrument dated **as of December 1, 20**13; **and OVERLOOK GARDENS PROPERTIES, LLC, a Georgia limited liability company,** Borrower under the Security Instrument; ~~and, in cases involving insurance upon completion, _____, General Contractor, the entity responsible for construction or substantial rehabilitation of the Project.~~ The parties hereto understand that the Security Instrument, the Note, this Request, and any documents submitted with this Request are considered to be consistent with and shall be interpreted consistently with HUD's regulations as they pertain to the Contract of Insurance. The parties hereto agree to be bound by Program Obligations. (The definition of any capitalized term or word used herein can be found in this Request, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument, except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Request rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

## I. CERTIFICATE OF LENDER

### A. LENDER SUBMISSIONS & REPRESENTATIONS

1. Lender submits separately a check to HUD for $**55,200.00** covering the first mortgage insurance premium, together with the other items called for in the Firm Commitment dated **October 22, 2013**, and in any extensions or amendments thereof. Lender certifies that all conditions of the Firm Commitment have been fulfilled to date, including any work done prior to endorsement of the Note that has been approved by HUD, in writing, and all HUD-imposed conditions have been met with respect to such work.

2. Lender submits separately the appropriate security agreement(s) executed by Borrower covering all of the Mortgaged Property that, under applicable law, may be subject to a security interest under the Uniform Commercial Code (**"UCC"**), whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (**"UCC Collateral"**).

3. Lender submits separately a certified survey of the Mortgaged Property, if required by HUD, and a title policy as specified in Program Obligations together with evidence that the Mortgaged Property is properly zoned.

4. Lender agrees that the amount approved for disbursement by HUD shall not be released unless the current endorsement to the title policy, insuring Lender and HUD, evidences that (a) the lien of the Security Instrument is prior to all liens and encumbrances that may have attached or defects that may have arisen subsequent to the recording of the Security Instrument, except such liens or other matters approved by HUD, including tax liens not delinquent, and (b) the lien of the Security Instrument is prior to all mechanics' and materialman's liens filed of record subsequent to the recording of the Security Instrument, regardless of whether such liens attached prior to the recording date.

5. Lender agrees to:  (a) obtain the prior written approval and/or consent of HUD in those instances required in the Security Instrument; (b) furnish HUD with all pleadings, reports and data in those instances required in the Security Instrument, including but not limited to the physical inspection report of the Mortgaged Property, except for physical inspections performed by HUD or on behalf of HUD, and financial reporting data; and (c) furnish HUD with a copy of any application by Lender for the appointment of a receiver pursuant to the Security Instrument and all related pleadings.

6. Lender agrees to furnish a copy of this Request to any successors and assigns of Lender and agrees that, in any contract for sale or assignment of the Security Instrument to a successor Lender (for purposes of servicing the Loan only), the successor Lender will agree to be bound by the provisions of this Request that relate to the servicing of the Loan.

7. To the best of our knowledge and information, any required repairs have been completed in accordance with Program Obligations, except for such items approved by HUD for delayed completion or non-critical deferred repairs as indicated on a separate schedule attached hereto as Exhibit **C**.

8.  Impound accounts for taxes, insurance and mortgage insurance premiums have been established and are adequately funded.

9.  Lender agrees (a) to require Borrower to keep the Mortgaged Property insured at all times against such hazards as Lender and HUD may from time to time require and as set forth in the Security Instrument, and (b) to notify HUD of any known payments made by an insurer.

10.  Lender certifies that all insurance policies on the Project comply with the terms of the Security Instrument and, where applicable, that those insurance policies have attached thereto a standard mortgagee clause making the loss payable to Lender, as its interest may appear, and where applicable, Lender is shown as an additional insured.  If Lender determined that any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Lender certifies that it has collected a receipt from the insurance company providing flood insurance evidencing payment for the premium, dated **N/A per Survey and Surveyor's Report.**

11.  The term **"Financing Charge(s),"** as used herein shall mean any charge, direct or indirect, for supplying the Loan to Borrower or servicing the Loan for HUD, Ginnie Mae, a third party investor or Lender's own account.

12.  If the Security Instrument is assigned to HUD under the Contract of Insurance, HUD shall not be bound by the requirements of this Request.

13.  Lender agrees to promptly review any Borrower's request to transfer the Project and not unreasonably withhold Lender's approval of the transfer.  If HUD approves the transfer, Lender agrees to execute a release and assumption agreement or a security instrument modification agreement incorporating any new Regulatory Agreement into the existing Security Instrument.  It is understood that Lender's consent to the transfer will in no way prejudice Lender's rights under the Contract of Insurance with HUD.

14.  Lender agrees (a) to notify HUD in writing immediately upon learning of any Violation of the Regulatory Agreement by Borrower, (b) that Violations under the terms of the Regulatory Agreement may only be treated as a default under the Security Instrument where HUD requests Lender to do so, and (c) following a Declaration of Default by HUD under the Regulatory Agreement and upon the request by HUD, Lender, at its option, may declare the entire Indebtedness to be due and payable.

## B.  FEES AND CHARGES BY LENDER

The charges enumerated on a separate schedule prepared by Lender are attached hereto as Exhibit **A**.  The charges have been (i) collected in cash or will be so collected not later than the date of initial endorsement; (ii) will be disbursed from Loan proceeds; or (iii) will be collected or disbursed as otherwise set forth in Program Obligations.

## C. ESCROWS AND DEPOSITS HELD BY LENDER

1. Borrower has deposited with Lender, or subject to the control and order of Lender in a depository satisfactory to Lender, in accordance with Program Obligations, the following sums required by the Firm Commitment: (*Check and complete applicable paragraphs.*)

☐    (a) Escrow deposit guaranteeing payment for off-site facilities in the amount of $_____. This deposit is in the form of _____(*cash or letter of credit*). The Escrow Agreement for Off-Site Facilities is dated _____, 20__, and is executed by _____.

☐    (b) Lender has received from Borrower a working capital deposit in the form of (*cash or letter of credit*)_____ in the sum of $_____, which Lender agrees to maintain and control. Funds in this deposit may be released or allocated for the purposes indicated in the Escrow Agreement for Working Capital (dated _____, 20__, and executed by _____) and for no other purpose unless Lender obtains the prior written approval of HUD.

☐    (c) Lender has [*collected from Borrower in cash*] OR [*set aside from the final disbursement of Loan proceeds*] funds totaling [150% of the amount necessary to complete the items of delayed completion] OR [120% of the amount necessary to complete non-critical, deferred repairs] described in Paragraph I.A.7, above.  The [Escrow Agreement for Incomplete Construction] OR [Escrow Agreement of Non-critical Deferred Repairs] is attached hereto.

☒    **(d) Lender has collected the sum of $358,800.00 for deposit into the Project's Reserve for Replacement account.**

2. Lender submits separately: (*Check applicable paragraphs.*)

☐    (a) Off-site bond in the amount of $_____.

☐    (b) Evidence to the effect that required off-site utilities and streets will be provided by the public authorities having jurisdiction or by public utility companies serving the Project.

3. As required by the Firm Commitment (*if required, check and complete the applicable paragraph*):

☐    Submitted separately is the sponsor's guarantee to meet an initial operating deficit (dated _____, 20__, and executed by _____).

☐    Escrow Agreement for Operating Deficit evidencing a (*cash, or letter of credit*) _____ deposit in the amount of $_____, dated _____, 20__, and executed by _____.

4. List any other escrows:

5. Beginning with the date on which the first payment toward amortization is required to be made by the terms of the insured Loan or at such later date as may be agreed to by HUD in writing, Lender

shall require a monthly deposit with Lender or in a depository satisfactory to Lender in accordance with Program Obligations of the sum required by the HUD Regulatory Agreement constituting a Reserve for Replacement, which account shall be subject to Lender's order and from which account withdrawals may be made only upon the receipt of HUD's written permission. Lender acknowledges that the amount of the monthly deposit may be increased or decreased from time to time at the direction of HUD in accordance with Program Obligations. Such funds shall at all times remain under the control of Lender or Lender's designee and shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations. Notice of any failure to receive the required deposits shall be forwarded to HUD within 60 days of the date such deposits are due.

6. In cases where a Residual Receipts account is required with respect to the Loan under the Regulatory Agreement, Lender shall deposit or place in a depository satisfactory to Lender, in accordance with Program Obligations, all funds received from Borrower for deposit therein. The Residual Receipts account will be subject to the control of Lender, and withdrawals may be made only with the prior written approval of HUD. These funds shall be held in an interest-bearing account which shall be insured or guaranteed by a federal agency and in accordance with Program Obligations. Lender agrees to notify HUD in writing of any non-compliance with Program Obligations with respect to such Residual Receipts account immediately when known to Lender.

### D. CERTIFICATIONS, AGREEMENTS, AND ACKNOWLEDGEMENTS

1. Lender certifies and agrees that no financing charges other than charges disclosed herein have been or shall be made. Until final endorsement for insurance by HUD, all funds collected pursuant to items (c), (d), or (e) below and not paid over to the permanent lender, plus any funds returned by the permanent lender, shall be held for the account of Borrower and shall be subject to HUD's control and direction in the event of a claim under the Contract of Insurance.

Lender further certifies and agrees that: (*Check and complete the following applicable subparagraphs*)

☐ (a) Lender has not imposed and will not impose a financing charge of any kind directly or indirectly, other than the initial service charge.

☐ (b) In addition to the initial service charge, Lender has collected in the form of (*cash or letter of credit*) _____ for the amount of $_____ as a discount or financing charge for the construction loan. Also, an amount of $_____ has been collected in the form of (*cash or letter of credit*) _____ to cover construction Loan extension fees. In an attached addendum, Lender has identified the time frames in which the extension fees must be paid.

☒ (c) Lender intends to retain the permanent loan and has collected a permanent placement fee of $ **See Exhibit A** . In addition to the initial service charge and permanent placement fee, Lender has collected in the form of (*cash or letter of credit*), **See Exhibit A** the amount of $ **See Exhibit A** as a discount or financing charge for the permanent loan. **The amount of the initial service charge is shown in Exhibit A.**

☐ (d) Lender has a firm commitment from _____ to purchase the

Loan when fully disbursed and fully insured at a financing charge or discount of _____ percent and Lender has collected in the form of (*cash or letter of credit*) _____ the amount of $_____ to cover said charge or discount.

☐ (e)  This Project shall be financed with (*tax-exempt or taxable*) _____ bonds.  Therefore, Lender has collected in the form of (*cash or letter of credit*) _____ the amount of $_____ and has distributed or shall distribute from Loan proceeds the amount of $_____ to cover the costs of issuance.  A statement is attached as <u>Exhibit___</u> itemizing these costs with an explanation of the necessity of each cost and the source of the funds.

☐ (f)  The Loan is a unitary loan under which the Lender intends to retain the Loan for both the construction and permanent loan terms.  Lender has collected a unitary loan placement fee of $_____.  In addition to the initial service charge and the unitary loan placement fee, Lender has collected in the form of (cash or letter of credit) _____ the amount of $_____ as a discount or financing charge for the unitary loan.

☒ (g)  Additional financing charges or discount of $ <u>**See Exhibit A**</u> are to be collected under <u>Exhibit **A**</u> attached hereto for the purpose shown in ~~(b)~~, (c), ~~(d)~~, ~~(e)~~, or ~~(f)~~.  *(**Strike inapplicable letters**)*  The arrangement for the collection of additional financing charges or discount must follow Program Obligations and use forms prescribed by HUD.

☒ (h)  The Note rate includes a servicing fee payable to Lender monthly during the life of the Loan (**"Servicing Fees"**).  In addition, the Lender may impose reasonable and customary administrative fees and charges (including but not limited to, reimbursements for out-of-pocket expenses) for handling and investing the cash held in the Reserve for Replacement, the Residual Receipts account, if applicable, and any other interest-bearing escrows related to the Project and for processing, reviewing and approving other matters, as more fully set forth in Program Obligations (**"Administrative Fees"**).  Borrower is entitled to earn interest on the Reserve for Replacement and Residual Receipts accounts, as more fully set forth in Program Obligations.  Lender shall not invest escrow account monies in interest-bearing account unless interest earned is added to and included in the relevant escrow account, and unless the net income is paid or credited to the account of Borrower.  Net income is defined as the earnings remaining after the following expenses are deducted:  (i) any Servicing Fees, and (ii) any Administrative Fees.

☐ (i)  The Loan to be made to Borrower will be financed through funds being provided by a third-party investor through the issuance to the investor of permanent participation certificates pursuant to a participation agreement between Lender and the investor, with respect to which agreement Lender has agreed to repay the investor at a stated interest rate according to a fixed payment schedule.

☒ (j)  The Loan to be made to Borrower will be financed through funds being provided by a third-party investor through the issuance to the investor of ~~construction and~~ permanent fully-modified, pass-through, mortgage-backed securities, guaranteed as to principal and interest by Ginnie Mae.

2.  Lender certifies and agrees that, except for (a) Loan advances made in accordance with Program Obligations, (b) notes executed pursuant to D.1(g) above, or (c) Lender advances made pursuant to the Security Instrument, Lender does not have outstanding and shall not make loans or advances to

Borrower, any of the sponsors, the general contractor, or the architect for any purpose connected directly or indirectly with this Project without prior written approval of HUD and that Lender has not made or offered, and shall not make or offer, any guarantees, pledges, reservations of sums to become due or other inducements to any entity or person to make loans or advances which Lender would be prohibited from making under the terms of this paragraph.

3. Lender certifies that Lender has not made and shall not make payment of any kickback or fee or other consideration, directly or indirectly, to any person who has received payment or other consideration from any other person in connection with this Loan transaction, including the purchase or sale of the Mortgaged Property, except for compensation paid or to be paid, if any, for the actual performance of services and approved by HUD.

4. Lender certifies that in any case where a letter of credit has been accepted instead of cash, (a) such unconditional and irrevocable letter of credit is in accordance with Program Obligations and has been issued by (1) another banking institution; or (2) Lender, subject to receiving HUD's written permission prior to initial endorsement; and (b) Lender has not made and shall not make any inducements as described in Section D.2 above to procure issuance of letters of credit. Lender also agrees that if demand under the letter of credit is not immediately met, Lender shall forthwith provide cash equivalent to the undrawn balance thereunder without recourse to Borrower and without regard to Lender's ability to recover such amount from any other entity or person who securitized the letter of credit.

5. (a) For Loans funded with the proceeds of state or local bonds, Ginnie Mae mortgage-backed securities, or other bond obligations as defined by HUD, any of which contain a prepayment lock-out and/or prepayment premium provision, Lender agrees, in the event of a default during the term of the prepayment lock-out and/or prepayment premium (i.e., prior to the date on which prepayments may be made with a prepayment premium of one percent or less), to follow those procedures set forth in Program Obligations.

(b) After commencement of amortization, Lender agrees to notify HUD of the delinquency when a payment is not received by the fifteenth (15th) day of the month in which it is due.

6. (a) Lender certifies to HUD that the following are the only identities of interest, as defined in Program Obligations, between Lender and Borrower, any Principal of Borrower, ~~Contractor, any subcontractor,~~ or the seller of the land:

  None _____

_____

~~(b) Lender agrees that it shall disclose to HUD any future identities of interest, as defined in Program Obligations, during the construction period or prior to final endorsement.~~

7. Lender certifies to HUD that no identity of interest, as defined in Program Obligations, exists between Lender and the counsel to Borrower and that no portion of the amounts included in the Loan for Borrower's attorneys has been paid to Lender or its employees.

8. Lender certifies to HUD that all funds, escrows, accounts and deposits specified in this Request and any and all other funds held by or at the order of Lender in connection with the Loan transaction covered by this Request shall be funds held pursuant to Program Obligations and any applicable escrow agreements.

9. Lender certifies that all HUD form closing documents submitted to HUD in connection with this transaction (with the exception of the Opinion by Counsel to Borrower and the accompanying Certification by Borrower) conform to those documents Lender obtained from HUD and such documents have not been changed or modified in any manner except as suitably identified and approved by HUD as evidenced by the **Closing Documents Memorandum** attached **as Exhibit B.** memorandum. It is understood that changes and modifications do not include filling in blanks, attaching exhibits or riders, deleting inapplicable provisions or making changes authorized by Program Obligations. Lender further certifies that all closing documents submitted to and accepted by HUD at closing in connection with this transaction are listed in the **Closing Documents Checklist** attached **as Exhibit B-1.** memorandum.

10. Lender acknowledges, based upon its reasonable due diligence, that Borrower has obtained the necessary governmental certificates, permits, licenses, qualifications and approvals of Governmental Authorities to own and operate the Mortgaged Property and to carry out all of the transactions required by the Loan Documents and to comply with applicable federal statutes and regulations of HUD in effect on the date of the Firm Commitment. Lender also acknowledges that appropriate actions have been taken by and necessary filings have been made with those Governmental Authorities all as disclosed by Borrower in Exhibit D, attached hereto.

11. [INTENTIONALLY OMITTED]

12. Lender certifies that it has made reasonable inquiry and has discovered no liens or encumbrances against the Mortgaged Property that are not reflected as exceptions to coverage in the title policy.

13. Lender certifies that the Loan does not violate the usury laws or laws regulating the use or forbearance of money of the Property Jurisdiction.

14. Lender agrees that, if there is a sale or transfer of all or a partial interest in the Note (other than a sale or transfer of a participation or other beneficial interest, e.g., a transfer of any interest of a Ginnie Mae MBS Security, or the creation of a security interest) or a change of the Loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change.

**15. See Exhibit E for PCNA Rider required by the MAP Guide.**

Lender hereby certifies that the statements and representations of fact contained in this instrument and all documents submitted and executed by Lender in connection with this transaction are, to the best of Lender's knowledge, true, accurate, and complete. This instrument has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

9

| Date | Lender |
|---|---|
| December 19, 2013 | RED MORTGAGE CAPITAL, LLC, a Delaware limited liability company |
|  | By _____ <br> Name: Jeff N. Leeth <br> Title: Director |

**Attachments:**

| Exhibit A | Lender's Financing Charges |
|---|---|
| Exhibit B | Closing Documents Memorandum |
| Exhibit B-1 | Closing Documents Checklist |
| Exhibit C | List of Required Repairs |
| Exhibit D | Borrower's Certification |
| Exhibit E | PCNA Rider |

Previous editions are obsolete;
Replaces form FHA-2455 (02/73)        Request for Endorsement        HUD-92455M (Rev. 04/11)

10

## II.  CERTIFICATE OF BORROWER

A.  The undersigned Borrower certifies to HUD:

    1.  Borrower has read the foregoing Certifications of Lender, and to the best of its knowledge and belief considers it correct.

    2.  All funds escrowed with Lender, as set forth in the Certifications of Lender, may be held by Lender for the purposes indicated therein, or in an Event of Default and with HUD's permission may be applied to the Indebtedness.

    3.  No Fixtures or Personalty acquired for the Project have been purchased using a conditional sale contract or other form of delayed payment

B.  Additionally, the undersigned certifies that:

    1. Borrower has received the sum of $**5,520,000.00**, constituting the full principal amount of the Loan for this Project.

    2. Construction or repairs is/are complete, except as otherwise noted in the Certifications of Lender, and is in accordance with the drawings and specifications or list of repairs required by HUD. The Security Instrument is a good and valid first lien; the Mortgaged Property is free and clear of all liens other than that of the Security Instrument or such inferior liens as have been approved by HUD; and all outstanding unpaid obligations contracted by or on behalf of Borrower, directly or indirectly, in connection with the Loan transaction, the acquisition of the Mortgaged Property, and the construction, substantial rehabilitation or repair of the Project are listed below:

        (a) HUD-approved notes (*copies attached*) $ **N/A**

        (b) Due General Contractor $ **N/A**

        (c) Other $ **N/A**

*(NOTE: If the space provided is inadequate to list all unpaid obligations, insert the total in each category and attach itemizations.  If there are no outstanding obligations, so state.)*

    3.  Except for any amounts due on notes listed in item II.B.2 above, the undersigned agrees to pay the foregoing obligations in cash and to furnish HUD with receipts, or other evidence of payment satisfactory to HUD, within 45 days following the date hereof.

    4.  Borrower represents and warrants to Lender and HUD that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial/final endorsement of the Note by HUD (**except for any UCC filings disclosed to Lender and HUD in connection with an existing mortgage loan secured by the Project, that are to be released in connection with the HUD-insured transaction**), and Borrower has taken and shall take no action which would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty (as listed below), that has been approved in writing by HUD.

11

<u>None</u> _____

_____

_____

The Borrower affirms that the statements and representations of fact by Borrower contained in this instrument and all documents are, to the best of Borrower's knowledge, true, accurate, and complete. This instrument has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

| Date | Borrower |
|---|---|
| December 19, 2013 | **OVERLOOK GARDENS PROPERTIES, LLC, a Georgia limited liability company** |
| | By:  **Sun Valley Properties, LLP, a Georgia limited liability partnership, its Managing Member** <br><br> By: _(signature)_ <br> **Name: Charles A. Gower** <br> **Title: Partner** |

12

## III.  CERTIFICATE OF GENERAL CONTRACTOR

A.  The undersigned general contractor certifies to HUD:

1.  The construction is in accordance with the Drawings and Specifications approved by HUD.

2.  All outstanding unpaid obligations contracted by or on behalf of the undersigned in connection with the Construction Contract are listed below:

| | $ |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

*(NOTE: If the space provided is inadequate to list all unpaid obligations, insert the total in each category and attach itemizations.  If there are no outstanding obligations, indicate "none.")*

B.  Except for unfinished work funded by an escrow or escrows approved by HUD, the undersigned agrees to pay the foregoing obligations, and to furnish HUD receipts or other evidence satisfactory to HUD, within 15 days following receipt of payment from Borrower.

13



~~The General Contractor affirms that the statements and representations of fact by General Contractor contained in this instrument and all supporting documentation thereto are, to the best of General Contractor's knowledge, true, accurate, and complete.   This instrument has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.~~

~~Name of Entity:~~ _____

~~By:~~ _____ /s/ _____

~~Printed Name, Title:~~ _____

~~Dated:~~ _____

~~By:~~ _____ /s/ _____

~~Printed Name, Title:~~ _____

~~Dated:~~ _____

## Warning

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

## EXHIBIT A
## FINANCING CHARGES

1.  HUD Fees.  Lender has remitted the following fees to HUD:

    **X**   (a)   HUD examination/application fee in the amount of **$16,560.00**.
    **X**   (b)   HUD inspection fee in the amount of **$1,500.00**.

2.  The following Financing Charges have been collected by Lender in cash or will be so collected in connection with endorsement:

    **X**   (a)   Initial service charge in the amount of **$55,200.00**.
    **X**   (b)   Permanent loan fee in the amount of **$19,000.00**.
    _____   (c)   Extension fees in the amount of $_____.
    _____   (d)   Permanent loan discount in the amount of $_____.
    _____   (e)   Other (specify)_____ in the amount of $_____.

    From the foregoing amount(s), Lender will pay the sum of $22,080.00 to Trillium Capital Resources for services provided in connection with the processing and closing of the Loan.

3.  Lender will receive Servicing Fees in accordance with Section I.D.1.(h) of this Request. Lender may receive Administrative Fees in accordance with Section I.D.1.(h) of this Request in such amounts as may be established by Lender from time to time (and Lender may receive reimbursement for its attorneys' fees and other costs and expenses incurred) in connection with processing, reviewing and approving (i) transfers of physical assets; (ii) commercial leases and any related amendments, waivers, renewals, expansions, contractions or terminations; (iii) matters related to title to the Project; and/or (iv) other matters which are subject to Lender's processing, review or approval under the Loan Documents, Program Obligations or otherwise in connection with holding and/or servicing the Loan.

## EXHIBIT B

## CLOSING DOCUMENTS MEMORANDUM

Pursuant to Section I.D.9 of the Request to which this Closing Documents Memorandum is attached:

A.  Attached hereto as Exhibit B-1 is a list of the closing documents submitted to and accepted by HUD at closing of this transaction.

B.  The following changes and modifications have been made to the HUD form closing documents (with the exception of the Opinion of Counsel to the Borrower and the accompanying Certification of Borrower) submitted to HUD in connection with this transaction. (It is understood that filling in blanks, attaching exhibits or riders, deleting inapplicable provisions, and making changes authorized by Program Obligations are not considered to be changes or modifications and are not required to be listed in this Closing Documents Memorandum.)

1.  Note.

   1.1  Endorsement panel. In the endorsement panel to be executed on behalf of HUD, the phrase "to the extent of advances approved by HUD" (and the separate signature line below that phrase) are shown as struck-through text, because for this Loan there are no separately-approved advances.

2.  Regulatory Agreement.

   2.1  Reserve for Replacement (Section III.10.b). Section III.10.b has been revised to reflect the initial deposit(s) to the Reserve for Replacement required by the Firm Commitment.

   2.2  Management Contract (Section IV.23). In accordance with HUD's Multifamily Regulatory Agreement FAQ #41, Section IV.23 has been revised to read as follows (additions are shown in bold; deletions are shown as struck-through text):

   "**TERMINATION OF CONTRACTS.** Any management contract entered into by Borrower pertaining to the Mortgaged Property shall contain ~~a~~ **termination** provisions that **are consistent with Program Obligations** ~~the contract shall be subject to termination without penalty and without cause upon written request by HUD and shall contain a provision that gives no more than a thirty day notice of termination~~. Upon ~~such~~ a request **by HUD to terminate the management contract pursuant to Program Obligations,** Borrower shall immediately arrange to terminate the contract, and Borrower shall also make arrangements satisfactory to HUD for continuing acceptable management of the Mortgaged Property effective as of the termination date of the contract."

2.3    <u>Section IX.50 (Non-Recourse Debt)</u>. Section 50 has been modified to refer to an attached Non-Recourse Riders. Non-Recourse Riders have been attached, to facilitate execution by the parties identified in Section 50.

3.    **<u>Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower & General Contractor</u>.**

3.1    <u>Reserve for Replacement (Section I.C.1.(d))</u>. Section I.C.1.(d) has been added to reflect the initial deposit(s) to the Reserve for Replacement required by the Firm Commitment, if any.

3.2    <u>Ginnie Mae Securities (Section I.D.1.(j))</u>. Section I.D.1.(j) has been revised to delete the reference to construction securities since the Loan is a permanent loan and Lender will not be issuing construction securities in connection therewith.

3.3    <u>Closing Documents Memorandum (Section I.D.9)</u>. Section I.D.9 has been revised to reflect the attachment of Exhibits B and B-1 to the Request.

3.4    <u>PCNA Rider (Section I.D.15)</u>. Section I.D.15. has been added to reference the PCNA Rider required by the MAP Guide.]

3.5    <u>List of Exhibit Attachments</u>. A list of attached Exhibits has been added at the end of the Certificate of Lender.

3.6    <u>Borrower's Listing of UCC Filings (Section II.B.4)</u>. Section II.B.4 has been revised to add a reference to UCC filings that have been made in connection with the existing mortgage loan secured by the Project, to be released in connection with the HUD-insured transaction.

## EXHIBIT B-1

## CLOSING DOCUMENTS CHECKLIST

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Section 223(f) Initial/Final Closing Checklist

Project Name <u>Overlook Gardens Apartments</u>

Checklist Draft Date <u>November 11, 2013</u>

FHA Project Number <u>061-11283</u>

Initial/Final Closing Date <u>December  19, 2013</u>

*Unless otherwise agreed, the HUD Attorney will obtain 3 sets of all documents: originals (O), certified copies (Cert), or photocopies (C), as noted. Where originals are requested, only 1 needs to be an original, and the rest may be copies.  If a copy is requested, an original will be accepted.*

| Item | HUD Form | # | Status and Comment |
|---|---|---|---|
| **I.    FHA Commitment** | | | |
| 1.  a.  FHA Firm Commitment | HUD-92432 | C | *Include all attachments including HUD-executed 92264, 92264-A, and property insurance requirements and schedule.* |
| b.  Amendments, if any | | C | |
| ~~c.  Assignments, if any~~ | | ~~C~~ | |
| **II.    Organizational, Due Diligence, and Other Supporting Documents** | | | |
| 2.  Borrower's   Incumbency   Certificate   with Organizational Documents attached | | O | *Update checklist as appropriate for entity type.*  **Signed or witnessed by person not signing loan documents.** |
| a.  Filed formation documents, from Secretary of State, as amended | | C | *e.g., Articles of Organization, Certificate of Limited Partnership, or Articles of Incorporation.*  **Current SOS certification required.** |
| b.  Operating   Agreement  /  Partnership Agreement / Bylaws, as amended | | C | *Should include HUD-required provisions and be certified by Borrower as current and correct.* |
| c.  Authorizing Resolution | | C | *If applicable (authority may be granted in governing agreement).* |
| d.  Status certificate | | C | *Should be dated w/in 30 days of closing.* |
| ~~e.  Qualification to Do Business in Project State~~ | | ~~C~~ | *~~For out-of-state entities, if applicable.~~* |
| Borrower's Managing Member / General Partner's Incumbency Certificate with Organizational Documents attached | | O | *As applicable.* |
| 3.  a.  Filed formation documents, from Secretary of State, as amended | | C | *e.g., Articles of Organization, Certificate of Limited Partnership, or Articles of Incorporation.* |
| b.  Operating   Agreement  /  Partnership Agreement / Bylaws, as amended | | C | *Should be certified by entity as current and correct.* |
| c.  Authorizing Resolution | | C | *If applicable (authority may be granted in governing agreement).* |
| ~~d.  Status certificate~~ | | ~~C~~ | *~~Should be dated w/in 30 days of closing.~~* |

223(f) Closing Checklist (*Revised 4/2013*)

Section 223(f) Initial/Final Closing Checklist
Project Name and/or Number: __Overlook Gardens Apartments, FHA Project No. 061-11283__

| | Item | HUD Form | # | Status and Comment |
|---|---|---|---|---|
| | e. Qualification to Do Business in Project State | | C | For out-of-state entities, if applicable, and if required. |
| ___ 4. | ALTA Survey Plat with HUD Survey Certification | | O | Dated within 120 days of closing. |
| ___ 5. | Surveyor's Report | HUD-92457M | O | Last inspection within 120 days of closing. |
| ___ 6. | Title Insurance Policy, with endorsements | | O | 2006 ALTA form, where approved for use in the applicable jurisdiction. HUD-required endorsements should be attached. Title exception documents and pro forma policy should be received & reviewed prior to closing. Include authority letter for title agent, if applicable. |
| | a. Title Exception Documents | | C | |
| | b. UCC Search Report | | C | |
| ___ 7. | Deed or Ground Lease | HUD-92070M, if Ground Lease | C | Provide Estoppel Certificate, if Ground Lease. |
| N/A 8. | Evidence of Zoning Compliance | | C | Usually a zoning endorsement to Title Policy; if not, a zoning opinion or letter from the zoning authority may be needed. |
| ___ 9. | Evidence of Building Code Compliance | | C | |
| N/A 10. | Assurance of Utility Service | | C | Not required unless so specified in the Firm Commitment. |
| ___ 11. | Opinion of Borrower's Counsel | HUD-91725M | O | Should include appropriate attachments. |
| | a. Certification of Borrower | HUD-91725M-CERT | O | |
| | b. Supporting legal opinion | | C | Bond/LIHTC opinions, if applicable. |
| | c. List of pending litigation | | C | If applicable. |
| ___ 12. | Inspection Fee Check | | O | |
| ___ 13. | Mortgage Insurance Premium (MIP) Check | | O | |
| ___ 14. | Special Conditions from Firm Commitment<br>___ 30. Cert. re: Lead Based Paint, Asbestos and Smoke Detectors<br>___ 34. Inspection report re: wood destroying organisms<br>37 and 40. Cert. re: Rent Roll | | C | |

223(f) Closing Checklist (Revised 4/2013)

Section 223(f) Initial/Final Closing Checklist
Project Name and/or Number:   Overlook Gardens Apartments, FHA Project No. 061-11283

| | | Item | HUD Form | # | Status and Comment |
|---|---|---|---|---|---|
| N/A | 15. | Local Requirements | | C | |
| | 16. | Attendance List | | O | |
| | | | | | HUD Loan Documents |
| | 17. | Note (Multistate) and Rider | HUD-94001M & state addendum | C | State-specific provisions and/or addenda may be required. |
| | 18. | Security Instrument | HUD-94000M & state addendum | O | State-specific provisions and/or addenda may be required. |
| | 19. | Regulatory Agreement | HUD-92466M | O | |
| | 20. | UCC Financing Statements (State & County) | | C | |
| | 21. | Request for Endorsement of Credit Instrument with PCNA Rider | HUD-92455M | O | With all applicable exhibits and attachments. |
| | 22. | Agreement and Certification | HUD-93305M | O | If applicable. |
| N/A | 23. | Short Form Cost Certification | HUD-2205-A | O | If applicable. |
| | 24. | Certified Closing Statement | | O | |
| | 25. | Certificate Regarding Tenant's Security Deposits | | O | If applicable. |
| | 26. | Lender's Assurance of Permanent Financing | | O | |
| | 27. | Certification Regarding Completion of Escrow Agreement for Non-critical, Deferred Repairs | HUD-92476.1M | O | If applicable. |
| N/A | 28. | Operating Deficit Escrow | HUD-92476a-M | O | If applicable. |
| N/A | 29. | Escrow Agreement for Off-Site Facilities | FHA-2446 | O | |
| N/A | 30. | Excess Mortgage Proceeds Escrow | | O | |
| N/A | 31. | Other escrow agreements, if applicable | | O | List as required, see Closing Guide § 2.8. |
| | 32. | Borrower's Oath | HUD-92478M | O | |
| IV. Secondary Financing Loan Documents | | | | | |
| N/A | 33. | Restrictive Covenants/Use Agreements | | C | With HUD rider if applicable. |
| N/A | 34. | Secondary Financing Loan Documents | | C | |
| | | a.  Loan Agreement | | C | |
| | | b.  Note | | C | |

223(f) Closing Checklist (*Revised 4/2013*)

Section 223(f) Initial/Final Closing Checklist
Project Name and/or Number:   Overlook Gardens Apartments, FHA Project No. 061-11283

| | Item | HUD Form | # | Status and Comment |
|---|---|---|---|---|
| | c.  Mortgage | | C | |
| | d. Subordination Agreement, or Rider to Note and Mortgage | HUD-92420M | O | If private, non-governmental secondary financing is approved, a Rider to the second mortgage is used (see Closing Guide § 5.1); if public financing, the HUD Subordination Agreement is required. |
| N/A 35. | Disbursement Agreement | | O | If applicable. |
| **V. HUD Administrative Documents and Additional Requirements** | | | | |
| 36. | Administrative Memo with attached Waivers and HUD-2 forms | | O | If applicable. |
| 37. | Document Review Worksheets, if applicable | | O | To the extent the field office program staff uses checklists or otherwise documents compliance with architectural, cost, valuation, or other underwriting requirements or Program Obligations, such documentation shall be retained. |
| 38. | Previous Participation Certification Clearance | HUD-92530 | C | |
| 39. | HUD Representative's Trip Report | HUD-95379 | O | |
| **VI. Additional Documents** | | | | |
| N/A 40. | Commercial Space Leases (with Tenant Estoppel Certificates) | | C | If applicable. |
| N/A 41. | Subordination, Non-Disturbance and Attornment Agreements | | C | If applicable. |
| ___ 42. | EEOC Certification | HUD-92010 | O | Unless collected previously by Housing. |
| ___ 43. | Title VI Assurance of Compliance | HUD-4190 | O | Unless collected previously by Housing. |
| ___ 44. | Borrower's Byrd Amendment Certificate | | O | Unless collected previously by Housing. |
| ___ 45. | Lender's Byrd Amendment Certificate | | O | Unless collected previously by Housing. |
| ___ 46. | LIHTC Certificate | | O | Unless collected previously by Housing. |

223(f) Closing Checklist (Revised 4/2013)
12/17/2013 17713439 V.3

## EXHIBIT C

### LIST OF REQUIRED REPAIRS
### TO BE COMPLETED AFTER ENDORSEMENT

None

## EXHIBIT D

## REQUIRED CERTIFICATES, PERMITS, LICENSES, QUALIFICATIONS, APPROVALS, ACTIONS, AND FILINGS

| Certificate(s) of Occupancy | | | REFERENCE PXA DATED 11/25/2015 |
|---|---|---|---|
| ☑ Applicable. ☐ Not Applicable. | | | Issuing Agency: _____ |
| Date Issued: _____, 20__ | | | Contact Info: _____ (name) |
| Amended: _____, 20 | | | _____ (phone) |
| Expiration date: _____, 20 | | | ATTACHED (email) |

**Elevator Permit(s)**
☐ Applicable. ☑ Not Applicable.
Issuing Agency: _____
Date issued: _____, 20__. Contact Info: _____ (name)
Amended: _____, 20__. _____ (phone)
Expiration date: _____, 20 _____ (email)

**Business License(s)**
☐ Applicable. ☑ Not Applicable.
Issuing Agency: _____
Date issued: _____, 20__. Contact Info: _____ (name)
Amended: _____, 20__. _____ (phone)
Expiration date: _____, 20 _____ (email)

**Swimming Pool Permit — SEASONAL**
☑ Applicable. ☐ Not Applicable.
Issuing Agency: _____
Date issued: _____, 20__. Contact Info: _____ (name)
Amended: _____, 20 _____ (phone)
Expiration date: _____, 20 _____ (email)

**Other (specify):**
Date issued: June 20, 2013 Issuing Agency: GA Dept. of Public Health (name)
Amended: _____, 20__. Contact Info: Sheri Moore (name)
Expiration date: Sept 15, 20 13 (478) 749-0106 (phone)
_____ (email)

### INSPECTION REPORTS

**Most Recent Building Department Report**
☑ Applicable. ☐ Not Applicable.
Date issued: Nov 7, 2013
Follow-up report date (if any): NA, 20
Unresolved issues (if any): NA

BIBB COUNTY
Issuing Agency: Dept. of Inspections & Fees
Contact Info: Ben Chesney (name)
(478) 751-7282 (phone)
_____ (email)

**Most Recent Fire Department Report**
☐ Applicable. ☑ Not Applicable.
Date issued: _____, 20__.
Follow-up report date (if any): _____, 20__.
Unresolved issues (if any): _____

Issuing Agency: _____
Contact Info: _____ (name)
_____ (phone)
_____ (email)

**Most Recent Zoning Department Report**
☑ Applicable. ☐ Not Applicable.
Date issued: Nov 6, 2013
Follow-up report date (if any): NA, 20
Unresolved issues (if any): NA

Macon Bibb County
Issuing Agency: Planning & Zoning Commission (name)
Contact Info: Ethan John (name)
(478) 751-7413 (phone)
_____ (email)

| Certificates of Occupancy | |
|---|---|
| Certificate No. | Date |
| 120 | 12-9-1988 |
| 121 | 12-12-1988 |
| 122 | 12-12-1988 |
| 123 | 12-12-1988 |
| 146 | 12-22-1988 |
| 147 | 12-22-1988 |
| 156 | 12-29-1988 |
| 157 | 12-29-1988 |
| 158 | 12-29-1988 |
| 185 | 1-30-1989 |
| 186 | 1-30-1989 |
| 187 | 1-30-1989 |
| 201 | 2-10-1989 |
| 202 | 2-10-1989 |

## EXHIBIT E
## PCNA RIDER

**Project: Overlook Gardens Apartments**
**FHA #: 061-11283**

The Secretary of Housing and Urban Development ("HUD") and Red Mortgage Capital, LLC ("Mortgagee") agree as follows:

1.    Mortgagee agrees to comply with the requirement as stated in the MAP Guide, Appendix 5G, Paragraph VI.C.1, as revised November 23, 2011, to obtain, for HUD evaluation, a new Project Capital Needs Assessment every ten years which covers the next ten years (or the remaining term of the Mortgage) plus two years.

2.    HUD agrees that Replacement Reserve funds may be used to pay for the costs of obtaining the above assessments.

# Exhibit 21

**Sun Valley Properties, LLP**
P.O. Box 5809
1320 Wynnton Road
Columbus, Georgia 31906
Telephone (706) 320-0090

December 8, 2015

Mr. James Croft                    (Via USPS & Email: jcroft@redcapitalgroup.com )
Red Capital Group
10 West Broad Street – 8th Floor
Columbus, OH 43215

      **RE:   Yield Spread Premium**

Dear Mr. Croft:

      It has recently come to my attention that there may have been an undisclosed yield spread premium associated with our Overlook Gardens loan. Did Red or anyone receive a yield spread premium associated with the Overlook Gardens loan? If so, how much was the yield spread premium and why was the yield spread premium not disclosed to us on the HUD-92455M at closing? Did Red or anyone receive any other fees or compensation that were not disclosed at closing?

      Also, is there a yield spread premium associated with the Creekwood rate lock of 3.56%? If so, how much is the yield spread premium?

      We assume the servicing fee on the Overlook loan is 25%. Is that correct? If not, what is it? What is the servicing fee on Creekwood?

Thank you,

Paul G. Hinman
Asset Manager

Cc:    Scott Taccati (Via Email Only: staccati@trillium-capital.com )

# Exhibit 22



RED Mortgage Capital, LLC

10 West Broad Street, 8th Floor • Columbus, OH 43215 • tel 800.837.5100 • tel 614.857.1400 • redcapitalgroup.com

Mr. Paul G. Hinman
Sun Valley Properties, LLP
P.O. Box 5809
1320 Wynnton Road
Columbus, Georgia 31906

      Re: Overlook Gardens and Creekwood

Dear Paul,

      I apologize for my delayed reply to your letter inquiry of December 8th. I felt that accuracy in our response was more important that speed.

      Regarding the Overlook Gardens loan closed in December 2013, there was no yield premium on the FHA insured mortgage loan. Both our lender's counsel for Overlook Gardens and outside counsel have reviewed the HUD-92455M (commonly referred to as the "Lender & Borrower Certificate") for Overlook Gardens. Counsel have confirmed that the Lender and Borrower Certificate was completed in accordance with all HUD rules, regulations and guidelines and is true and correct. Red Mortgage Capital submitted the FHA insured mortgage loan on Overlook Gardens to Ginnie Mae for securitization. As part of that process, Red Mortgage Capital sold the Ginnie Mae security to Red Capital Markets, a registered-broker, which Red Capital Markets underwrote the sale of the security at prevailing market conditions and assumed the related risk of the security transaction.

      Regarding the Creekwood loan, there is no projected yield premium on the FHA insured mortgage loan scheduled to close December 17, 2015. Red Mortgage Capital and lender's counsel have reviewed the draft Lender and Borrower Certificate for Creekwood and agree it has been prepared in accordance with HUD rules, regulations and guidelines. However, I believe that you are aware that the amounts reflected therein may change depending on the status of non-critical repairs projected as of the date of closing. Creekwood will also be submitted to Ginnie Mae for securitization, resulting in a more advantageous rate to the borrower.

      As a lender, Red Mortgage Capital establishes mortgage rates and closes all FHA insured mortgage loans consistent with HUD guidelines and prevailing industry practices. I have reviewed the 3.56% mortgage rate, which you agreed to on the Creekwood loan. The servicing fee on the Creekwood mortgage loan is also 0.25% of the loan amount, and is include in the mortgage rate. I believe you received an excellent mortgage rate, given a variety of factors, including but not limited to, the specific terms of the loan, its securitization as a Ginnie Mae security, the state of interest rates and capital markets, and preferences and demand of institutional investors in such loans.

      I hope this responds to your inquiry. We look forward to closing Creekwood in the near future.

               Very truly yours,

               James F. Croft

# Exhibit 23

# Sun Valley Properties, LLP
### P.O. Box 5809
### 1320 Wynnton Road
### Columbus, Georgia 31906
### Telephone (706) 320-0090

December 16, 2015

Mr. James Croft                    (Via USPS & Email: jcroft@redcapitalgroup.com )
Red Capital Group
10 West Broad Street – 8th Floor
Columbus, OH 43215

      **RE:    Overlook Gardens and Creekwood**

Dear Mr. Croft:

      I received your reply to my December 8, 2015 letter.

      Thank you for confirming Red did not receive a yield spread premium for the Overlook Gardens loan and that there is no yield spread premium included in the rate for the Creekwood loan scheduled to close next week.  I am glad to know Red worked to obtain the best available interest rates for Sun Valley for the loans on these two properties.

Thank you,

Paul G. Hinman
Asset Manager

Cc:    Scott Taccati (Via Email Only: staccati@trillium-capital.com )

# Exhibit 24

1
The Honorable James L. Robart

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8  JAMES L. SCHNEIDER, II, individually,

9                              Plaintiff,      No. 10-1714

10      v.                                     **DECLARATION OF MARIE HEAD**

11  PRUDENTIAL HUNTOON PAIGE
    ASSOCIATES, LTD, a Delaware corporation;
12  PRUDENTIAL MORTGAGE CAPITAL
    COMPANY, INC., a Delaware corporation and
13  MARIE HEAD, individually and MARIE HEAD
    and JOHN DOE HEAD, as a marital
14  community.,

15                              Defendants.

16

        I, Marie Head, on oath, state:
17

        **1. Declarant.** I am over 18 years of age, have personal knowledge of the facts set forth
18

in this declaration and am competent to testify to them. I became the President and Chief
19

Executive Officer of Prudential Huntoon Paige, Ltd. (PHP) in 2004, when the corporate office
20

relocated to Atlanta. I am familiar with all aspects of the loan transaction process, and oversaw
21

the Seattle office during the time that Mr. Schneider was employed by PHP.
22

        **2. Prudential Huntoon Paige, Ltd.** PHP is a separately owned entity of Prudential
23

Mortgage Capital Company (PMCC.) PHP specializes in Federal Housing Administration
24

DECLARATION OF MARIE HEAD - 1                    WINTERBAUER & DIAMOND PLLC
10-1714                                          1200 Fifth Avenue, Suite 1700
                                                 Seattle, Washington 98101
                                                 Telephone: (206) 676-8440

1    fixed-rate and long-term. It is a unit of Prudential Mortgage Capital Company, LLC (PMCC),

2    which is the commercial mortgage lending business of Prudential Financial, Inc. PHP has been

3    in business since 1973, and was acquired by PMCC in 2000. In 2004, PHP's corporate

4    headquarters were relocated from Edison, New Jersey, to Atlanta, Georgia. At that time, PHP

5    also had regional offices in Denver, Colorado, and Seattle, Washington, and all of these offices

6    originated, underwrote and participate in closing loans. In 2005, PHP established a regional

7    office in Chicago, Illinois and the Seattle office's underwriting function was eliminated. From

8    2005 until 2010, the Seattle office only originated FHA loans. In May, 2010, PHP closed the

9    Seattle office completely, and was left with regional offices in Atlanta, Denver and Chicago,

10   satellite offices in other areas, and no office in Seattle. In connection with the closure of the

11   Seattle office, PHP offered Mr. Schneider the opportunity to transfer elsewhere and remain with

12   the company. He declined, which resulted in the separation of his employment.

13        **3. PHP's Loan Officer Specialists**. During his employment with PHP, Mr. Schneider

14   held the position of Loan Officer Specialist. He was one of 9 such Specialists across the

15   company who were responsible exclusively for FHA product. These Specialists, including Mr.

16   Schneider, were paid largely on a commission-basis, in accordance with the terms of the PMCC

17   Loan Officer Commission Plan. The compensation plan for the Specialists was materially

18   different than the compensation plan for other PHP employees, none of whom were paid

19   commissions. During the course of Mr. Schneider's employment with PHP, the commission

20   plan that applied to Mr. Schneider was updated annually, with the exception of 2008. The last

21   change during Mr. Schneider's employment was made effective January 1, 2009, and was

22   commonly referred to as the 2009 Plan.

23        **4.     PHP's Business.** Being an FHA-approved mortgage lender means that PHP has

24

DECLARATION OF MARIE HEAD - 2
10-1714

WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Telephone: (206) 676-8440

1    been approved by the FHA to participate in the FHA's mortgage insurance programs, including

2    as an approved multifamily mortgagee by making mortgage loans for the financing and

3    refinancing of multifamily rental properties and long-term health care facilities in accordance

4    with FHA regulations pursuant to the National Housing Act. PHP originates these loans with

5    borrowers through its own personnel, as well as through the services of contracted, independent

6    mortgage brokers; manages and services the loans; and sells corresponding securities to investors

7    in the secondary market.    The refinancing of a multifamily residential property illustrates the

8    general process.    PHP negotiates the terms and conditions of the refinancing with the

9    owner/operator of the property, i.e., the borrower. Those terms include an estimated interest rate.

10    Once agreement in principle is reached between PHP and the borrower, the loan is assigned to a

11    PHP underwriter for further review. Thereafter the loan is packaged and presented to the

12    Department of Housing and Urban Development (HUD) for still further review and approval. All

13    of the terms of the loan are conditioned upon FHA approval. The interest rate projected

14    throughout the loan transaction is an estimated rate until FHA issues its loan commitment. Once

15    HUD approval is secured, PHP notifies the borrower and, assuming the borrower still wishes to

16    move forward with the transaction, PHP issues a funding commitment letter to the borrower.

17    The funding commitment letter includes a rate lock authorization, which records the borrower's

18    instructions to PHP when PHP thereafter trades in the open secondary market a security that

19    corresponds to the loan. PHP essentially markets the security to potential investors. In the

20    context of this example, i.e., a multifamily rental property, the loan security would be backed by

21    the Government National Mortgage Association (GNMA or "Ginnie Mae"), which means that

22    GNMA would guarantee the repayment of its principal and interest in full. These securities often

23    are referred to as "pass through" certificates because the principal and interest of the underlying

24

DECLARATION OF MARIE HEAD - 3
10-1714

WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Telephone: (206) 676-8440

1   loans are "passed through" to the investors. The rate lock authorization may take different

2   forms. For example, it might require PHP to further confer with the borrower under certain

3   circumstances, or it might give PHP permission to commit the borrower to a specific interest rate

4   without further discussion, i.e., to lock in that interest rate, if it is available. Under the latter

5   circumstance, PHP is not required to disclose to the borrower the actual rate that is secured from

6   the investor. That rate may be different than the rate which the borrower is locked into. That

7   difference may create a trading premium that accrues to the benefit of PHP. In other words,

8   there are opportunities for PHP to realize a profit based on the margin between the interest rate

9   locked in with the borrower, and the interest rate at which the loan security is sold to the third

10   party. PHP also generates revenue from financing fees and placement fees. It is no secret that

11   PHP and its competitors utilize this strategy as their business model. This same general business

12   model can be found in any area of business that operates under profit margins, such as the retail

13   and food industries. What is carefully guarded, however, is the profit margin at which a

14   company such as PHP generates and then sells a loan on any given loan transaction. As interest

15   rates are always in a state of flux, no two loan transactions are ever the same.

16   **5. The Rate Lock Information.** The rate lock information described above is highly

17   proprietary. PHP views it as extremely confidential and manages it with corresponding care and

18   diligence. In the context of any particular deal or transaction, PHP typically limits written

19   disclosure of rate lock information to a single document, namely, the Trade Commitment, which

20   is a letter signed by the investor, i.e., the third-party purchaser of the loan security, that records

21   and confirms the borrower's interest rate lock as well as the premium at which the corresponding

22   loan security was sold to the investor. The borrower is not a party to the Trade Commitment or

23   related loan security transaction. The rate lock and trading premium information is not made

24

DECLARATION OF MARIE HEAD - 4
10-1714

WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Telephone: (206) 676-8440

1   available to the borrower, it is not disclosed outside the company other than to the parties to the

2   Trade Commitment, to my knowledge it may not be disclosed to others without the purchaser's

3   knowledge and consent, it is not saved in hard copy form, and it is stored electronically under

4   password protection. Only certain, specified persons/positions within the company have access

5   to the information electronically. These persons include Specialists, like Mr. Schneider, but

6   policy prohibits them from printing the information; they have access to it only electronically,

7   not in any hard copy format. This password protection system was put in place because of a

8   prior unauthorized, albeit inadvertent, disclosure. Through these and other measures, PHP

9   greatly restricts, controls and monitors the disclosure of rate lock information, permitting its

10   distribution only on a strict, need-to-know basis. In my experienced, this level of care is not

11   unique to PHP, but rather is industry standard. The general rule is that trade details are

12   considered to be, and treated as, confidential information between the parties to the transaction.

13   This level of care is necessary because the information is highly sensitive and subject to easy use

14   and/or manipulation to PHP's competitive disadvantage. For example, if a competitor had

15   access to information regarding PHP's interest rate locks and premiums on various deals, the

16   competitor could use that information to underbid PHP, to attack PHP's reputation by claiming

17   that the borrower could have obtained a better deal (i.e., lower interest rate) through the

18   competitor, or to persuade or encourage a borrower to second-guess the value of the loan the

19   borrower entered into, despite the fact that PHP, in order to secure the borrower's business in the

20   first place, had to offer a competitive interest rate by industry standards. The unauthorized

21   disclosure of premiums, or profit margins, can be even more damaging in PHP's line of business

22   due to changing interest rates. Constantly-changing market forces outside of PHP's control (i.e.,

23   interest rates) nearly guarantee that one borrower, based simply on the timing of when its loan

24

DECLARATION OF MARIE HEAD - 5
10-1714

WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Telephone: (206) 676-8440

1  closes, will receive a different interest rate at a different premium than another borrower. This is
2  an unavoidable reality in the loan industry. However, if information regarding profit margins
3  was shared among borrowers started comparing loan terms, this fact can be easily forgotten
4  amidst the focus on who ultimately received a better deal. To date, the only known document to
5  contain highly sensitive interest rate lock and premium information is the Trade Commitment.
6  The Trade Commitment is essentially a two- or three-page letter, which confirms and records,
7  among other things, the borrower's interest rate lock, and the premium at which the loan was
8  sold to the third-party financial institution. The borrower does not see the Trade Commitment
9  due to its highly sensitive nature, and because by the time the document is generated, the
10 borrower has already formally secured a loan with a competitive interest rate. Redacting
11 information related to the premium will not protect PHP from unfair scrutiny, as individuals with
12 knowledge of how the FHA loan industry works would be able to extrapolate the redacted
13 information, based on the information left in the document.

14      I declare under penalty of perjury that the foregoing is true and correct.

15      Executed on this 18th day of February, 2011, at Atlanta, Georgia.

17                                          Marie Head

DECLARATION OF MARIE HEAD - 6
10-1714

WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Telephone: (206) 676-8440

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

2

I hereby certify that on June 3, 2011, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system which will send notification of such filing to the following:

4

Mr. Mario Bianchi
Lasher Holzapfel Sperry & Ebberson PLLC
601 Union Street, Suite 2600
Seattle, WA 98101

5

6

7

DATED this 3rd day of June, 2011.

8

9

Rachel Emens
Legal Assistant
WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Phone: 206-676-8440
Fax: 206-676-8441
mail@winterbauerdiamond.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF MARIE HEAD - 5
10-1714

# Exhibit 25

## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

JOSHUA HAUSFELD,

    Plaintiff,

    v.

                             Civil Action No. TDC-14-0142

LOVE FUNDING CORPORATION,

    Defendant.

### ORDER

Pending before the Court are the Motion for Summary Judgment, ECF No. 31, filed by Defendant Love Funding Corporation ("LFC"), and the Cross-Motion for Partial Summary Judgment, ECF No. 32, filed by Plaintiff Joshua Hausfeld.

For the reasons stated in the accompanying memorandum opinion, LFC's Motion for Summary Judgment is DENIED. Hausfeld's Cross-Motion for Partial Summary Judgment, ECF No. 32, is GRANTED IN PART and DENIED IN PART. The Cross-Motion is GRANTED as to Hausfeld's deferred commission and Forest Grove claims under the MWPCL, but is DENIED as to LFC's affirmative defense of set-off and recoupment.

It is so ORDERED.

Date: September 17, 2015                          _____/s/_____
                                         THEODORE D. CHUANG
                                         United States District Judge

# Exhibit 26



**LOVE FUNDING**
KNOWLEDGE. INTEGRITY. RESULTS.

1250 Connecticut Ave., NW, Ste. 550 Washington, DC 20036
TELEPHONE 202.887.8475 FAX 202.887.5286
www.lovefunding.com

*Personal & Confidential*

April 14, 2010

Mr. Joshua S. Hausfeld
Love Funding Corporation
1250 Connecticut Avenue.
Suite 550
Washington, DC 20036

    Re:    Employment Agreement – Move from Underwriting to Origination Position

Dear Mr. Hausfeld:

Love Funding Corporation (LFC) is pleased to offer you the opportunity to move from your current job in Underwriting to a position in Origination. A description of the position and the general terms of your employment are as follows:

| | |
|---|---|
| **Title:** | Vice President – Loan Originator |
| **Duties:** | Originate loans through direct borrower contact, coordinate the preparation and submission of potential loans to funding sources, facilitate the process from application to commitment, and assist in closing loans. LFC agrees to provide, and make available to you, adequate staff to effect timely and competent processing and underwriting. We understand that your primary focus will be originating FHA loans, and you may also originate US agency loans (FNMA, FHLMC) as well as other loan products from time to time. We do require concurrence with your overall individual marketing plan. |
| **Reporting:** | Initially, you will report directly to the undersigned, Mark Dellonte, in our Washington DC office. You will also report indirectly to the members of the Executive Committee. Presently that committee is comprised of the Karen Ford, Senior Vice President – Administration and Finance, Brian Robertson, Senior Vice President – Operations, and Jon Camps, Senior Vice President – Chief Underwriter. Reporting assignments may change from time to time. |
| **Effective Date:** | January 1, 2010 |
| **Office:** | LFC will provide office space in our Washington, DC office and business furnishings and necessary business equipment, including a computer, printer, fax, phone service (including cell phone), answering machine, and high-speed internet access. |

EXHIBIT
Dellonte 8
11/12/14

ATLANTA  BOSTON  CLEVELAND  DALLAS  DENVER  DETROIT  KNOXVILLE  NEW YORK  PALM BEACH  ST. LOUIS  WASHINGTON, D.C.

CONFIDENTIAL

**Travel/**
**Entertainment:** Business travel (airfare, hotel, entertainment, car rentals, mileage allowance for use of personal vehicles, etc.) outside of the Washington, DC area, entertainment expenses, and miscellaneous out-of-pocket expenses associated with executing your job for LFC are reimbursed upon submission of a completed expense report with appropriate receipts.

**Conventions:** LFC normally schedules originators for one or two conferences or conventions each year for business development and education purposes, consistent with the annual marketing plan. Company paid attendance at conferences is at the discretion and approval of Executive Management.

**Compensation:** Salary of $100,000 per annum to be paid on a biweekly basis plus production commissions as appropriate pursuant to LFC's . Compensation Policy. Commission is paid quarterly in arrears after the fees are earned and received by the Company. At your level, you are required to cover your base salary two and a quarter (2.25) times before earning commissions.

Commissions are earned based upon individual Annual Production as follows:

| Cumulative Total "Annual Production" | Percentage AP Bonus |
|---|---|
| $0 – Base Salary Cover | 0.0% |
| Next $100,000 | 25.0% |
| Next $100,000 | 30.0% |
| Next $100,000 | 35.0% |
| Next increment to $1,000,000 | 45.0% |
| $1,000,000 – infinity | 55.0%* |

"Annual Production" is defined as that amount of cumulative fees, net of direct offsets to fee income specific to any loan (e.g. correspondent capital markets firm participation in fees, outside broker fees, legal fees not paid by the borrower, etc.), earned and received by the company each calendar year arising from:

- 100% of origination fees generated from FHA insured mortgages where LFC is the underwriter/processor and mortgagee;

- 100% of profits less .125% (12.5 basis points) of the loan amount, net of losses previously experienced, from the sale of FHA insured mortgages or GNMA securities (see Note 1. below);

2

**LOVE FUNDING**

- Credit for two (2) years of the servicing fees generated from any closed loan for which Love Funding has retained the servicing rights (typically 12 basis points per year on FHA loans) to be credited upon the closing of the loan.

- 110% of revenue generated for non-recourse conventional programs originated by Love Funding and placed through another lender;

- 70% of revenue generated from loan placements which are originated by someone other than you in Love Funding but assigned to you, from existing LFC/Heartland loan servicing portfolios or originated through affiliated companies (these deals are referred to as "House Deals");

- 100% of conventional securitization profits or losses (see Note 1. below on treatment of losses) allocable to specific loans;

- 100% of Shared Revenue (see Note 4. below) generated;

- 100% of any fees earned for arranging real estate sales, leasing commissions, disposition fees, investment advisory fees earned by the originator for the Company as long as the originator is in the employ of the Company.

\* *Production of fee income greater than $1,000,000 will trigger a deferred compensation mechanism, whereby a percentage (5%) of the total AP bonus (55%) is deferred. Once the 55% commission level is reached, 50% will be paid in the next commission pay period while 5% will be deferred over a three-year period. Vesting of the deferred bonus will be ratable over 3 years and governed under the terms of the Vesting Agreement. Payment of the deferred bonus shall be made in a lump sum at the end of the three-year period.*

---

*Note 1. In the event of securitization losses, such losses allocable to specific loans will be a deduction from future Annual Production, and not assessed retroactively. In any calendar year, originators may opt to forego both the opportunity for securitization profits and the risk of securitization losses. Such election must be noticed in writing to management prior to January 1st of each year.*

*Note 2. Transactions that are assigned by LFC and not directly originated by any originator, or which require uncommon utilization of LFC resources to cause the transaction to be completed, will have*

**LOVE FUNDING**
KNOWLEDGE. INTEGRITY. RESULTS.

3

CONFIDENTIAL

diminished credit toward Annual Production. Such reduction in credit toward Annual Production, or redistribution of such credits, will be adjudicated by the Executive Management Committee.

*Note 3.* All material, direct expenses related to any specific transaction in excess of the application fee collected for that transaction will be an off-set to credits to Annual Production for that transaction. Such expenses shall include travel and entertainment costs, third-party expenses paid by Love Funding and not reimbursed, and all other costs borne by Love Funding to complete the transaction.

*Note 4.* Shared Revenue is fee, servicing income, or other income (as above) generated by a transaction in which two or more originators are involved. The Company will support and encourage the practice of originators collaborating with other originators and working as a team with fees earned split equitably among the team. All fee splits will be recommended by originators but splits will be determined by the Executive Management Committee, based upon the recommendations of the originators, and an evaluation of the respective contributions of time and talent. Splits may be modified as the processing continues because of changes in responsibility and effort. Modification could include changes in proportions as well as inclusion of addition personnel.

*Note 5.* Upon termination of employment, production commissions may be paid to the former originator based on the discretion of the Executive Management Committee. Such production commissions shall be ratable to the extent that the former originator contributed to the overall necessary and normal requirements by originators to close the loan, the amount of staff effort required to close the in the originator's absence, and the circumstances surrounding the termination of employment of the originator.

*Note 6.* Application fees and non-refundable retainers are not counted toward Annual Production and will be used to offset direct expenses incurred with the processing and closing of the transaction.

*Note 7.* LFC reserves the right to modify its compensation policy as deemed necessary and prudent by the Executive Management Committee.

LOVE FUNDING
KNOWLEDGE. INTEGRITY. RESULTS.

4

CONFIDENTIAL

LFC_0000883

**Deals in Process:**

**Lutz Care and Rehabilitation Center:** As previously agreed, you will be compensated pursuant to the company practice for compensating Underwriters for deals originated. You will receive 25% of the revenue generated net of the fees owed to any broker on the deal. You will not receive annual production credit for this deal.

**Chatsworth at Wellington Green:** As previously agreed, you will be compensated pursuant to the company practice for compensating Underwriters for deals originated. You will receive 25% of the revenue generated net of the fees owed to any broker on the deal. You will not receive annual production credit for this deal.

All other deals currently in your pipeline will be treated in accordance with the origination payment schedule described above.

**Vacation:**            Three weeks of paid vacation per year.

**Personal Days:**    Two personal days per year.

**Sick Days:**           Employees are eligible for sick leave after the first 90 days of employment. Ten days per year are earned for sick time and may be accrued from year to year during employment without limitation. Your employment to date will remain as time in service to the company and your eligibility for benefits will remain intact as they are.

**Fringe Benefits:**   You will continue to be eligible to participate in the current program of group benefits provided to LFC employees. The benefits are reviewed and updated from time to time. The following is a summary of the current benefits:

*Life insurance* is provided by LFC at no cost to the employee and is based on the employee's annual salary, which at your level is twice your salary.

*Disability insurance* is provided at no cost to the employee and is a long-term policy that can provide up to 60% of your monthly earnings, should you become disabled

*Health insurance* is offered to employees with 70% of premiums paid by LFC for the base plan PPO option.

*Dental insurance* is also offered to employees with 70% of premiums paid by LFC.

*Flexible Benefit Spending Accounts* are also offered at an optional 100% employee cost, with enrollment at January 1 annually.

5

LOVE FUNDING
KNOWLEDGE. INTEGRITY. RESULTS.

CONFIDENTIAL

A *401(k) Plan* is sponsored by the Company. Currently, employee contributions are matched by LFC at Fifty Percent (50%) up to the first Six Percent (6.0%) contributed by you. The vesting schedule for the Company match is as follows:

| | |
|---|---|
| Less than two years: | 0% |
| Two years to three years: | 20% |
| Three years to four years: | 40% |
| Four years to five years: | 60% |
| Five years to six years: | 80% |
| Six years or more: | 100% |

*Tuition Reimbursement* for approved course work directly related to job responsibilities will be considered on a case-by-case basis.

**Annual Reviews:** One key consideration for continued employment will be a review of loan closings as well as loans in process. Consistent *Annual Production* (defined under "Compensation", above) of not less than $500,000 must appear to be achievable and continue during any trailing twelve-month period.

**Timing & Effect:** This proposal sets forth the entire understanding between you and Love Funding Corporation and supersedes all other and any previous written and oral agreements.

**Employment Basis:** LFC employees are at-will. LFC may terminate employment at any time with or without cause if business conditions dictate, in LFC sole discretion. In addition, LFC reserves the right to modify the terms and conditions of any employment, including but not limited to, compensation and benefits, at any time in its sole discretion.

LOVE FUNDING
KNOWLEDGE. INTEGRITY. RESULTS.

6

CONFIDENTIAL

If you have questions regarding our benefits plan, please contact Brian Robertson in the St. Louis office (314-512-7959) and he will be glad to assist you.

Should you elect to accept this employment agreement, please indicate your acceptance by signing a copy of this agreement and forwarding it to my attention.

Sincerely,
LOVE FUNDING

Mark Dellonte
President

AGREED & ACCEPTED:

Joshua S. Hausfeld                                          4/14/10
                                                            Date

cc:    Karen Ford
       Jon Camps                    Gloria Clement

LOVE FUNDING
KNOWLEDGE. INTEGRITY. RESULTS.

7

CONFIDENTIAL

**LOVE FUNDING**

Josh Hausfeld Commission Analysis for 2012

## Origination Income:

| Closing | Closing Date | Loan Amount | LFC Fee % | LFC Fee $ | Other LFC Expenses | Originator % | Deal Split | Annual Production Credit | Cumulative Annual Production Credit |
|---|---|---|---|---|---|---|---|---|---|
| Chateau at Bothell Landing | 05/30/12 | 11,597,600 | 0.50% | 58,488 | 0.00 | 100% | 50% | 29,244 | 29,244 |
| Commonwealth ALF Kilmarnock | 07/24/12 | 8,032,000 | 1.00% | 80,320 | 0.00 | 100% | 100% | 80,320 | 109,584 |
| Fred Lind Manor | 07/30/12 | 3,822,250 | 0.50% | 30,578 | 0.00 | 100% | 50% | 15,289 | 124,853 |
| Chapin Center | 06/09/12 | 3,060,000 | 1.75% | 53,900 | 0.00 | 100% | 100% | 53,900 | 178,753 |
| Governor's Center | 08/09/12 | 6,704,000 | 1.75% | 117,320 | (26,816.00) | 100% | 100% | 90,504 | 269,257 |
| Wilkmansett Center East | 08/09/12 | 5,104,000 | 1.75% | 89,320 | (20,416.00) | 100% | 100% | 69,004 | 338,161 |
| Wilkmansett Center West | 08/09/12 | 8,768,000 | 1.75% | 153,440 | (35,072.00) | 100% | 100% | 118,368 | 456,529 |
| Brenneman Farms | 08/30/12 | 26,657,200 | 0.25% | 66,643 | 0.00 | 100% | 100% | 66,643 | 523,172 |
| Jackson Plaza Nursing & Rehab | 10/23/12 | 13,392,000 | 0.50% | 66,960 | 0.00 | 100% | 100% | 66,960 | 590,132 |
| | | | | | | | | | 590,132 |
| | | | | | | | | | 590,132 |

## Securitization Income:

| | Date | Par Amount | Premium | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Orchard Park of Murphy (Draw) | 01/27/12 | 206,007 | 4.50% | 12,670 | (357.51) | 100% | 100% | 12,513 | 602,645 |
| Orchard Park of Murphy (Draw) | 02/27/12 | 621,158 | 4.50% | 27,953 | (776.48) | 100% | 100% | 27,176 | 629,821 |
| Orchard Park of Murphy (Draw) | 03/26/12 | 700,160 | 4.50% | 31,509 | (875.24) | 100% | 100% | 30,633 | 660,454 |
| Orchard Park of Odessa (Draw) | 01/27/12 | 267,785 | 3.00% | 8,034 | (334.74) | 100% | 100% | 7,699 | 668,153 |
| Orchard Park of Odessa (Draw) | 02/28/12 | 284,108 | 3.00% | 5,523 | (355.14) | 100% | 100% | 8,168 | 676,321 |
| Orchard Park of Odessa (Draw) | 03/27/12 | 276,223 | 3.00% | 8,287 | (345.58) | 100% | 100% | 7,941 | 684,263 |
| Orchard Park of Murphy (Draw) | 04/26/12 | 1,050,032 | 4.50% | 47,251 | (1,312.54) | 100% | 100% | 45,939 | 730,202 |
| Orchard Park of Murphy (Draw) | 05/29/12 | 716,631 | 4.50% | 32,248 | (895.79) | 100% | 100% | 31,353 | 761,554 |
| Orchard Park of Murphy (Draw) | 06/26/12 | 978,612 | 4.50% | 44,038 | (1,223.27) | 100% | 100% | 42,814 | 804,368 |
| Orchard Park of Odessa (Draw) | 04/26/12 | 185,330 | 3.00% | 5,591 | (232.94) | 100% | 100% | 5,358 | 809,726 |
| Orchard Park of Odessa (Draw) | 05/30/12 | 716,744 | 3.00% | 21,562 | (868.43) | 100% | 100% | 20,664 | 830,390 |
| Orchard Park of Odessa (Draw) | 06/28/12 | 216,406 | 3.00% | 6,492 | (270.51) | 100% | 100% | 6,222 | 836,612 |
| Chateau at Bothell Landing | 05/08/12 | 11,897,600 | 8.50% | 994,296 | (563,879.00) | 100% | 50% | 215,209 | 1,051,820 |
| Commonwealth ALF Kilmarnock | 03/30/12 | 8,032,000 | 2.64335% | 228,416 | (10,040.00) | 100% | 100% | 218,370 | 1,270,190 |
| Fred Lind Manor | 10/30/12 | 3,810,150 | 6.00% | 228,609 | 14,782.69 | 100% | 50% | 111,923 | 1,382,113 |
| Chapin Center | 06/30/12 | 3,060,000 | 5.00% | 154,000 | (0.850.00) | 100% | 100% | 150,150 | 1,532,263 |
| Governor's Center | 09/30/12 | 6,704,000 | 5.00% | 335,200 | (9,350.00) | 100% | 100% | 325,850 | 1,858,083 |
| Wilkmansett Center East | 08/30/12 | 5,104,000 | 5.00% | 255,200 | (6,380.00) | 100% | 100% | 248,820 | 2,107,903 |
| Wilkmansett Center West | 08/30/12 | 8,768,000 | 5.00% | 438,400 | (10,960.00) | 100% | 100% | 427,440 | 2,535,343 |
| Brenneman Farms | 11/01/12 | 26,629,292 | 7.00% | 1,864,037 | (376,394.27) | 100% | 100% | 1,487,633 | 4,022,996 |
| Orchard Park of Murphy (Draw) | 07/30/12 | 605,182 | 4.50% | 27,233 | (756.48) | 100% | 100% | 26,477 | 4,049,473 |
| Orchard Park of Murphy (Draw) | 08/29/12 | 911,686 | 4.50% | 41,026 | (1,139.01) | 100% | 100% | 39,586 | 4,089,356 |
| Orchard Park of Murphy (Draw) | 09/28/12 | 446,455 | 4.50% | 20,090 | (558.07) | 100% | 100% | 19,532 | 4,108,891 |
| Orchard Park of Odessa (Draw) | 07/30/12 | 96,597 | 3.00% | 2,898 | (108.25) | 100% | 100% | 2,490 | 4,111,380 |
| Orchard Park of Odessa (Draw) | 08/30/12 | 423,890 | 3.00% | 12,711 | (529.91) | 100% | 100% | 12,181 | 4,123,561 |
| Orchard Park of Odessa (Draw) | 09/26/12 | 550,818 | 3.00% | 16,525 | (688.52) | 100% | 100% | 15,836 | 4,139,397 |
| Jackson Plaza Nursing & Rehab | 11/29/12 | 13,392,000 | 9.875% | 1,322,460 | (691,452.00) | 100% | 100% | 630,998 | 4,770,395 |
| Orchard Park of Murphy (Draw) | 10/29/12 | 235,086 | 4.50% | 10,579 | (293.66) | 100% | 100% | 10,285 | 4,780,681 |
| Orchard Park of Murphy (Draw) | 11/28/12 | 309,835 | 4.50% | 13,943 | (387.30) | 100% | 100% | 13,555 | 4,794,236 |
| Orchard Park of Odessa (Draw) | 10/29/12 | 663,209 | 3.00% | 20,496 | (854.01) | 100% | 100% | 19,642 | 4,813,878 |
| Orchard Park of Odessa (Draw) | 11/28/12 | 676,877 | 3.00% | 20,306 | (846.10) | 100% | 100% | 19,460 | 4,833,338 |
| Orchard Park of Odessa (Draw) | 12/28/12 | 670,100 | 3.00% | 20,103 | (637.63) | 100% | 100% | 19,265 | 4,852,604 |
| | | | | | | | | | 4,852,604 |
| | | | | | | | | | 4,852,604 |

## Sale/Val. of Servicing Income:

| | Date | Par Amount | LFC's Portion | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Chateau at Bothell Landing | 05/30/12 | 11,697,600 | 0.240% | 28,074 | 0.00 | 100% | 50% | 14,037 | 4,866,641 |
| Commonwealth ALF Kilmarnock | 07/24/12 | 8,032,000 | 0.240% | 19,277 | 0.00 | 100% | 100% | 19,277 | 4,885,918 |
| Fred Lind Manor | 07/30/12 | 3,822,200 | 0.240% | 9,173 | 0.00 | 100% | 50% | 4,587 | 4,890,504 |
| Chapin Center | 06/09/12 | 3,060,000 | 0.240% | 7,392 | 0.00 | 100% | 100% | 7,392 | 4,897,896 |
| Governor's Center | 08/09/12 | 6,704,000 | 0.240% | 16,090 | 0.00 | 100% | 100% | 16,090 | 4,913,986 |
| Wilkmansett Center East | 08/09/12 | 5,104,000 | 0.240% | 12,250 | 0.00 | 100% | 100% | 12,250 | 4,926,236 |
| Wilkmansett Center West | 08/09/12 | 8,768,000 | 0.240% | 21,043 | 0.00 | 100% | 100% | 21,043 | 4,947,279 |
| Brenneman Farms | 08/30/12 | 26,657,200 | 0.240% | 63,977 | 0.00 | 100% | 100% | 63,977 | 5,011,256 |
| Jackson Plaza Nursing & Rehab | 10/23/12 | 13,392,000 | 0.240% | 32,141 | 0.00 | 100% | 100% | 32,141 | 5,043,397 |
| | | | | | | | | | 5,043,397 |

## Commissions Table:

| Fee Range | Paid at | Based On | Commission |
|---|---|---|---|
| 0 - 200,000 | 0% | 200,000 | - |
| 200,001 - 300,000 | 25% | 100,000 | 25,000 |
| 300,001 - 400,000 | 30% | 100,000 | 30,000 |
| 400,001 - 500,000 | 35% | 100,000 | 35,000 |
| 500,001 - 1,000,000 | 45% | 500,000 | 225,000 |
| 1,000,000 + | 65% | 4,043,397 | 2,723,658 |
| | | 5,043,397 | 2,558,658 |

| | |
|---|---|
| Less Commissions Paid Previously | (1,950,545) |
| Commission Amount Due | 608,323 |
| Less Deferred Compensation within 55% tier | (202,170) |
| Total Due as of 1/25/13 | 406,153 |

Prepared by

Steve King
Vice President - Administration & Finance

Authorized by

Karen L. Foye
Executive Vice President and COO

## Commissions Summary:

| | Pay Date | Amount |
|---|---|---|
| Orchard Park of Murphy - 03 Securitization Premiums | 4/20/2012 | 0 |
| Orchard Park of Odessa - 01 Securitization Premiums | 4/20/2012 | 0 |
| Chateau at Bothell Landing - Origination | 7/13/2012 | 0 |
| Chateau at Bothell Landing - Securitization | 7/13/2012 | 38,678 |
| Chateau at Bothell Landing - Servicing | 7/13/2012 | 4,211 |
| Orchard Park of Murphy - Q2 Securitization Premiums | 7/13/2012 | 39,568 |
| Orchard Park of Odessa - Q2 Securitization Premiums | 7/13/2012 | 11,762 |
| Commonwealth ALF Kilmarnock - Origination | 10/19/2012 | 36,144 |
| Commonwealth ALF Kilmarnock - Securitization | 10/19/2012 | 98,267 |
| Commonwealth ALF Kilmarnock - Servicing | 10/19/2012 | 8,674 |
| Fred Lind Manor - Origination | 10/19/2012 | 6,880 |
| Fred Lind Manor - Securitization | 10/19/2012 | 50,330 |
| Fred Lind Manor - Servicing | 10/19/2012 | 2,064 |
| Chapin Center - Origination | 10/19/2012 | 25,154 |
| Chapin Center - Securitization | 10/19/2012 | 82,882 |
| Chapin Center - Servicing | 10/19/2012 | 4,068 |
| Governor's Center - Origination | 10/19/2012 | 49,777 |
| Governor's Center - Securitization | 10/19/2012 | 179,751 |
| Governor's Center - Servicing | 10/19/2012 | 8,849 |
| Wilkmansett Center East - Origination | 10/19/2012 | 37,992 |
| Wilkmansett Center East - Securitization | 10/19/2012 | 136,851 |
| Wilkmansett Center East - Servicing | 10/19/2012 | 6,738 |
| Wilkmansett Center West - Origination | 10/19/2012 | 65,103 |
| Wilkmansett Center West - Securitization | 10/19/2012 | 235,092 |
| Wilkmansett Center West - Servicing | 10/19/2012 | 11,573 |
| Brenneman Farms - Origination | 10/19/2012 | 36,654 |
| Brenneman Farms - Securitization | 10/19/2012 | 818,210 |
| Brenneman Farms - Servicing | 10/19/2012 | 35,187 |
| Orchard Park of Murphy - Q3 Securitization Premiums | 10/19/2012 | 47,243 |
| Orchard Park of Odessa - Q3 Securitization Premiums | 10/19/2012 | 16,778 |
| Jackson Plaza Nursing & Rehab - Origination | 1/25/2013 | 36,828 |
| Jackson Plaza Nursing & Rehab - Securitization | 1/25/2013 | 347,049 |
| Jackson Plaza Nursing & Rehab - Servicing | 1/25/2013 | 17,678 |
| Orchard Park of Murphy - Q4 Securitization Premiums | 1/25/2013 | 13,111 |
| Orchard Park of Odessa - Q4 Securitization Premiums | 1/25/2013 | 32,102 |
| | | 2,558,658 |